## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

HOLBROOK HOLDINGS, INC.,

                     *Plaintiff*,

   v.

MARC COHODES,

                    *Defendant*.

Civil Action No. CV-24-175-BU-JTJ

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Holbrook Holdings, Inc., for its complaint against Defendant Marc Cohodes, alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff Holbrook Holdings, Inc., an award-winning financial advisory firm with a well-earned reputation for conducting itself with honesty, transparency, and the highest ethical standards, brings this defamation action against short seller Marc Cohodes to hold Cohodes responsible for a relentless, unhinged, and vindictive smear campaign that he has waged against Holbrook over the past year.

2.     As a short seller, Cohodes essentially bets against the stock prices of companies that he shorts, with the hope that he will earn profits if the company's stock price goes down. When he takes a short position, he commonly announces it publicly and then proceeds to levy attacks and criticism on his target company and its management, in the transparent hope that the negative publicity will cause the stock price to drop and benefit his position.

3.     Cohodes, who has an apparent flair for self-promotion—especially on social media—has also curated a cult-like fanbase that views him as an all-knowing sleuth with an eye

for identifying companies that are engaging in fraudulent or illegal activity, or otherwise "cooking the books." Thus, when he takes a short position and begins targeting a company, he commonly claims to have determined that the company is corrupt and run by criminals.

4.     As Holbrook would learn the hard way, Cohodes also has a well-earned reputation for being abrasive, belligerent, and highly sensitive to any criticism—especially of his checkered investment track record.

5.     In the fall of last year, Cohodes announced on X (formerly Twitter) that he had a short position in the stock of an investment bank called B. Riley, which is publicly traded on the NASDAQ. As is his consistent pattern, Cohodes then began publicly accusing B. Riley and its management of corruption and fraud.

6.     One of Holbrook's two mutual funds happens to hold some B. Riley corporate bonds among its hundreds of positions. Holbrook does not otherwise have any relationship with B. Riley.

7.     In the midst of Cohodes's attacks on B. Riley, one of Holbrook's principals took umbrage at what looked to be a very transparent effort by Cohodes to gin up negative publicity about B. Riley, drive down its stock price, and monetize his short position. The Holbrook X account published a short, factual tweet that was mildly critical of Cohodes's conduct and track record.

8.     The Holbrook account actually deleted the tweet fairly quickly—not because it was unfair or inaccurate in any way, but because Cohodes's online army of zealous supporters began inundating Holbrook with abuse for daring to question their leader Cohodes. Unfortunately for Holbrook, Cohodes also saw the tweet before it was deleted. And he was not happy about having his motives or track record questioned, to put it mildly.

9.     The same day, Cohodes turned his social media wrath on Holbrook, tweeting about the company at least eighteen times that day, and leveling childish insults like calling Holbrook's CEO an "asshat" and calling Holbrook's mutual fund a "bag of shit."

10.     If Cohodes had satiated his vindictive impulses with sophomoric insults alone, that likely would have been the end of the matter.

11.     But Cohodes did not stop there.  Instead, he began repeatedly tweeting accusations to his followers that Holbrook and its principals were engaged in securities fraud and an unlawful "kickback" scheme with B. Riley.  Cohodes repeated similar allegations on social media over the course of nearly a year.

12.     Although presented as facts, those accusations have absolutely no basis in reality, and Cohodes knew it at the time he published them.  Cohodes simply fabricated outrageous and inherently damaging allegations out of whole cloth in order to punish Holbrook for having the temerity to question him.

13.     And yet, the matter still would have likely ended there if Cohodes simply did the responsible thing and acknowledged that the defamatory claims he made about Holbrook were not true.  Holbrook gave him that chance, and Cohodes instead responded defiantly, essentially bragging about how he had managed to convince his acolytes that Holbrook was guilty of "corruption" and "malfeasance."

14.     Left with no other choice, Holbrook brings this defamation suit to hold Cohodes accountable for his actions and to hold him liable for the harm that he has caused to Holbrook's business and reputation through the intentional and malicious dissemination of defamatory falsehoods.

## PARTIES

15.     Plaintiff Holbrook Holdings, Inc. is a financial advisory firm that is incorporated in Oregon and has its principal place of business in Atlanta, Georgia.

16.     Defendant Marc Cohodes is a well-known short seller.  He is a citizen of the State of Montana and resides in Bozeman, Montana.

## JURISDICTION & VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §1332 because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000.00, excluding interest.

18.     This Court has personal jurisdiction over Defendant Marc Cohodes because he is a citizen of the State of Montana and resides in Bozeman, Montana.

19.     Venue is proper in this District because Defendant resides in this District, Defendant is subject to personal jurisdiction in this District, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**Holbrook Experiences Rapid Growth While Staying True to Its Founding Principles**

20.     Holbrook is the brainchild of its Founder, Chief Executive Officer, and Portfolio Manager Scott Carmack.  After graduating from Harvard University with honors in 2001, Carmack began his career in financial advisory and investment services at JP Morgan in New York City. Carmack founded Holbrook in December 2015, originally working out of the attic of his Portland, Oregon residence.

21.     The company was founded with a goal of providing potential high risk-adjusted returns for clients utilizing an empirical approach that provides clients with proprietary research and   in-depth   market   commentary,   while   maintaining   impeccable   transparency,   open

4

communication, and the highest ethical standards.

22.     Holbrook launched its first mutual fund, the Holbrook Income Fund, in July 2016. The Holbrook Income Fund was originally funded personally by Carmack and his partner, Holbrook Chief Operating Officer Mike Burns.  In 2022, Holbrook launched a second fund, the Holbrook Structured Income Fund.

23.     At its inception, Holbrook had only about $30,000 in Assets Under Management (AUM), a measure of the market value of the investments managed on behalf of clients.  By February 2023, Holbrook had eclipsed $1 billion in AUM.

24.     Both the Holbrook Income Fund and the Holbrook Structured Income Fund are today managed by Carmack, along with Holbrook Portfolio Manager Ethan Lai, who has had a long career in investment services, including stints as an investment analyst for SunTrust and Goldman Sachs.

25.     The Holbrook Income Fund boasts a five-star rating from Morningstar, and just last year Refinitiv Lipper recognized it as the best flexible income fund in the U.S. for both its three-year and five-year performance.

26.     In keeping with its mission statement, Holbrook has maintained an impeccable track record of ethical standards and transparency.  Since its inception, neither Holbrook nor any of its "advisory affiliates"—a defined term that includes all officers, directors, and non-clerical employees—has ever been found to have violated any SEC, CFTC, or other federal agency regulations or statutes.  Nor has Holbrook or any of its advisory affiliates ever been the subject of a disciplinary order by the SEC, the CFTC, or any state regulatory agency.

**Defendant Marc Cohodes Develops a Reputation for Pugnacity**

27.     Defendant Marc Cohodes is a well-known short seller.  As opposed to investors who typically take "long" positions expecting to profit when the value of a stock or another security increases over time, in the context of stock, short sellers essentially bet against companies and hope to profit if the value of the stock goes down.  The practice typically involves borrowing stock, selling it on the open market, and then hopefully repurchasing the stock at a lower price after the value decreases.

28.     The nature of a short position means that while a fall in the value of the shorted stock can result in profits for the short seller, if the bet fails and the stock value increases, this can result in steep losses.  Thus, short sellers have a very strong financial interest in seeing that the companies they have bet against fail.

29.     In the 1980's, Cohodes joined a New Jersey hedge fund that was then called Rocker Partners.  The firm focused primarily on short selling, and Cohodes became its General Partner.

30.     In 2001, Rocker Partners was accused in a civil suit of conspiring with the financial publication TheStreet.com to plant a series of negative stories about a company that Rocker Partners was short on.  It turned out that Rocker Partners owned a large, undisclosed stake in TheStreet.com at the same time that TheStreet.com was publishing stories that would benefit Rocker Partners' short position.

31.     In 2005, Cohodes and Rocker Partners were again accused of attempting to manipulate the market to profit from a short position in the stock of online retailer Overstock.com.  Overstock alleged that Cohodes and Rocker Partners colluded with a supposed "independent" research group to publish a series of reports that were uniformly negative about Overstock and which were intended to drive Overstock's stock price down and thus secretly benefit Rocker

Partners.   While Cohodes and Rocker Partners denied any wrongdoing, they ultimately paid millions of dollars to settle the lawsuit.

32.   In 2006, after his partner retired, Cohodes took over sole control of the venture, which he rechristened Copper River Partners.

33.   However, not long after Cohodes assumed full control of Copper River, the firm met its demise in spectacular fashion during the financial crisis of 2008.   Although stock prices were generally plunging during the crisis, which in theory should have been a boon for short sellers, the stocks that Cohodes and Copper River chose to short saw large gains, not losses.   That year, the fund faced losses of over 50%, and Cohodes was forced to shutter Copper River for good. Cohodes claimed that the spectacular failure of Copper River was the result of behind-the-scenes intrigue that he blamed on Goldman Sachs.

34.   With his hedge fund and his reputation in tatters, Cohodes retreated to a 20-acre property in Sonoma wine country, told a reporter that he would "never" be in the short selling business again, and stated that the experience of his firm going belly up only served to convince him "how despicable people are."

35.   After spending years in proverbial exile, Cohodes resurfaced in 2017 and sought to make a comeback and reestablish his public image as a famed short seller.   But this time, there would be no hedge fund—he would go it solo and use his own money to finance his shorts.

36.   Cohodes cultivated a brash, tough-talking, aggressive image. He also began to market himself as an expert in sniffing out fraud and scam businesses.   Thus, rather than simply predicting that a given company might see a decline in stock value due to macro market factors, changing trends, or unfortunate business decisions, Cohodes's new modus operandi was to

aggressively and publicly proclaim that the companies he singled out for short bets were outright frauds and run by criminals.

37.     His reputation in that regard was greatly burnished in 2022, when he was an early skeptic of Sam Bankman-Fried, his cryptocurrency exchange and hedge fund FTX, and banks like Silvergate and Signature that catered to the crypto industry.

38.     Cohodes has also used Twitter (now X) to promote himself to great effect.   He developed a dedicated army of followers who see him as a master sleuth and a bulwark against corporate executives who do not play by the rules.   Today, his X account has nearly 200,000 followers.

39.     Cohodes's hyper-aggressive social media persona is decidedly not an act.   The real Marc Cohodes is indeed aggressive, brash, and, above all, hyper-sensitive to even the slightest criticism or questioning of his financial acumen.   The tales of Cohodes's obsession with petty grievances are legion.

40.     Even relatively fawning profiles in the financial press have described him as "relentlessly self-promoting," "nasty, prickly," "irascible," prone to being in a "foul mood," and an "intentionally profane growling bear."

41.     A full decade after the 2008 financial crisis that saw his hedge fund Copper River implode, Cohodes told a reporter for Financial News that even then, if he saw former Morgan Stanley CEO John Mack—who had generically criticized short sellers' role in causing the 2008 market crisis—in a crosswalk, Cohodes would "run him over."

42.     Some former associates and partners—like his former partner at Rocker Partners— refuse to even speak with him.   One former business associate described him as "one of the most

stubborn, grudge-holding, toxic people I have ever met," and noted that he "will NEVER admit he is wrong and he holds grudges years later."

43.     In 2020, Cohodes and his then-wife purchased an 84-acre property in Gallatin County, Montana from a multi-generational ranching family.  There was a public river access near the home that local hunters and anglers had used for decades.  Shortly after buying the property, the Cohodeses began inundating the Sheriff's Office and county officials with calls and emails demanding that people legally accessing the river be arrested for trespassing and claiming that those using the area to recreate were "druggies."  They built fencing and hung no trespassing signs, and even filed for a restraining order against an elderly man who would park on the public road near their home so that he could enjoy the morning sunrise.

44.     In August 2023, Cohodes was interviewed on X Spaces by Edwin Dorsey, founder of the investing newsletter the Bear Cave.  Dorsey began what was clearly intended as a flattering and friendly interview by describing himself as a "fan" of Cohodes, whom he considered a "mentor."  But when Dorsey then dared to gently ask Cohodes about critics of some of his investments that did not pan out, Cohodes flew into a rage, cursed at, and threatened the interviewer, called the interviewer (and other perceived critics) "f***ing sociopaths," and claimed that those who dare criticize him are just "jealous of what I've done and who I am."

45.     In response to a question about retail investors who lost money investing in AMC based on Cohodes's advice, Cohodes stated that he himself had lost one million dollars but that he didn't care because "I piss a million dollars."  Cohodes concluded his rant by telling his interviewer to "use your Stanford education" and stop asking about "bullshit," and exclaiming, "I don't need you disrespecting me.  Am I f***ing clear?"

46.     By the end of the interview, Cohodes was still steaming about the seemingly softball question his friend had asked him.  He concluded the discussion by telling his interviewer, "you should go f*** yourself, and look in the mirror and say 'what the f*** am I doing,' because if it wasn't for me, no one would know who the f*** you are."

47.      When Cohodes's natural penchant for flinging grotesque insults and accusations intersects with his own financial interest as a short seller, the ensuing results are predictably toxic.

48.     For example, in 2018, Cohodes had a short position in the stock of generic drugmaker Lannett.  Cohodes decided to pick a public fight with high-frequency trader Guy Gentile, who was a long investor in Lannett and had publicly touted the company.  Cohodes's numerous social media attacks on Gentile included calling him a "greaseball," "asshat," and claiming that Gentile is a "wife beater" who "belongs behind bars."

**Enraged by Holbrook's Mild Criticism, Cohodes Responds with Defamatory Attacks**

49.     At any given time, the Holbrook Income Fund has approximately two-hundred different holdings.  The largest, by percentage of allocation, are U.S. government bonds.

50.     The Holbrook Income Fund also invests in corporate bonds.  Among the numerous corporate bonds in the fund's portfolio are those of a financial services company and investment bank called B. Riley.  B. Riley is a public company, and its stock is traded on the NASDAQ exchange under the ticker symbol "RILY."

51.     Sometime in the late summer or early fall of 2023, Cohodes took a short position in B. Riley stock.  Consistent with his standard playbook, Cohodes then began tweeting negatively about B. Riley in earnest, with the apparent motive of driving its stock price down so that he could profit from his short.

52.     Also consistent with his playbook, Cohodes proclaimed to his many thousands of

followers on X that he was targeting B. Riley not merely because he thought its future business prospects were dim, but because the investment bank was, supposedly, an outright fraud and scam.

53.     The purported basis for this claim is tenuous and convoluted.  In early November 2023, it was announced that John Hughes, the co-founder of a company called Prophecy Asset Management, had pled guilty to federal charges of conspiracy to commit securities fraud.  The plea deal between Hughes and the Department of Justice also made reference to a "Conspirator #2," who was not indicted, but who the government believed had participated in Hughes's unlawful scheme.  That individual was identified in media reports as Brian Kahn, the CEO of Franchise Resource Group.  Kahn, in turn, had done business with B. Riley in the past.  Even though there was no allegation from the government that B. Riley had anything whatsoever to do with Hughes or his unlawful activities, Cohodes seized on the indictment and repeatedly labeled B. Riley a fraud and a scam based only on the notion that it had a relationship with someone who had a relationship with someone who had been indicted.

54.     Beginning on November 6, 2023, Cohodes began tweeting about B. Riley almost nonstop, oftentimes tweeting multiple times in a single day, with the consistent theme being that B. Riley is a fraudulent enterprise run by criminals:





55.     In December 2023, frustrated by Cohodes's concerted efforts to drive down B. Riley's stock price for profit, Holbrook CEO Scott Carmack stepped into the fray and published a tweet on Holbrook's X account that was mildly critical of Cohodes's conduct.  The tweet stated, in sum and substance, that Cohodes's claim to be a defender of shareholders against greedy corporate management was somewhat ironic in light of the fact that Cohodes built his wealth as a hedge fund manager and then shuttered his fund, Copper River, leading to huge losses for his investors.

56.     Carmack ended up taking down the tweet within 48 hours because he was immediately inundated with abusive messages from Cohodes's army of supporters.

57.     Unfortunately for Carmack and Holbrook, the "profane growling bear" had already been poked, and this single, innocent, and factual tweet would trigger a seemingly endless wave of vindictive retaliation from Cohodes.

58.      The avalanche began on the morning of December 17, 2023, when Cohodes

published the first of at least 18 separate tweets that day attacking Holbrook.  He began by repeatedly referring to Holbrook—which he apparently believed, erroneously, to be the name of the individual in charge of the company—as an "asshat."



59.     He would repeat the "asshat" insult multiple times that day, along with referring to Holbrook's Income Fund (HOBIX) as a "bag of Shit."



13



60.     His vindictive desires not satiated by sophomoric insults alone, Cohodes quickly pivoted to accusing Holbrook and its leadership of breaching fiduciary duties to investors and engaging in securities fraud.

61.     These accusations began during Cohodes's December 17, 2023 tweet storm when Cohodes claimed to his followers that Holbrook was violating SEC regulations by holding "non Investment Grade Securities."



62.     That allegation, and the suggestion that Holbrook's investment in B. Riley bonds would in any way run afoul of SEC rules, is completely false.  Holbrook's holding of B. Riley

bonds in its mutual funds is not unlawful or improper in any respect, and the holdings are fully consistent with the statements in the prospectus for each of Holbrook's mutual funds, both of which are publicly available on Holbrook's website.  Any investor with Cohodes's experience would know these allegations were untrue.

63.     Cohodes followed up that tweet with another, less than an hour later, in which he labelled Holbrook a "scam outfit."

64.     Just five days later, on December 22, 2023, Cohodes unveiled a new line of attack, claiming that Holbrook's investment in B. Riley bonds was part of an unlawful quid pro quo. Specifically, Cohodes claimed that Holbrook invested in B. Riley in exchange for its founder, Bryant Riley, agreeing to "tout" Holbrook's mutual funds to Riley's wealthy clients.



65.     What Cohodes baselessly accused Holbrook of is serious business.  It is a violation of federal securities laws for an investment advisor to steer a client to invest in a particular security while failing to disclose to the client that the advisor is receiving a "kickback," in the form of cash or any other benefit, for inducing clients to invest in that security.  In no uncertain terms, Cohodes thus conveyed to his followers that Holbrook had engaged in securities fraud.

66.     That accusation is completely false.  Aside from having invested in B. Riley's corporate bonds, Holbrook has no relationship with B. Riley.  It has no selling agreement with

B. Riley that would allow B. Riley's financial advisors to recommend or sell Holbrook's mutual funds to B. Riley's clients, and neither Holbrook nor its principals have ever received any form of kickback or other compensation from B. Riley, related to Holbrook's investments or otherwise.

67.     That was far from the only time Cohodes would lob fraud allegations at Holbrook.

68.     On February 29, 2024, Cohodes posted yet another tweet about Holbrook being invested in B. Riley shares.  After a couple of his followers chimed in on the thread and continued discussing Holbrook, Cohodes directly claimed that Holbrook was "in" on a supposed fraudulent scheme with B. Riley, and again claimed that there was a kickback scheme in place.



69.     Lest there should be any doubt that Cohodes was directly accusing Holbrook of illegality, he followed up the "fraud" tweet with another a couple weeks later, in which he claimed that Holbrook would soon "get exposed for what they are doing" with B. Riley.  Cohodes emphasized the point by tagging the X handles of the SEC, the federal agency responsible for enforcement of federal securities laws, and FINRA, which regulates brokerage firms and exchange markets.

70.     Again, these accusations are completely false.  Holbrook has not engaged in any kind of fraudulent conduct.  It is not aware of any fraudulent conduct by B. Riley either, and it certainly is not "in" on any fraudulent scheme of any kind.

71.     By August 2024—nearly a year after Holbrook had drawn Cohodes's ire due to a

single, quickly deleted tweet—Cohodes was still at it.  On August 12, 2024, he published a tweet

calling Holbrook a "financial charade."



72.    The very next day, he doubled down on his previous claim that Holbrook and

B. Riley were engaged in an unlawful "kickback" scheme, this time telling his followers that he

was "sure" that was the case.



73.     Again, the accusation that there is any kind of kickback agreement between Holbrook and B. Riley is absolutely false.

**Holbrook Asks Cohodes to Act Responsibly, and Instead He Doubles Down**

74.     On September 16, 2024, counsel for Holbrook sent Cohodes a letter demanding a retraction of his false accusations about the company, including the claims that Holbrook's investment strategy violated SEC rules, that Holbrook had engaged in a kickback scheme with B. Riley, and that Holbrook was involved in any fraudulent conduct with regard to B. Riley.

75.     Holbrook did not make any financial demand.  It simply asked that Cohodes agree to delete his tweets and acknowledge the obvious falsity of those accusations.

76.     In keeping with his apparent inability to accept criticism or acknowledge his mistakes, Cohodes instead doubled down in his attorney's response to Holbrook's retraction demand.

77.     In doing so, he confirmed, proudly and boldly, that his tweets were not meant to convey that Holbrook was merely "incompetent" or "stupid."   Instead, Cohodes fully

acknowledged that he intended to convey to his followers and readers that Holbrook was "corrupt" and guilty of "malfeasance."

78.     On October 8, 2024, Cohodes appeared as a guest for an interview with the "Hedgeye Investing Summit," during which he again bragged about his attacks on Holbrook. Tacitly acknowledging that his repeated claims of Holbrook being involved in securities fraud were completely fabricated, Cohodes admitted, "I don't even know who Holbrook is or what they do."  But, he said, since Holbrook dared to "pick a fight" with him, then his intention is to "end the fight" and "skate them into the concrete."

### Holbrook Brings This Action to Hold Cohodes Accountable for Vindictively and Deliberately Spreading Falsehoods

79.     As set forth above, Cohodes intentionally and knowingly published to his many thousands of followers fabricated claims that Holbrook is involved in securities fraud.  He did so not because he actually believed this to be the case—there is no factual basis by which Cohodes could draw such a conclusion—but because he was enraged that Holbrook dared to criticize his conduct toward B. Riley.

80.     These actions have caused, and continue to cause, enormous harm to Holbrook and its business and reputation.  Holbrook conservatively estimates that Cohodes's actions have caused it to suffer at least $5 million in reputational harm.

81.     In addition to reputational harm, Holbrook has suffered economic damages as a result of Cohodes's false and defamatory statements.  Despite Holbrook's continued excellent performance—among peer funds, the Income Fund is in the top two percentile year-to-date, top three percentile over the last three years, top one percentile over the last five years, and top one percentile since inception—Cohodes's defamatory statements have caused a demonstrable slowing of the trend growth in Holbrook's AUM, which in turn equates to less revenue for

Holbrook.   The loss of revenue attributable to Cohodes's false statements to date is nearly $5 million.

82.     Cohodes's false and defamatory statements have also caused at least $4 million in damage to Holbrook's enterprise value.

83.     Cohodes's egregious and vindictive behavior toward Holbrook is far outside the bounds of responsible public discourse.   At this point, Holbrook has unfortunately concluded that Cohodes will not stop this course of conduct unless he is held accountable for his actions.

## FIRST CLAIM FOR RELIEF

## LIBEL PER SE FOR STATEMENTS IN THE DECEMBER 17, 2023 X POST

84.     Holbrook repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

85.     On December 17, 2023, Cohodes published a post on his personal account ("@AlderLaneEggs") on the social media site X.com (formerly Twitter).

86.     The post stated, referring to Holbrook: "He also has a problem with $BW I think I will write a letter about @HolbrookHldgs to the @SECGov about hold non Investment Grade Securities..  I also wonder if the $RILY clients own his Shit Ass Mutual Fund..  Friends dont Let Friends own $HOBIX. ..  Good to see another $RILY victim on TILT on a Sunday @FriendlyBearSA @AureliusValue @joe_bananas9 .. I wonder if this guy is one of Parker Petite's illegit kids?"

87.     The post was published to a worldwide audience on X's platform.   It remains available online at the URL: https://x.com/AlderLaneEggs/status/1736499333024071942.   A copy of the post as it appears on X.com is attached hereto as Exhibit A.

88.     The December 17, 2023 X post is of and concerning Holbrook.

89.     The December 17, 2023 X post was intended to convey, and was understood by readers as conveying, the factual accusation that Holbrook's holding of B. Riley bonds in its mutual funds was improper and in violation of SEC rules.

90.     The December 17, 2023 X post is false and defamatory.

91.     The December 17, 2023 X post is libelous per se in that it exposes Holbrook to contempt, ridicule, and obloquy, tends to affect Holbrook in its trade and business, and accuses Holbrook of engaging in unlawful conduct.

92.     By publication of the December 17, 2023 X post, Cohodes caused harm to Holbrook's reputation.

93.     Cohodes published the December 17, 2023 X post with a reckless disregard for the truth, in that he was aware at the time of publication that the statement was false or, at a minimum, had a high degree of awareness that the statement was probably false.

94.     As a direct and proximate result of the publication of the false and defamatory December 17, 2023 X post, Holbrook has suffered damages, including injury to reputation and economic damages, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### LIBEL PER SE FOR STATEMENTS IN THE FEBRUARY 29, 2024 X POST

95.     Holbrook repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

96.     On February 29, 2024, Cohodes published a post on his personal account ("@AlderLaneEggs") on the social media site X.com (formerly Twitter).

97.     The post stated, referring to Holbrook: "He is in on the fraud.  betcha riley asset management owns his shit ass fund."

98.     The post was published to a worldwide audience on X's platform.  It remains available online at the URL: https://x.com/AlderLaneEggs/status/1763418187998044442.  A copy of the post as it appears on X.com is attached hereto as Exhibit B.

99.     The February 29, 2024 X post is of and concerning Holbrook.

100.    The February 29, 2024 X post was intended to convey, and was understood by readers as conveying, the factual accusation that Holbrook colluded with B. Riley to engage in securities fraud.

101.    The February 29, 2024 X post is false and defamatory.

102.    The February 29, 2024 X post is libelous per se in that it exposes Holbrook to contempt, ridicule, and obloquy, tends to affect Holbrook in its trade and business, and accuses Holbrook of engaging in unlawful conduct.

103.    By publication of the February 29, 2024 X post, Cohodes caused harm to Holbrook's reputation.

104.    Cohodes published the February 29, 2024 X post with a reckless disregard for the truth, in that he was aware at the time of publication that the statement was false or, at a minimum, had a high degree of awareness that the statement was probably false.

105.    As a direct and proximate result of the publication of the false and defamatory February 29, 2024 X post, Holbrook has suffered damages, including injury to reputation and economic damages, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### LIBEL PER SE FOR STATEMENTS IN THE AUGUST 13, 2024 X POST

106.    Holbrook repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

107.   On August 13, 2024, Cohodes published a post on his personal account ("@AlderLaneEggs") on the social media site X.com (formerly Twitter).

108.   The post stated, referring to Holbrook: "I am sure there is a kickback from $RILY to him."

109.   The post was published to a worldwide audience on X's platform.  It remains available online at the URL: https://x.com/AlderLaneEggs/status/1823448176000696636.  A copy of the post as it appears on X.com is attached hereto as Exhibit C.

110.   The August 13, 2024 X post is of and concerning Holbrook.

111.   The August 13, 2024 X post was intended to convey, and was understood by readers as conveying, the factual accusation that Holbrook engaged in a kickback scheme whereby it would invest in B. Riley bonds in exchange for B. Riley steering its own clients to invest in Holbrook's mutual fund.

112.   The August 13, 2024 X post is false and defamatory.

113.   The August 13, 2024 X post is libelous per se in that it exposes Holbrook to contempt, ridicule, and obloquy, tends to affect Holbrook in its trade and business, and accuses Holbrook of engaging in unlawful conduct.

114.   By publication of the August 13, 2024 X post, Cohodes caused harm to Holbrook's reputation.

115.   Cohodes published the August 13, 2024 X post with a reckless disregard for the truth, in that he was aware at the time of publication that the statement was false or, at a minimum, had a high degree of awareness that the statement was probably false.

116.    As a direct and proximate result of the publication of the false and defamatory August 13, 2024 X post, Holbrook has suffered damages, including injury to reputation and economic damages, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Holbrook Holdings, Inc. respectfully requests that the Court award it relief against Defendant Marc Cohodes as follows:

117.    Actual and compensatory damages exceeding $75,000, as well as interest, reasonable attorneys' fees, and costs, as allowed by law;

118.    Punitive damages, as allowed by law; and

119.    Such other and further relief as the Court deems appropriate.

### JURY TRIAL DEMAND

Plaintiff demands trial by jury for all claims and issues that are so triable.


Date:  November 8, 2024

/s/ Matthew J. Kelly
Matthew J. Kelly
TARLOW STONECIPHER WEAMER & KELLY, PLLC
1705 West College Street
Bozeman, MT 59715
Email: MKelly@lawmt.com

Andrew C. Phillips (*Pro Hac Vice* forthcoming)
Shannon B. Timmann (*Pro Hac Vice* forthcoming)
Hannah Menchel (*Pro Hac Vice* forthcoming)
MEIER WATKINS PHILLIPS PUSCH LLP
919 18th Street NW, Suite 650
Washington, DC 20006
Email: andy.phillips@mwpp.com
Email: shannon.timmann@mwpp.com
Email: hannah.menchel@mwpp.com

*Counsel for Plaintiff Holbrook Holdings, Inc.*