Calvin J. Stacey
Morgan M. Sorena
STACEY & FUNYAK
P.O. Box 1139
Billings, MT 59103-1139
Phone: (406)259-4545
cstacey@staceyfunyak.com
msorena@staceyfunyak.com

ATTORNEYS FOR DEFENDANT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| HOLBROOK HOLDINGS, INC. ) | CAUSE NO.: CV-24-175-BU-JTJ |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **DEFENDANT'S FIRST** |
| ) | **SUPPLEMENTAL RESPONSES** |
| ) | **TO PLAINTIFF'S FIRST** |
| MARC COHODES, ) | **SET OF REQUESTS FOR** |
| ) | **PRODUCTION** |
| Defendant. ) | |

TO: Plaintiff Holbrook Holdings, Inc., and its counsel of record, Matt J. Kelly, Tarlow Stonecipher Weamer & Kelly, 1705 West College St., Bozeman, MT 59715-4913; and Andrew C. Phillips, Mark Thomson, Shannon B. Timmann, Hannah Menchel, Meier Watkins Phillips, Pusch, LLP, 1120 20th Street N.W., Suite 550, Washington, DC 20036:

Defendant Marc Cohodes provides his first supplemental responses to Plaintiff

Holbrook Holdings, LLC's First Set of Requests for Production as follows:

1

## REQUESTS FOR PRODUCTION

**Request No. 1.**

All documents and communications that you contend provide a factual basis for, or support the truth of, the statements you made in the December 17, 2023 X Post, the February 29, 2024 X Post, and the August 13, 2024 X Post.

**Response**

Objection – Unduly burdensome. Defendant relied on all facts available at the time of the three posts including information involving B. Riley Financial, Inc. most of which was available to the public. (See Answers to Interrogatory Nos. 2, 4, 6, 7 and 8). Defendant, at this time, cannot recall each and every document or communications that he may have examined or considered at or near these dates.

**Request No. 2.**

All documents and communications referencing or relating to Holbrook or its principals Scott Carmack, Michal Burns, and Brian Zeck.

**Response**

Documents and communications responsive to this Request for Production include those that may have been identified on behalf of Plaintiff through his counsel. (*See* September 16, 2024 and September 27, 2024 letters and attachments of Steven M. Wilker in the possession of Plaintiff.) Also produced are copies of all posts Defendant has been able to secure that may involve Plaintiff as well as posts from Plaintiff, Bates stamped MC 0001-MC 0031).

2

**First Supplemental Response 5/27/26:**

Consistent with Defendant's First Supplemental Answer to Interrogatory No. 1 which is incorporated by this reference, additional documents and communications which includes TCRs identified as MC0032-MC0212 are furnished once again even though they were produced to plaintiff on April 23, 2026, approximately three weeks prior to the filing of Plaintiff's Motion to Compel. Plaintiff, pursuant to a subpoena duces tecum served upon Hedgeye Risk Management has also received documents Bates stamped Hedgeye000001-000036 consisting of any and all communications between defendant and representatives of Hedgeye. Additionally, the Declaration of Defendant Marc Cohodes as well as attachments to his Declaration filed as Doc. 34 in Case No. 2:25-cv-0041-BU-JTJ was provided to plaintiff on April 3, 2026 which included in party communicationsconcerning plaintiff. Additionally, plaintiff has served subpoenas duces tecum upon Nathan Koppikar and Koppikar, Orso Partners, LP, BRC Group Holdings, Inc. f/k/a B. Riley Financial, Inc. seeking copies of any and all communications with defendant concerning Holbrook or its principals. Defendant is also attempting through a third-party to review once again any text messages, emails or posts that in any way make reference to plaintiff or its principals. If documents or communications are obtained through this search, this Request for Production will be further supplemented.

**Request No. 3.**

All social media posts, comments, and direct messages sent by or received by you referencing or relating to Holbrook or its principals Scott Carmack, Michal Burns, and

3

Brian Zeck.

**Response**

See documents produced in Response to Request No. 2.

**Request No. 4.**

All communications with Keith McCullough, or any other representative of Hedgeye, relating to or referencing Holbrook or its principals Scott Carmack, Michal Burns, and Brian Zeck.

**Response**

None known in the possession of Defendant however it is noted that a subpoena has been served on Hedgeye Risk Management, LLC dated February 19, 2026 by Plaintiff requesting that any and all communications between Hedgeye members, principals or employees including but not limited to Keith McCullough concerning Plaintiff or its principals have been requested and Defendant reserves the right to review any and all documents produced pursuant to the subpoena in order to supplement this response.

**First Supplemental Response 5/27/26:**

Plaintiff has served a subpoena duces tecum upon Hedgeye Risk Management and in response, Hedgeye Risk Management has produced documents Bates stamped Hedgeye 000001-Hedgeye000036 which consists of any and all communications between or among any Hedgeye members, principals or employees including but not limited to Keith McCullough concerning Holbrook BRC Group Holdings, Inc. or B. Riley Financial, Inc. as well as communications with defendant concerning Holbrook and other entities since

4

January 1, 2021. Defendant is unaware of any other documents but will conduct another search for any communications with Keith McCullough or other Hedgeye representations referencing plaintiff or its principals.

**Request No. 5.**

All documents concerning your investment activities (including borrowing, lending, purchasing, or selling securities or derivatives) related to B. Riley, including documents sufficient to identify:

    a. The nature of such investment activities;

    b. The terms of all transactions related to such investment activities;

    c. The dates of such investment activities;

    d. The amounts you paid or received in connection with such investment activities; and

    e. Your profits or losses in connection with such investment activities.

**Response**

Please see answer to Interrogatory No. 9, incorporated by this reference. The documents requested will not be produced as they are irrelevant, the request is unduly burdensome and discovery into defendant's personal financial investments, profits and loss would be an unwarranted and harassing invasion into his personal financial privacy.

**Request No. 6.**

All communications referencing or relating to B. Riley, including but not limited to your  investment activities concerning B. Riley.

**Response**

Objection – the request is unduly burdensome in that it seeks information irrelevant to the issues raised by Plaintiff in its Complaint. Additionally, this request is so broad that it also could be seeking documentation, if any, submitted to the SEC and others, all of which would be privileged and not subject to disclosure pursuant to protections afforded defendant pursuant to any and all applicable rules or regulations. As for X posts, plaintiff should have access to any communications of that type referencing or relating to B. Riley. Defendant is investigating as to whether or not these X posts are retrievable.

**First Supplemental Response 5/27/26:**

This discovery request is not only unduly burdensome but seeks information irrelevant to the issues raised by plaintiff in its Complaint. Plaintiff contends that defendant defamed plaintiff through three separate X-posts, Exhibits A, B and C attached it its Complaint. Plaintiff is seeking and obtaining in discovery defendant's communications with third-parties related to Holbrook Holdings, Inc. and any of its principals. However, defendant's communications referencing or relating to B. Riley, a nonparty to this litigation, are irrelevant to the claims of plaintiff. Plaintiff alleges it has been defamed, not B. Riley. Without waiving this objection, defendant has previously, prior to the filing of plaintiff's motion to compel, produced his Declaration filed in Case No. 2:25-cv-00041-BU-JTJ which includes TCRs related to B. Riley Financial, Inc. as well as producing additional TCRs, to some extent related to B. Riley Bates stamped MC0032-MC0212.

**Request No. 7.**

All documents related to the alleged securities fraud and an unlawful "kickback"

scheme mentioned in the February 29, 2024 X Post and the August 13, 2024 X Post.

**Response**

See documents produced, Bates Stamped MC 0001-MC 00131.

**Request No. 8.**

Documents sufficient to show each instance, between January 1, 2022 and present date, in which you publicly attacked a company you had shorted.

**Response**

Objection – relevancy and the request is unduly burdensome.

**Request No. 9.**

All documents and communications related to the veracity of your claims about companies that you shorted between January 1, 2022 and present date.

**Response.**

Objection – relevancy and the request is unduly burdensome.

**Request No. 10.**

All nonprivileged communications related to this lawsuit, including communications with State Farm Fire and Casualty Company or other insurance carriers with any purported or claimed interest in this lawsuit.

**Response**

None.

**Request No. 11.**

All communications with the United States Securities and Exchange Commission

relating to B. Riley and/or Holbrook.

**Response**

Objection on the grounds that any and all communications with the SEC are privileged and not discoverable pursuant to federal regulations that may apply to communications from individuals/entities that may be related to communications related to possible securities law violation.

**Request No. 12.**

All documents and communications you referenced, reviewed, or relied upon in drafting your responsive pleadings, responses to Plaintiff's interrogatories, or responses to Plaintiff's requests for admission.

**Response**

To the extent this Request seeks documents and communications between counsel, they are protected pursuant to the attorney-client privilege thus no response will be given. The only responsive pleading submitted as of this date is the Answer of Defendant prepared as a result of privileged communications between counsel and the Defendant thus no documentation will be produced. Documents reviewed to provide responses to discovery requests include Plaintiff's Complaint, Pre-Litigation Correspondence between counsel for the parties, in the possession of Plaintiff.

**Request No. 13.**

All documents and communications that support, undermine, or relate to the denials and affirmative defenses raised in your Answer.

8

**Response**

Objection – this discovery request is unduly broad and impossible to respond to at this point in the proceedings as discovery has not been completed and it is unknown as to what documents and information will be relevant to the Answer of Defendant as well as any and all affirmative defenses. As for affirmative defenses, please refer to Plaintiffs' Preliminary Pre-Trial Statement. (Doc. 47).

**Request No. 14.**

All documents and communications you obtain pursuant to any public records request, subpoena, or investigation in connection with this action.

**Response**

None. Any documentation obtained by counsel is protected by the attorney work product doctrine.

**Request No. 15.**

All documents you intend to introduce as exhibits or otherwise rely on in this matter.

**Response**

Unknown at this time.

DATED this 27ᵗʰ day of May, 2026.

STACEY & FUNYAK

By: _____
Calvin J. Stacey
*Counsel for Defendant Marc Cohodes*

As to Objections:                    By: _____
Calvin J. Stacey
*Counsel for Defendant Marc Cohodes*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27ᵗʰ day of May, 2026, a copy of the foregoing *Defendant's First Supplemental Responses to Plaintiff's First Set of Requests for Production* was served upon the following counsel of record via U.S. Mail/Email:

1.    Matthew J. Kelly
      Tarlow Stonecipher Weamer & Kelly, PLLC
      1705 West College Street
      Bozeman, MT  59715
      mkelly@lawmt.com

2.    Andrew C. Phillips (*Pro Hac Vice*)
      Shannon B. Timmann (*Pro Hac Vice*)
      Hannah Menchel (*Pro Hac Vice*)
      MEIER WATKINS PHILLIPS PUSCH LLP
      919 18th Street NW, Suite 650
      Washington, DC 20006
      Email: andy.phillips@mwpp.com
      Email: shannon.timmann@mwpp.com
      Email: hannah.menchel@mwpp.com

By: _____

Fred Simpson
Rachel H. Parkin
HALL & EVANS, LLC
Millennium Building, Suite 403
125 Bank Street
Missoula, MT 59802
Telephone: 406-532-2635
Facsimile: 406-519-2035
simpsonf@hallevans.com
parkinr@hallevans.com

*Attorneys for Defendant/Counterclaimant Marc Cohodes*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| STATE FARM AND CASUALTY COMPANY, an Illinois Company, | Case No. 2:25-cv-00041-BU-JTJ |
| Plaintiff, | |
| vs. | |
| MARC COHODES, an individual, and HOLBROOK HOLDINGS, INC., an Oregon Corporation, | **DECLARATION OF DEFENDANT MARC COHODES** |
| Defendants. | |
| MARC COHOLDES, an individual, | |
| Counterclaim Plaintiff, | |
| vs. | |
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois Company, | |
| Counterclaim Defendant. | |

1

I, Marc Cohodes, pursuant to 28 U.S.C. § 1746, hereby depose and state upon personal knowledge:

1.      I am an adult over the age of 18 and a resident of the State of Montana. The information set forth herein is true and correct and based upon my own personal knowledge. I am competent to testify in this case and as to the matters set forth herein.

2.      Attached as **Exhibit A** is a true and correct copy of the Answer and Demand for Jury Trial (Doc. 46) filed by my counsel in the Underlying Lawsuit.

3.      Other than the State Farm Homeowner's Policy (Policy No. 26-BN-H027-8 with effective dates from September 30, 2023 to September 30, 2024) and the State Farm Umbrella Policy (Policy No. 26-BN-M013-4, with effective dates from November 5, 2023 to November 5, 2024), I have no other insurance policies that apply to the Underlying Lawsuit.

4.      I have been an investor and fund manager for over 40 years, and have invested exclusively as a private investor for more than a decade now.  I began my career at Northern Trust Company in 1982 after graduating Babson College with a BS in Finance.  I eventually became General Partner of Rocker Partners (later known as Copper River Partners), an investment fund with over $1 billion in assets under management that focused on shorting overvalued stocks, fraud detection, and identifying companies with flawed business models.  Over the course of my

career, I have exposed many publicly traded companies and individuals who were engaged in fraud, illegal conduct, questionable accounting, and stock manipulation, including Lernout & Hauspie, Media Vision Technology, NovaStar Financial, AremiSoft, California Micro Devices, Network Associates, TakeTwo Interactive, Krispy Kreme Donuts, Boston Chicken, MiMedx Group Inc., and others. In connection with my research and investigations, I routinely provide valuable and timely information to the Securities and Exchange Commission and the Department of Justice about companies engaged in fraudulent business practices.

5.     More recently, my work helped expose FTX, Silvergate and Signature Bank. My investigations of fraud in financial markets have been reported in The Wall Street Journal, The New York Times, Barron's, Bloomberg, and Institutional Investor, on CNN, and in award-winning books about financial fraud, such as Selling America Short and The Most Dangerous Trade. I have also been  the subject of two Harvard Business School case studies about my successful efforts to expose frauds.

6.     It is my practice to publicly identify companies that I believe have engaged in fraud, or otherwise have overvalued securities, to inform the markets, investors, and regulators. Over the years I have done this by writing op-ed pieces, by publishing websites dedicated to specific companies, by filing whistleblower complaints, and by posting on Twitter (now X). I have over 175,000 followers on X. where I regularly post my opinions and views about the markets and specific

3

companies and engage with other investors—those who agree with me and those who do not. I firmly believe that this open and vibrant public discourse makes the markets more transparent and protects investors.

7.    The tweets at issue in the underlying libel lawsuit were posted by me on X, including the tweets dated December 17, 2023, February 29, 2024, and August 13, 2024. Those three tweets state my opinions, based on the information that was available to me at the time and that I believed then and believe now to be true. I formed those opinions after months of careful research and interactions with other investors, using my decades of experience identifying fraud and accounting improprieties.

8.    On October 4, 2024, approximately a month before Holbrook filed a libel suit against me, my attorney Fred Norton with the Norton Law Firm in Oakland, California sent a letter to Holbrook. A true and accurate copy of that letter is attached hereto as **Exhibit B**.

9.    The October 4, 2024, letter was sent by Mr. Norton on my behalf. The letter incorporates my opinions and is based upon my research. The letter explains precisely why I believed, and continue to believe, in the veracity of my posts on X.

10.    My research shows that SEC and DOJ charging documents revealed that B. Riley, a financial services firm, was doing significant business with Bian Kahn, an unindicted co-conspirator in a massive Ponzi scheme. (Ex. B at p. 1).

11.    B. Riley could not report its second quarter 2024 financial results, instead, filing an NT 10-Q announcing a massive write down of Kahn-affiliated assets of up to $370 million. (Ex. B at p. 1).

12.    My research showed a discrepancy between what Holbrook said in its SEC filings about its B. Riley holdings and what basic research shows Holbrook actually holds. (Ex. B at p. 1).

13.    The facts are B. Riley's assets are tainted by fraud (and now even B. Riley admits significant impairment); Holbrook is concentrated in B. Riley (including holding 35% of Riley's outstanding baby bonds); and Holbrook has misrepresented the size of its B. Riley position in SEC filings. (Ex. B at 3).

14.    I formed the opinion, based on the evidence available to me, and shared with others on Twitter (now X), that Holbrook's investment in B. Riley reflects neither stupidity nor incompetence: it reflects malfeasance.

15.    Based on my research into Holbrook, I, through my attorney Leah Judge, sent two TCR (Tip, Complaint or Referral) letters to the United States Securities and Exchange Commission concerning Holbrook's investments (through its mutual funds) in B. Riley and other questionable companies.

16.    These TCR letters sent by my attorney incorporate my opinions and are based upon my extensive research. True and correct copies of these TCR letters are attached as **Exhibit C.** I have redacted the name of my co-complainant from these letters to protect that person's privacy.

17.    I had no malicious intent in posting any tweets to X, and had no intent to cause any specific harm, or any harm at all. Rather, my only purpose in posting these tweets was to share the truth with the investing public and regulators about Holbrook and the dangers I believed its funds posed to investors.

18.    I also posted these tweets so as to defend myself against Holbrook's own defamatory tweets against me, which I reasonably understood to be a self-motivated, bad-faith attempt by Holbrook to discredit me and silence my criticism of B. Riley's ongoing fraud. Attached as **Exhibit D** are true and correct copies of Holbrook's tweets about me.

19.    I had no profit motive nor did i make any profit from my posts concerning Holbrook. I had no financial interest of any sort in Holbrook or Holbrook's mutual funds at the time I published the posts which are the subject of the Underlying Lawsuit. Publishing information about Holbrook was not a part of my trade, profession or occupation.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 27th day of March, 2026.

_____
Marc Cohodes

6

Case 2:24-cv-00175-DLC   Document 46   Filed 03/30/26   Page 1 of 17

Calvin J. Stacey
Morgan M. Sorena
STACEY & FUNYAK
P.O. Box 1139
Billings, MT 59103-1139
Phone: (406)259-4545
cstacey@staceyfunyak.com
msorena@staceyfunyak.com

ATTORNEYS FOR DEFENDANT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | | |
|---|---|---|
| HOLBROOK HOLDINGS, INC. | ) | CAUSE NO.: CV-24-175-BU-JTJ |
| | ) | |
| Plaintiff, | ) | Judge John Johnston |
| | ) | |
| v. | ) | **DEFENDANT'S ANSWER** |
| | ) | **AND JURY TRIAL DEMAND** |
| MARC COHODES, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Marc Cohodes ("Cohodes"), by and through his counsel of record, for his Answer to Plaintiff's Complaint, admits, denies and alleges as follows subject to the following qualifications:

The Complaint filed in this matter and many of the allegations found in paragraphs 1-83 do not comply with the requirements of Rule 8 of the Federal Rules of Civil Procedure and specifically the requirement of plaintiff to state, in short and plain terms, a claim showing an entitlement to relief. As a consequence, the allegations found in many

1

EXHIBIT A

Case 2:24-cv-00175-DLC   Document 34-1   Filed 03/20/25   Page 2 of 17

of those paragraphs of the Complaint make it difficult for Cohodes to fully and completely respond to each and every factual and nonfactual allegation and to that extent, Cohodes, by way of his Answer, will attempt in good faith to respond to the extent possible at this time subject to later amendment. Many allegations are nothing more than statements of opinions rather than factual allegations. (e.g. ¶¶1-4).

1. Denies the allegations in paragraph 1.

2. Answering paragraph 2, defendant admits that he is an investor, however, all other allegations found within this paragraph are denied.

3. Answering paragraph 3, admits that defendant is an investor, however, all other allegations found within this paragraph are denied.

4. Denies the allegations in paragraph 4 of the Complaint.

5. Answering paragraph 5, admits the first sentence of the paragraph, however, denies the second sentence of the paragraph.

6. Answering paragraph 6, upon information and belief, admits that plaintiff may hold some P. Riley corporate bonds, however, all other remaining allegations found within this paragraph are denied.

7. Denies the allegations found in paragraph 7.

8. Answering paragraph 8, upon information and belief, admits that plaintiff deleted the tweet, however, all remaining allegations found within this paragraph are denied.

2

9.    Denies the allegations found in paragraph 9.

10.    Denies the allegations in paragraph 10.

11.    Denies the allegations in paragraph 11.

12.    Denies the allegations in paragraph 12.

13.    Denies the allegations in paragraph 13.

14.    Denies the allegations in paragraph 14.

15.    Answering paragraph 15, based solely information and belief, admits that plaintiff is incorporated in Oregon with its principal place of business in Atlanta, Georgia, however, is without sufficient knowledge or information to form a belief as to the remaining allegations and therefore must deny the same.

16.    Answering paragraph 16, admits the plaintiff is an investor residing in Manhattan, Montana and all other allegations found within this paragraph are denied or alternatively call for a legal conclusion thus no response is deemed required.

17.    Answering paragraph 17, no response is deemed required as a determination of jurisdiction is to be decided by the Court, not the parties.

18.    Answering paragraph 18, no response is deemed required as a determination of jurisdiction is to be decided by the Court, not the parties.

19.    Answering paragraph 19, admits that venue is proper, however, all remaining allegations are denied as they either call for a legal conclusion or are

3

denied in respect to the facts alleged.

20.    Answering paragraph 20, defendant is without sufficient knowledge or information to form a belief as to the truth of the company and therefore must deny the same.

21.    Answering paragraph 21, defendant is without sufficient knowledge or information to form a belief as to the truth of the company and therefore must deny the same.

22.    Answering paragraph 22, defendant is without sufficient knowledge or information to form a belief as to the truth of the company and therefore must deny the same.

23.    Answering paragraph 23, defendant is without sufficient knowledge or information to form a belief as to the truth of the company and therefore must deny the same.

24.    Answering paragraph 24, defendant is without sufficient knowledge or information to form a belief as to the truth of the company and therefore must deny the same.

25.    Answering paragraph 25, defendant is without sufficient knowledge or information to form a belief as to the truth of the company and therefore must deny the same.

4

Case 2:24-cv-00175-DLC    Document 84-1    Filed 03/07/26    Page 5 of 17

26.    Answering paragraph 26, defendant is without sufficient knowledge or information to form a belief as to the truth of the company and therefore must deny the same.

27.    Answering paragraph 27, admits that defendant is an investor, however, all other allegations are denied.

28.    Admits the allegations in paragraph 28.

29.    Answering paragraph 29, admits the allegations in the first sentence of the paragraph, however, denies the second sentence of the paragraph.

30.    Denies the allegations in paragraph 30.

31.    Answering paragraph 31, admits that in 2005 a lawsuit was filed Overstock.com, however, all remaining allegations are denied except the last sentence of the paragraph is admitted.

32.    Admits the allegations of paragraph 32.

33.    Answering paragraph 33, admits that Copper River closed in 2009, however, all remaining allegations within this paragraph are denied.

34.    Denies the allegations in paragraph 34.

35.    Denies the allegations in paragraph 35.

36.    Denies the allegations in paragraph 36.

37.    Admits the allegations in paragraph 37.

5

38.    Denies the allegations in paragraph 38.

39.    Denies the allegations in paragraph 39.

40.    Denies the allegations in paragraph 40.

41.    Answering paragraph 41, admits that any and all documents referred to in this paragraph speak for themselves and to the extent that any allegations is contrary to the documents, those allegations are denied.

42.    Denies the allegations found in paragraph 42.

43.    Answering paragraph 43, admits the first sentence of the paragraph, however, all remaining allegations are denied.

44.    Denies the allegations in paragraph 44.

45.    Answering paragraph 45, denies the allegations as they are taken out of context.

46.    Answering paragraph 46, denies the allegations as they are taken out of context.

47.    Denies the allegations in paragraph 47.

48.    Denies the allegations in paragraph 48.

49.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 49 and therefore, must deny the same.

50.    Based upon information and belief, admits the allegations found in paragraph 50.

51.    Answering paragraph 51, admits the allegations in the first sentence of the paragraph, however, all other allegations are denied.

52.    Answering paragraph 52, admits that he investigated matters related to B. Riley, however, all other allegations found within this paragraph are denied.

53.    Answering paragraph 53, denies the allegations found in the first sentence of the paragraph and is without sufficient knowledge or information to form a belief as to the remaining allegations and therefore must deny the same subject to amendment as discovery is commenced and completed in this matter.

54.    Answering paragraph 54, admits that all tweets speak for themselves, however, all other allegations found within this paragraph are denied.

55.    Answering paragraph 55, admits that all tweets speak for themselves, however, all other allegations found within this paragraph are denied.

56.    Answering paragraph 56, defendant is without sufficient knowledge or information to form a belief concerning the allegation that the tweet was taken down within 48 hours and therefore must deny the same and in respect to all remaining allegations, they are denied.

57.    Denies the allegations found in paragraph 57.

7

58.    Answering paragraph 58, the tweet speaks for itself and any allegation to the contrary is denied and all other allegations found within this paragraph are denied.

59.    Answering paragraph 59, the tweet speaks for itself and any allegation to the contrary is denied and all other allegations found within this paragraph are denied.

60.    Denies the allegations found in paragraph 60.

61.    Answering paragraph 61, the tweet speaks for itself and any allegation to the contrary is denied and all other allegations found within this paragraph are denied.

62.    Denies the allegations found in paragraph 62.

63.    Denies the allegations found in paragraph 63.

64.    Answering paragraph 64, the tweet speaks for itself and any allegation to the contrary is denied and all other allegations found within this paragraph are denied.

65.    Denies the allegations in paragraph 65.

66.    Denies the allegations in paragraph 66.

67.    Denies the allegations in paragraph 67.

68.    Answering paragraph 68, the tweet speaks for itself and any allegation

8

to the contrary is denied and all other allegations found within this paragraph are denied.

69.    Denies the allegations in paragraph 69.

70.    Denies the allegations in paragraph 70.

71.    Answering paragraph 71, the tweet speaks for itself and any allegation to the contrary is denied and all other allegations found within this paragraph are denied.

72.    Answering paragraph 72, the tweet speaks for itself and any allegation to the contrary is denied and all other allegations found within this paragraph are denied.

73.    Denies the allegations in paragraph 73.

74.    Denies the allegations in paragraph 74.

75.    Denies the allegations in paragraph 75.

76.    Denies the allegations in paragraph 76.

77.    Denies the allegations in paragraph 77.

78.    Answering paragraph 78, the tweet speaks for itself and any allegation to the contrary is denied and all other allegations found within this paragraph are denied.

79.    Denies the allegations in paragraph 79.

9

Case 2:24-cv-00175-DLC    Document 54-1    Filed 03/30/25    Page 10 of 17

80.    Denies the allegations in paragraph 80.

81.    Denies the allegations in paragraph 81.

82.    Denies the allegations in paragraph 82.

83.    Denies the allegations in paragraph 83.

84.    Answering paragraph 84, defendant realleges and incorporates by this reference each and every answer to each and every paragraph of the Complaint.

85.    Answering paragraph 85, the post speaks for itself and any allegation to the contrary is denied.

86.    Answering paragraph 86, the post speaks for itself and any allegation to the contrary is denied.

87.    Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 87 and therefore must deny the same.

88.    Answering paragraph 88, the post speaks for itself and any allegation to the contrary is denied.

89.    Denies the allegations in paragraph 89.

90.    Denies the allegations in paragraph 90.

91.    Denies the allegations in paragraph 91.

92.    Denies the allegations in paragraph 92.

Case 2:24-cv-00175-DLC Document 46 Filed 03/30/26 Page 11 of 17

93. Denies the allegations in paragraph 93.

94. Denies the allegations in paragraph 94.

95. Answering paragraph 95, defendant realleges and incorporates by this reference each and every response to each and every paragraph of the Complaint.

96. Answering paragraph 96, admits that the post speaks for itself and any allegations to the contrary is denied.

97. Answering paragraph 97, admits that the post speaks for itself and any allegation to the contrary is denied.

98. Answering paragraph 98, admits that the post speaks for itself and any allegation to the contrary is denied.

99. Denies the allegations in paragraph 99.

100. Denies the allegations in paragraph 100.

101. Denies the allegations in paragraph 101.

102. Denies the allegations in paragraph 102.

103. Denies the allegations in paragraph 103.

104. Denies the allegations in paragraph 104.

105. Denies the allegations in paragraph 105.

106. Answering paragraph 106, defendant realleges and incorporates by this reference each and every response to each and every paragraph of the Complaint.

11

Case 2:24-cv-00175-DLC    Document 54-1    Filed 03/30/26    Page 12 of 17

107.  Answering paragraph 107, admits that the post speaks for itself, however, any allegation to the contrary is denied.

108.  Answering paragraph 108, admits that the post speaks for itself, however, any allegation to the contrary is denied.

109.  Answering paragraph 109, admits that the post speaks for itself, however, any allegation to the contrary is denied.

110.  Denies the allegations in paragraph 110.

111.  Denies the allegations found in paragraph 111.

112.  Denies the allegations in paragraph 112.

113.  Denies the allegations in paragraph 113.

114.  Denies the allegations in paragraph 114.

115.  Denies the allegations in paragraph 115.

116.  Denies the allegations in paragraph 116.

117.  Denies the allegations in paragraph 117.

118.  Denies the allegations in paragraph 118.

119.  As the allegations in paragraph 119 do not demand a response, no response is deemed required, however, defendant denies any and all claims made against him that would allow any relief to be awarded by the jury or the Court.

Case 2:24-cv-00175-DLC    Document 34-1    Filed 12/30/25    Page 13 of 17

## FIRST AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because the alleged statements and/or alleged implications are not false.

## SECOND AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because the alleged statements and/or alleged implications do not assert verifiably false facts.

## THIRD AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because to the extent that any statements and/or implications could be interpreted as asserting verifiable facts, those facts are substantially true.

## FOURTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, as it does not expose Plaintiff to hatred, contempt, ridicule or obloquy or causes Plaintiff to be shunned or avoided or that has a tendency to injure Plaintiff and Plaintiff's occupation.

## FIFTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, as the alleged language although may be considered unpleasant or annoying it does not constitute libel.

## SIXTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because some or all of the alleged statements and/or implications are not reasonably susceptible of defamatory meaning.

## SEVENTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because Holbrook is a public figure for the purposes of all matters alleged in the Complaint, and Holbrook cannot prove that Cohodes published any statement or implications about Holbrook with actual malice.

## EIGHTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, as any alleged libelous statements are nothing more than expressions of opinions thus are not actionable.

14

Case 2:24-cv-00175-DLC    Document 46    Filed 03/07/25    Page 15 of 17

## NINTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because Holbrook's reputation in the community was not changed by acts or omissions by Cohodes thus he could not be the cause of any damage to Holbrook's reputation.

## TENTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because Holbrook has not suffered any actual damages caused by the statements identified in the Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because any injuries or damages allegedly suffered by Holbrook were not proximately caused by any acts or omissions of Cohodes.

## TWELFTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because Holbrook's damages, if any, are vague, uncertain, and speculative.

15

## THIRTEENTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff is not entitled to punitive damages from Cohodes because Cohodes's alleged conduct does not rise to the requisite level of culpability to justify an award of such damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

Subject to amendment and in order not to waive this affirmative defense, Plaintiff's Complaint fails, in whole or in part, because Cohodes's conduct was legally justified and/or privileged and cannot give rise to any liability on his part.

WHEREFORE, Defendant prays that Plaintiff take nothing by way of its Complaint and same be dismissed with prejudice and for such other relief as the Court deems proper under the circumstances.

**DATED** this 30th day of December, 2025.

STACEY & FUNYAK

By:  /s/Calvin J. Stacey
Calvin J. Stacey
*Counsel for Defendant Marc Cohodes*

16

Case 2:24-cv-00175-DLC   Document 84-61   Filed 03/30/26   Page 17 of 17

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of December, 2025, a copy of the foregoing *Defendant's Answer and Jury Trial Demand* was served upon the following counsel of record by the following means:

<u>1,2,3</u>    CM/ECF
_____    Hand Delivery
_____    U.S. Mail

1.    Clerk of Court

2.    Matthew J. Kelly
Tarlow Stonecipher Weamer & Kelly, PLLC
1705 West College Street
Bozeman, MT   59715
mkelly@lawmt.com

3.    Andrew C. Phillips (*Pro Hac Vice*)
Shannon B. Timmann (*Pro Hac Vice*)
Hannah Menchel (*Pro Hac Vice*)
MEIER WATKINS PHILLIPS PUSCH LLP
919 18th Street NW, Suite 650
Washington, DC 20006
Email: andy.phillips@mwpp.com
Email: shannon.timmann@mwpp.com
Email: hannah.menchel@mwpp.com

By:   /s/Calvin J. Stacey

17

NORTON
lawfirm

Fred Norton
fnorton@nortonlaw.com
510-906-4901

October 4, 2024

**VIA E-MAIL:** steven.wilker@tonkon.com

Steven M. Wilker
Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, Oregon 97204
Ph: 503.802.2040

   *Re: Holbrook Holdings*

Mr. Wilker,

   I write in response to your letter of September 27, 2024.

   As you know, there has been ample discussion on X (formerly Twitter) about potentially fraudulent transactions involving B. Riley since at least November 2023, when SEC and DOJ charging documents revealed that B. Riley was doing significant business with Bian Kahn, an unindicted co-conspirator in a massive Ponzi scheme. Your client injected itself into that conversation in December 2023, coming to B. Riley's defense and criticizing B. Riley's skeptics, Mr. Cohodes among them. Given Holbrook's concentrated position in B. Riley and its related securities, your client's defense of B. Riley was unsurprising.

   Suffice it to say, the news has only gotten worse for B. Riley (and Holbrook's investors) over the last ten months. B. Riley could not even report its second quarter financial results, instead filing an NT 10-Q announcing a massive write down of Kahn-affiliated assets of up to $370 million. The write down was no surprise to anyone paying attention.

   As it has become increasingly obvious that investing in B. Riley and its related securities is (charitably) a bad idea, users on X have asked why a mutual fund like Holbrook would make such bad investments. There are at least three competing opinions: Holbrook is (1) stupid, (2) incompetent, or (3) corrupt.

   Mr. Cohodes settled on option three. A glance at the broader online discussion of B. Riley quickly confirms that the basis for Mr. Cohodes's opinion is no secret. A year's worth of damning revelations about B. Riley's financial health. Holbrook's concentrated position in B. Riley—including holding 35% of B. Riley's outstanding baby bonds. The discrepancy between what Holbrook says in its SEC filings about its B. Riley holdings and what basic research shows Holbrook actually holds. Mr. Cohodes did the math, and it did not add up to stupidity or incompetence.

EXHIBIT B

With this context, it should be evident that none of the tweets you identify is defamatory. Mr. Cohodes expressed his opinions as to why Holbrook would invest in and defend B. Riley and through his posts, individually and in aggregate, provided the basis for his thesis. But we can examine the tweets one by one:



That Holbrook is "tied at the HIP" to B. Riley is a statement of opinion, expressed in colloquial terms. The factual basis for the opinion—Holbrook's concentrated position in B. Riley and its related securities—is disclosed. When an investor and a company have aligned their interests as significantly as Holbrook and B. Riley have—so much so that Holbrook felt compelled to start Twitter fights with B. Riley critics to defend the failing company—it is entirely defensible to say they are "tied at the hip."



That Holbrook is an "idiot" attracted to a "fraud" like B. Riley is a statement of opinion. Your letter suggests that the tweet accused your clients of committing fraud, but that is clearly not

what Mr. Cohodes said. B. Riley is the fraud and Holbrook is the "idiot" attracted to the fraud. The basis for Mr. Cohodes's opinion that B. Riley is a fraud has been amply disclosed online and in the financial media. It is hardly a logical leap to conclude that heavy investment in a company obviously tainted by fraud makes the investor an "idiot." Mr. Cohodes's opinion that Holbrook was an "idiot" is not defamatory and in any event is now outdated. Mr. Cohodes no longer opines that Holbrook's position is idiotic; he opines that the position must be corrupt.



In response to others' speculation as to "why Holbrook would do this," Mr. Cohodes "bet" that Holbrook was corrupt—an explicit statement of opinion. As discussed above, the basis for this opinion has been disclosed. B. Riley's assets are tainted by fraud (and now even B. Riley admits significant impairment); Holbrook is concentrated in B. Riley (including holding 35% of Riley's outstanding baby bonds); and Holbrook has misrepresented the size of its B. Riley position in SEC filings. Mr. Cohodes is of the opinion that if it looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck.

October 4, 2024
Page 4



Again, Mr. Cohodes opines that Holbrook's large concentration in B. Riley is suspicious, and the basis for that suspicion is fully disclosed. See above discussion about the duck. Moreover, your response appears to be that Holbrook's prospectus allows it to hold non-investment grade securities, not that Mr. Cohodes was incorrect in pointing out that B. Riley was doing so—and doing so heavily.



Again, Mr. Cohodes opines (much like "I bet …," "I am sure …" is a classic expression of an opinion) that Holbrook is corrupt; the basis for the opinion is disclosed in Mr. Cohodes's tweets. The "Lord Weary" tweet provides helpful context for the broader discussion of Holbrook's investment decisions, including the process of elimination in assessing Holbrook's investment thesis—stupidity, incompetence, or corruption.



Again, the tweet reflects Mr. Cohodes's opinion that Holbrook's concentration in B Riley and its related securities indicates the corruption of its leadership, not its incompetence or stupidity. The basis for the opinion is fully disclosed in Mr. Cohodes's tweets.



Here, Mr. Cohodes reposted another user's tweet that engaged with the debate of whether Holbrook is corrupt, incompetent, or stupid. Sheida Rasooli offers another possibility: lazy.

To reiterate, Mr. Cohodes has formed the opinion, based on the evidence available to him and shared with others on Twitter, that Holbrook's investment in B. Riley reflects neither stupidity nor incompetence: it reflects malfeasance. In response, you make self-serving denials on behalf of Holbrook (narrowly tailored), state Holbrook is "transparent about its rationale in investing in B. Riley bonds" (rationale forthcoming), and note that Holbrook discloses to

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

October 4, 2024
Page 7

investors that it may invest in non-investment grade securities (a non sequitur at best). Nowhere do you suggest that the concentrated investment in B. Riley, and Holbrook's vigorous defense of that position, was anything other than a terrible decision for Holbrook's investors. In other words, Holbrook's defense is that its lousy investment decision was not corrupt, as it appears, but merely stupid or incompetent.

Mr. Cohodes is open to learning more about Holbrook's investment strategy, and if you provide evidence to back up your assertions, he is open to changing his mind. Until then, he stands behind his expressed opinions.

Very truly yours,

Fred Norton
THE NORTON LAW FIRM, P.C.

NORTON
law firm pc

Leah Judge
ljudge@nortonlaw.com
510-906-4919

November 12, 2024

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, D.C. 20549

**Re:  TCR Concerning Holbrook Holdings, Inc. (Related to TCRs No. 17013-051-624-477 and 17253-741-928-245).**

To Whom It May Concern:

I make this submission concerning Holbrook Holdings, Inc. ("Holbrook") on behalf of my client Marc Cohodes.  The submission is related to two prior TCRs submitted jointly by Mr. Cohodes and ▮▮▮▮▮▮, also my client.  Those TCRs concern B. Riley Financial, Inc. (TCR No. 17013-051-624-477) and Marcum LLP (17253-741-928-245).  Both Messrs. ▮▮▮▮ and Cohodes hold short positions in B. Riley's stock.

Holbrook is a financial advisory firm that manages two mutual funds: the Holbrook Income Fund (HOBIX), launched in 2016, and the Holbrook Structured Income Fund, launched in 2022.  The Holbrook Income Fund holds unsecured bonds issued by B. Riley (Nasdaq: RILY). It also holds unsecured bonds issued by Babcock & Wilcox (NYSE: BW) and Synchronoss Technologies (Nasdaq: SNCR).  Until September 2024, BW comprised about 32% of B. Riley's portfolio and Synchronoss comprised about 12% of B. Riley's Portfolio.  In short, my client believes that Holbrook's concentrated position in unsecured bonds issued by RILY, BW, and SNCR, coupled with Holbrook's misleading representations to its investors about those securities, warrant investigation of Holbrook.

As detailed in previously lodged TCRs, since at least November 2023 Messrs. ▮▮▮▮ and Cohodes have been investigating B. Riley and its ties to Brian Kahn, an unindicted co-conspirator in the fraud perpetrated by Prophecy Asset Management.[1]  Among other transactions, the TCRs specifically detailed my clients' concerns with B. Riley's August 2023 leveraged buyout of The Franchise Group (FRG), where Kahn had served as CEO since 2019. The TCRs explained that FRG's assets were implicated in the Prophecy Fraud; that FRG's credit

---

[1] *See* SEC Press Release, *SEC Charges President/CCO of Prophecy Asset Management Advisory Firm with Multi-Year Fraud* (Nov. 2, 2023), *available at* https://www.sec.gov/newsroom/press-releases/2023-231; DOJ Press Release, *Former Top Executive of Investment Fund Admits $294 Million Securities Fraud Conspiracy* (Nov. 2, 2023), *available at* https://www.justice.gov/usao-nj/pr/former-top-executive-investment-fund-admits-294-million-securities-fraud-conspiracy

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

EXHIBIT C

rating had been downgraded; and that B. Riley had pledged FRG receivables as collateral for major loans. All of this called into question the financial stability of B. Riley and the accuracy of its representations to shareholders.

Doubling down on the fraud, B. Riley issued materially misleading financial statements that *marked up* the value of its FRG assets in April 2024. Then in August 2024, B. Riley acknowledged that it would in fact report $435 to 475 million in quarterly losses related to FRG's performance. At the same time, B. Riley and its founder also disclosed that they had received subpoenas form the SEC. FRG declared bankruptcy last week. To date, B. Riley has not filed either its Q2 or Q3 earnings reports. As the financial implications of B. Riley's entanglement with the Kahn enterprise has become clear, the market has responded accordingly with RILY stock falling more than 70% since November 2023.

Notwithstanding B. Riley's public downward spiral, Holbrook Income Fund maintains outsized positions in B. Riley baby bonds. Bloomberg data from Q2 of 2024 shows that Holbrook held **35% of outstanding** Riley 5.50% Senior Notes due 2026 (Nasdaq: RILYK) and **13% of outstanding** Riley 5% Senior Notes due 2026 (Nasdaq: RILYG). The same data shows Holbrook holds **33.8% of outstanding** Babcock & Wilcox 8.125% Senior Notes due 2026 (NYSE: BWSN); **13.1% of outstanding** Babcock & Wilcox 6.50% Senior Notes due 2026 ((NYSE: BWNB); and **25.59% of outstanding** Synchronoss 8.375% Senior Notes due 2026 (Nasdaq: SNCRL).



Mr. Cohodes is a financial expert and professional investor. In his experience, it is highly unusual for a mutual fund to hold such large positions in the baby bonds of a company whose creditworthiness is obviously questionable. Baby bonds are unsecured; in the event of bankruptcy, B. Riley has at least $600 million of secured debt it would need to repay before baby bond holders received any sort of payment.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

But Holbrook is not simply holding an unwisely large position in the unsecured debt of B. Riley and associated companies. It is also misleading its investors about the nature of these holdings. In both its 2023 and 2024 Forms N-CSR, Holbrook categorized its RILY, BW, and SNCR baby bonds as "corporate bonds" on its Schedule of Investments.[2] Although Holbrook discloses that it classifies baby bonds as corporate bonds,[3] a corporate bond is different in kind from a baby bond. Corporate bonds are secured corporate debt; it is much less risky to own secured corporate bonds than unsecured baby bonds. By hiding its significant baby bond holdings among its corporate bonds, Holbrook is intending to convey to its investors—retail investors—that its portfolio is less risky than it is.

This conclusion is reinforced by the fact that Holbrook has another category of investments in which it could appropriately group its baby bonds: preferred stock.[4] Holders of preferred stock—just like holders of baby bonds—are behind corporate bondholders during bankruptcy or liquidation. Like baby bonds, preferred stocks are higher risk securities than corporate bonds. By deceptively lumping in baby bonds with "corporate bonds," Holbrook can misleadingly convey to investors that its portfolio is less concentrated in high-risk securities. To wit, in 2023 Holbrook represented that preferred stock comprised only 3.7% of its portfolio, while "corporate bonds" comprised 53.4%.[5] And in 2024, Holbrook represented that preferred stock comprised only 4% of its portfolio, while "corporate bonds" comprised 48%.[6]

In fact, secured, corporate bonds comprised a far smaller portion of Holbrook's holdings in both 2023 and 2024. In 2023, Holbrook represented that it held approximately $575 million in "corporate bonds," but its misclassified RILY, BW, and SNCR baby bonds accounted for *$71 million of this total*—12%.[7] Likewise, in 2024 Holbrook represented that it held approximately $728 million in "corporate bonds," but its misclassified RILY, BW, and SNCR baby bonds accounted for *$146 million* of this total—20%.[8] And this accounts <u>only</u> for Holbrook's misclassification of RILY, BW, and SNCR baby bonds. A quick look shows that Holbrook has also improperly lumped unsecured debt from other issuers into the "corporate bond" Schedule of Investments in both its 2023 and 2024 Form N-CSRs.

Holbrook further tells on itself by stating the <u>number</u> of baby bonds it holds in the "Principal Amount ($)" column of its Schedule of Investments. In both Holbrook's 2023 and 2024 Forms N-CSR, the Schedule of Investments has six columns: "Principal Amount ($)";asset name; "Spread"; "Coupon Rate (%)"; "Maturity"; and "Fair Value." For example, in its 2024

---

[2] Holbrook Holdings 2023 Form N-CSR at pp. 9-11 (Apr. 30, 2023), *available at* https://www.sec.gov/Archives/edgar/data/1552947/000158064223003586/holbrook_ncsr.htm; Holbrook Holdings 2024 Form N-CSR at pp. 10-12 (Apr. 30, 2024), *available at* https://www.sec.gov/Archives/edgar/data/1552947/000158064224005610/holbrook_ncsra.htm

[3] Holbrook 2023 Form N-CSR at p. 27; Holbrook 2024 Form N-CSR at p. 28.

[4] Holbrook 2023 Form N-CSR at p. 5; Holbrook 2024 Form N-CSR at p. 6.

[5] Holbrook 2023 Form N-CSR at pp. 5 & 9.

[6] Holbrook 2024 Form N-CSR at pp. 6 & 10.

[7] Holbrook 2023 Form N-CSR at pp. 9-12.

[8] Holbrook 2024 Form N-CSR at pp. 10-13.

Form N-CSR, Holbrook provides the following information about its RILY, BW, and SNCR unsecured bonds:[9]

| "Principal Amount ($)" | Asset | Spread | Coupon Rate (%) | Maturity | Fair Value |
|---|---|---|---|---|---|
| 2,063,398 | B Riley Financial, Inc | n/a | 5.5000 | 03/03/25 | 45,043,979 |
| 1,653,842 | Babcock & Wilcox Enterprises, Inc. | n/a | 8.1250 | 02/28/26 | 31,422,997 |
| 749,541 | Babcock & Wilcox Enterprises, Inc. | n/a | 6.5000 | 12/31/26 | 12,427,390 |
| 1,858,470 | B Riley Financial, Inc. | n/a | 5.000 | 12/31/26 | 35,756,962 |
| 1,121,767 | Synchronoss Technologies, Inc | n/a | 8.3750 | 06/30/26 | 23,557,107 |

The Q2 2024 Bloomberg data included above (incorporated in the chart below), confirms that the "Principal Amount ($)" actually represents the number of baby bonds held:

| Baby Bond | "Principal Amount ($)" (Holbrook 2024 Form N-CS; current through Apr. 30, 2024) | Bloomberg Q2 Data on HOBIX Position (current through June 30, 2024) |
|---|---|---|
| RILY - 5.5% Note | 2,063,398 | 2,100,636 |
| BW - 8.125% Note | 1,653,842 | 1,691,310 |
| BW - 6.5% Note | 749,541 | 793,069 |
| RILY - 5% Note | 1,858,470 | 1,669,483 |
| SNCR – 8.375% Note | 1,121,767 | 1,242,610 |

Moreover, a quick glance at Holbrook's 2023 and 2024 Schedule of Investments shows that when Holbrook in fact holds a corporate bond, it does not make the same "mistake" in the "Principal Amount ($)" column—it provides the value of the asset, not the quantity it holds.

In summary, based on my Mr. Cohodes's extensive experience with financial markets and the evidence of misrepresentation presented above, he believes it is extremely suspicious that 20% of Holbrook Income Fund's "corporate bonds" are, in fact, B. Riley-related junk bonds. Mr. Cohodes has been discussing Holbrook with SEC enforcement attorney Jennifer Calabrese since August 2024, when he first disclosed his concerns about Holbrook. Mr. Cohodes is

---

[9] Holbrook 2024 Form N-CSR at pp. 10-12.

prepared to provide further assistance to the SEC and any other law enforcement agency in an investigation of Holbrook.

Sincerely,

Leah Judge
THE NORTON LAW FIRM P.C.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

NORTON

Leah Judge
ljudge@nortonlaw.com
510-906-4919

May 19, 2025

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, D.C. 20549

      **Re: Supplemental TCR Concerning Holbrook Holdings, Inc. (Related to TCRs No. 17314-902-557-371; 17013-051-624-477; 17253-741-928-245; TCR No. 17358-507-891-255)**

To Whom It May Concern:

      I make this supplemental submission concerning Holbrook Holdings, Inc. ("Holbrook") on behalf of my client Marc Cohodes. The submission supplements TCR No. 17314-902-557-371, submitted on November 12, 2024 ("First Holbrook Submission"). The First Holbrook Submission is attached here as **Exhibit A**. Mr. Cohodes's Holbrook submissions are also related to three additional TCRs submitted jointly by Mr. Cohodes and ▮▮▮▮▮▮▮, also my client, concerning B. Riley Financial, Inc., Marcum LLP, and CBIZ, Inc.[1] Those submissions detailed B. Riley's questionable transactions with an unindicted co-conspirator in the fraud perpetrated by Prophecy Asset Management and B. Riley's issuance of materially misleading financial statements. Both Messrs. ▮▮▮▮ and Cohodes hold short positions in B. Riley's stock.

      As explained in the First Holbrook Submission, Holbrook is a financial advisory firm that manages two mutual funds, including the Holbrook Income Fund (HOBIX). HOBIX holds large positions in B. Riley unsecured debt and at least two B. Riley-affiliated companies, Babcock & Wilcox (NYSE: BW) and Synchronoss Technologies (Nasdaq: SNCR). B. Riley owns nearly one-third of B&W's common stock,[2] and Synchronoss is also a B. Riley related party.[3]

      The First Holbrook Submission explained why, based on my Mr. Cohodes's decades of experience in the industry, it was highly unusual for a mutual fund to hold such large positions in

---

[1] These three TCRs were submitted on November 30, 2023 (TCR No. 17013-051-624-477), September 3, 2024 (TCR No. 17253-741-928-245), and January 2, 2025 (TCR No. 17358-507-891-255).

[2] Babcock & Wilcox Annual Report at pp. 26-27 (Mar. 31, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001630805/000163080525000007/bw-20241231.htm

[3] Synchronoss Annual Report at p46 (Mar. 12, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001131554/000113155425000029/sncr-20241231.htm

the unsecured debt of B. Riley, a company with obviously questionable creditworthiness. The submission also explained that Holbrook had misled its retail investors in its Form N-CSRs by lumping its unsecured debt in with corporate bonds, two securities with very different risk profiles. Indeed, at the time of the First Holbrook Submission in November 2024, approximately 20% of HOBIX's "corporate bonds" were, in fact, B. Riley-related junk bonds.

Events since November 2024 raise additional concerns about Holbrook's investments in, and relationship with, B. Riley and Riley-related parties. Evidence strongly suggests that Holbrook has manipulated the price of certain B. Riley unsecured bonds and the unsecured bonds issued by Riley-related B&W (and likely Synchronoss, too). To wit, it appears that Holbrook effectively cornered the market for RILYK, RILYG, BWSN, and BWNB unsecured bonds over the last 18 months, artificially propping up the price of this distressed debt and depressing its yield, only to be bailed out by B. Riley and Riley-backed B&W through private exchanges in March and May of this year.

As detailed in the First Holbrook Submission, HOBIX's position in four RILY and BW unsecured bonds—specifically RILYK, RILYG, BWSN, and BWNB—continued to grow through 2024. By January 31, 2025, HOBIX held **54.4% of outstanding RILYK**, up from 35% in Q3 2024, and **42.8% of outstanding BWSN**, up from 33.83% in Q3 2024. Attached as **Exhibit B** is a chart showing HOBIX's positions in RILYK, RILYG, BWSN, and BWNB from Q1 2023 through March 31, 2025.

Extraordinarily, B. Riley announced on March 26, 2025 that an unidentified "investor" had agreed to exchange $123 million in outstanding unsecured bonds consisting of *$86 million in RILYK and $37 million RILYG* for $88 million in "newly issued 8.00% Senior Secured Second Lien Notes" and warrants to buy 351,000 common shares for $10.00 each over the next seven years.[4] Holbrook was the only "investor" with sufficient holdings in RILYG and RILYK to make this deal and B. Riley's April 1, 2025 8-K confirmed that HOBIX was, in fact, the counterparty to the transaction.[5] As shown in **Exhibit B**, HOBIX eliminated its position in RILYK and RILY G through the private placement.

Unsurprisingly, after Holbrook dumped its RILYK and RILYG holdings, the price of those securities fell dramatically. On March 26, the date of the private placement, RILYG closed at $12.61 and RILYK closed at $21.60. On May 16, RILYG closed at $7.70 and RILYK closed at $16.63—*a 39% and 25% loss in value, respectively.* By its terms, Riley offered the March 26 private placement only to Holbrook, leaving non-Holbrook investors holding securities worth significantly less with Holbrook out of the market it had propped up for so long.

---

[4] B. Riley Press Release, *B. Riley Financial Announces Private Bond Exchange to Reduce Debt by Approximately $35 Million* (Mar. 26, 2025), https://ir.brileyfin.com/2025-03-26-B-Riley-Financial-Announces-Private-Bond-Exchange-to-Reduce-Debt-by-Approximately-35-Million
[5] *See* B. Riley Form 8-K EX-10.4, Registration Rights Agreement (Marc. 26, 2025), https://www.sec.gov/Archives/edgar/data/1464790/000121390025027230/ea023597801ex10-4_briley.htm

After closing its positions in RILYK and RILYG, Holbrook still held outsized positions in both BWSN and BWNB. However, as of May 12, 2025, it appears likely that this is no longer the case.

That day, B&W announced—just as Riley announced in March—that it had entered a private placement with "a limited number of noteholders" to exchange $131.8 million of B&W's existing unsecured debt for $100.8 million in newly issued notes.[6] The exchange consisted of $84 million in BWSN and $48 million in BWNB. Given Holbrook's disproportionately large positions in both BWSN and BWNB—holding 44.94% and 22.88%, respectively, of outstanding shares as of May 2—it is highly probable that Holbrook is one of the "noteholders" in the B&W private placement. As with RILYK and RILYG, Mr. Cohodes anticipates that the price of both BWSN and BWNB will fall dramatically once Holbrook is no longer propping them up.[7]

In short, based on his decades of experience and analysis of the data, Mr. Cohodes believes that Holbrook, together with B. Riley, has engaged in a market manipulation scheme to artificially inflate the prices of RILYK, RILYG, BWSN, and BWNB. As discussed, it is highly unusual for a mutual fund serving retail investors to hold outsized positions in baby bonds peddled by companies with obviously questionable creditworthiness. Indeed, B&W's auditors just issued a going concern opinion in the company's 2024 financials. Despite the obvious downward trajectory of both B. Riley and B&W over the past eighteen months, Holbrook continued to consolidate its position in the companies' unsecured debt while simultaneously misclassifying that debt in its SEC filings. *See* Exhibit A. Mr. Cohodes believes it is more than serendipitous that Holbrook has since scored exclusive private placements with Riley and (likely) B&W to offload those illiquid positions.

Holbrook's conduct with respect to the above-discussed securities should be investigated. Mr. Cohodes is prepared to provide further assistance to the SEC and any other law enforcement agency.

Sincerely,

Leah Judge
THE NORTON LAW FIRM P.C.

---

[6] Babcock & Wilcox Press Release, *Babcock & Wilcox Announces Private Bond Exchanges to Reduce Outstanding Debt, Lower Annual Interest Expense and Extend Debt Maturity to 2030* (May 12, 2025), https://www.babcock.com/home/about/corporate/news/babcock-and-wilcox-announces-private-bond-exchanges-to-reduce-outstanding-debt-lower-annual-interest-expense-and-extend-debt-maturity-to-2030

[7] Since May 12, the price of BWSN and BWNB have risen. The price of RILYK and RILYG also rose in the week following the March 26 announcement of the Holbrook private placement, before falling dramatically.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

**12/16/23 @ 6:22 pm**



11:39

← **Post**

**Holbrook Holdings**    **Follow**
@HolbrookHldgs

Sure did.  Also read the third party former SEC lawyer investigation saying no evidence of fraud in FRG - which is what RILY owns.  Also listened to the entire RILY presentation.  Also listened to @AlderLaneEggs run his mouth.

6:22 PM · 12/16/23 · **48** Views

**1** Like

**This post has been deleted.**



**12/16/23 @ 6:23 PM**



11:39

←         **Post**

**Holbrook Holdings**      ( Follow )
@HolbrookHldgs

@AlderLaneEggs has a playbook - undermine depository institutions by shaking confidence - only RILY isn't a depository institution.  So he will fail here.

6:23 PM · 12/16/23 · **43** Views

**1** Like

♡     ↻     ♡     ◻     ↑

**This post has been deleted.**



**12/16/23 @ 6:24 PM**



11:39

← **Post**

**Holbrook Holdings**   ( Follow )
@HolbrookHldgs

He even failed with $HOME – please read about how non other than Warren Buffett gave him a spanking

6:24 PM · 12/16/23 · **64** Views

**1** Like

This post has been deleted.



**12/16/23 @ 6:29 PM**



11:39

← **Post**

**Holbrook Holdings**    Follow
@HolbrookHldgs

And what is @AlderLaneEggs anyways – a hypocrite who got wealthy off the backs of shareholders then shut down his hedge fund with massive shareholder losses...only to then create the narrative that he is cleaning up the world from greedy execs 😂😂😂😂😂

6:29 PM · 12/16/23 · **53** Views

**This post has been deleted.**



**12/16/23 @ 6:30 PM**



11:39

← **Post**

**Holbrook Holdings**    Follow
@HolbrookHldgs

I suspect those massive prints at the close on Friday are precursors to an insider buyback filing – we shall see.

6:30 PM · 12/16/23 · **53** Views

**1** Like

**This post has been deleted.**

**12/16/23 @ 6:59 PM**



11:39

← **Post**

**Holbrook Holdings**
@HolbrookHldgs
**Follow**

Average Price prints and MoC orders - so yeah sold at end of day to the buyers - every share sold has a buyer Spence.  Been seeing you ride the short narrative as well - good luck - time will tell.

6:59 PM · 12/16/23



**This post has been deleted.**

**12/16/23 @ 7:04 PM**



11:39

←         **Post**

**Holbrook Holdings**    Follow
@HolbrookHldgs

And wait? Your contention is insiders are selling
personal stock so that the company can cover
the dividend?  Think about what you just wrote.

7:04 PM · 12/16/23

**1** Like

**This post has been deleted.**



**12/16/23 @ 7:10 PM**



11:38

←          **Post**

**Holbrook Holdings**    Follow
@HolbrookHldgs

Here is some free knowledge. An insider, or an institution gives a broker a Market on Close BUY order - the broker spends much of the day buying it up and then the broker prints it as a SELL to Finra at 4 pm - the Institution or insider or whoever was the buyer.

7:10 PM · 12/16/23 · View

This post has been deleted.

11:38    insider or whoever was the buyer.



**Audrey** liked a post you were mentioned in

And wait? Your contention is insiders are selling personal stock so that the company can cover the dividend? Think about what you just wrote.

**Holbrook Holdings** @HolbrookHldgs · 16h
Replying to @tspencer322 @joe_bananas9 and 3 others

And wait? Your contention is insiders are selling personal stock so that the company can cover the dividend? Think about what you just wrote.

♡ 1

**Holbrook Holdings** @HolbrookHldgs · 16h
Replying to @tspencer322 @joe_bananas9 and 3 others

Average Price prints and MoC orders – so yeah sold at end of day to the buyers – every share sold has a buyer Spence. Been seeing you ride the short narrative as well – good luck – time will tell.



**Spence** ≈ ✔ @tspencer322 · 16h
Replying to @HolbrookHldgs @joe_bananas9 and 3 others

😂😂. They were sales. It's on the Tlk f

Over 1.2M sold and it's probably insiders trying to pay for the $30m in dividends they issued



**12/17/23 @ 9:52 AM**



Don't know the man - never met him. Lots of people go to Harvard.

9:52 AM · 12/17/23 · **22** Views



**This post has been deleted.**

B



**Marc Cohodes** ✔ @AlderLaneEggs · 6/1/25

Replying to @FriendlyBearSA and @0GBaconMemes

So people like **Holbrook** can attract Investors..

💬　　　🔁　　　♡ 8　　　ıl̗ıl̗ 721　　　🔖　　　⬆

MC 0001



**Marc Cohodes** ✔ @AlderLaneEg... · 5/5/25 𝕏
**Holbrook** has their hands full and suing me has to be a "Concordia" moment.. @AureliusValue @SECGov @MorningstarInc .. Mark Thompson sued me for using the word "nonsense" I have been to these rodeos before

>  **Marc Cohodes** ✔ @AlderLa... · 5/5/25
>
> How does a "High Rated" Morningstar Fund end up in this Garbage? @MorningstarInc Joe Six Pack deserves better. @SECGov Just a complete Train Wreck but when you get in Bed With Bryant Riley.... x.com/AlderLaneEggs/...



Case 2:24-cv-00175-DLC    Document 55-2    Filed 05/28/26    Page 60 of 270

MC 0002



**Marc Cohodes** ✓ @AlderLaneEg... · 5/5/25 ✗

Why was there no disclosure of **Holbrook** dumping their Ill Liquid Baby Bonds back to $RILY for 92% of a private placement that doesnt trade.. @MorningstarInc is this ok with you? @SECGov needs to look into the concentrated and illiquid Portfolio of **Holbrook** Funds and their ties to Show more



Case 2:24-cv-00175-DLC    Document 55-2    Filed 05/28/26    Page 61 of 270

MC 0003



**Marc Cohodes** ✅ @AlderLaneEg... · 5/5/25 ✕

Why would **Holbrook** Funds (who is suing me) own 45 % and 22% of these $BW Baby Bonds? Why? It so happens that $RILY and $BW are joined at the hip.. @MorningstarInc shouldnt you look into the concentrations of these illiquid Securities in a Mutual Fund Structure? @business @WSJ Show more



○ 4          ⟲ 2          ♡ 17          �Ill 16K          🔖          ⬆

MC 0004

**Marc Cohodes** ✔ @AlderLaneEg... · 5/5/25  X

**Holbrook** and $Rily are indeed tied at the hip.... What a pair... So how does a Mutual Fund own 22 and 45% of an issue that $RILY is a related party to? In what world is this ok? @SECGov @MorningstarInc

Bryant Riley owned 1,373,213 shares of BW as of 4/2/25, according to RILY's 13D filed 4/2/25.

B. Riley Securities beneficially owned 15,573,362 shares of BW as of 4/2/25, according to B. Riley Securities' 13D filed 4/2/25.

So, the 28.8m number in BW's proxy is B. Riley Financial + Bryant Riley + B. Riley Securities. The 4/2 13D was filed to update B. Riley Financial's beneficial ownership of BW following the separation.

| 0.4400 | -0.0242 |
| 6.37 | -7.72 |
| 7.25 | -10.03 |



○ 3          ↑⥮ 3          ♡ 16          ᵢᵢᵢ 7K          ▢          ↑

MC 0005



**Marc Cohodes** ✔ @AlderLaneE... · 3/28/25

Replying to @FriendlyBearSA

In my opinion **holbrook** has major problems and suing a Whistleblower which I am in their case opens up a can of worms.. Lets see what happens with their $BW debt @SECGov @business

   4   856

MC 0006



**Marc Cohodes** ✅ @AlderLaneE... · 3/28/25 X

This must relate to **Holbrook** and $RILY

>  **The Friendly Bear** ✅ @Frie... · 3/28/25
>
> If a plaintiff claims they're not "in cahoots" with an issuer then turns around and does a privately negotiated distressed debt exchange with said issuer, should the defendant consider Rule 11 ... Show more

💬 1     🔁     ❤️ 2     📊 7.9K     🔖     ↗️

MC 0007



**Marc Cohodes** ✪ @AlderLaneE... · 8/12/24  𝕏

This Asshat who runs **Holbrook** $Hobix is not going to be smiling for long.. $RILY someone like the @SECGov should ask him how a Money Market Equivalent lost 1.5% today. @AureliusValue @FriendlyBearSA .The Asshat's name is Scott Carmack . Stay Tuned



ПULDRUUК
— HOLDINGS —

## INVESTMENT TEAM

Scott Carmack

CEO & Portfolio Manager



MC 0008



## Marc Cohodes ✅ @AlderLa… · 8/12/24 ✕

**Holbrook** needs to get Investigated. $RILY

---

### ⚫ **Buyside of Wall Street L…** ✅ · 8/12/24

One of the biggest losers in Riley? A fund whose bmark is 1-3 UST/Corp, markets itself current income/preserve capital, 210bps in fees! & top 1% for last 5 years! Holbrook Capital-owns 3.7M+ RILY Bonds. PM Harvard Grad! Wow, @AlderLaneEggs @FriendlyBearSA @ParrotCapital



MC 0009

Case 2:24-cv-00175-DLC    Document 55-2    Filed 05/28/26    Page 67 of 270



**Marc Cohodes** ✔ @AlderLane... · 11/10/24 ✕

Guy Gentile didnt like that I exposed him for beating his wife and kids, which in my book is just too dam bad.When you speak out against bad actors they try to shut you up by suing you.. It simply doesnt work with me... I reported **Holbrook** to the @SECGov for numerous violations Show more

💬 7          ⟲ 3          ♡ 38          �ᴉⱶⱶ 12K          🔖          ⬆

MC 0010



**Marc Cohodes** ✔ @AlderLa... · 11/13/24

The one thing I know for sure in my latest Dust Up with **Holbrook** is that I have a few tricks up my sleeve and people out there running their mouths will not be happy $RILY

💬 3          🔁 1          ♡ 21          ᴵˡᵢ 7.8K          🔖          ⬆

Case 2:24-cv-00175-DLC   Document 55-2   Filed 05/28/26   Page 69 of 270

MC 0011



**Marc Cohodes** ✔ @AlderLane... · 10/11/24

**Holbrook** Funds(namely Scottie Carmack) does not like that I mention them and $RILY are tied to the hip. Scroll to the bottom and listen to this Asshat..

eaglefms.com/interviews/ @AureliusValue @FriendlyBearSA x.com/67585891sd/sta...

This post is unavailable.

 1          ⟲ 2          ♡ 13          �ⅈⅼⅈ 12K          🔖          ⬆

MC 0012



**Marc Cohodes** ✅ @AlderLaneE... · 9/27/24  X

This explains why attorneys have been hassling you, @FriendlyBearSA and myself... Something very very bad is brewing and can also explain why **Holbrook** is in tilt $RILY

 **AV** ✅ @AureliusValue · 9/27/24

Grand Juries now empaneled to investigate $ACHC malfeasance -- company admits that at least three different US Attorney's Offices involved, including SDNY.  These hellish hospitals have treated patients horribly for years in order to juice profits.

Item 8.01     Other Events.

On September 24, 2024, Acadia Healthcare Company, Inc. ("Acadia") received a voluntary request for information from the United States Attorney's Office for the Southern District of New York as well as a grand jury subpoena from the United States District Court for the Western District of Missouri (W.D.Mo.) related to its admissions, length of stay and billing practices. In addition, Lakeland Hospital Acquisition, LLC, a subsidiary of Acadia, also received a grand jury subpoena from W.D.Mo. on the same day regarding similar subject matter. Acadia anticipates receiving similar document requests from the U.S. Securities and Exchange Commission and may receive additional document requests from other governmental agencies. Acadia is fully cooperating with authorities and, at this time, cannot speculate on whether the outcome of these investigations will have any impact on its business or operations.

○ 1          ↑⏎ 5          ♡ 23          �ɪlɪ 11K          ⬜          ↑

Case 2:24-cv-00175-DLC    Document 55-2    Filed 05/28/26    Page 71 of 270

MC 0013



**Marc Cohodes**  @AlderLaneE... · 8/14/24  X

**Holbrook** has major problems

>  **Sheida Rasooli** @RasooliS... · 8/14/24
>
> $HOBIX shareholding in $SNCR is kinda interesting given the $RILY staged exit from their position. I wonder what the relationship is between the 3 parties
>
> x.com/ParrotCapital/...

💬 3　　⟲　　♡ 17　　ılıl 14K　　🔖　　↥

MC 0014



MC 0015

**Marc Cohodes** ✔ @AlderLaneE... · 8/12/24 ✕

**Holbrook** Holdings | Funds... This outfit has major problems and is tied at the HIP to $RILY .... Run and walk from this financial charade... $RILY @AureliusValue @SECGov




Holbrook Holdings | Funds

From holbrookfunds.com

 4      3      21      8.2K



**Marc Cohodes** ✔ @AlderLa... · 8/12/24    𝕏

**Holbrook** needs to get Investigated. $RILY

 **Buyside of Wall Street L...** ✔ · 8/12/24

One of the biggest losers in Riley? A fund whose bmark is 1-3 UST/Corp, markets itself current income/preserve capital, 210bps in fees! & top 1% for last 5 years! Holbrook Capital-owns 3.7M+ RILY Bonds. PM Harvard Grad! Wow, @AlderLaneEggs @FriendlyBearSA @ParrotCapital



💬 1          ⇄ 3          ♡ 20          �ili 17K          🔖          ⬆️

MC 0016



**Marc Cohodes** ✔ @AlderLane... · 12/22/23  𝕏
My Bet is **Holbrook** Invested in $RILY garbage in exchange for Bryant Riley touting **Holbrook**'s Shit Ass Mutual Fund to Riley's Wealth Clients.. No one is stupid enough to own this Dog Shit

>  **Spence** ☕ ✔ @tspencer3... · 12/22/23
> Replying to @missrobbie67 @AlderLaneEggs and 4 others
> Makes you curious as to why Holbrook would do this... Seems like $RILY is just a big circle jerk of friends of friends, who loan each other money in a circle, and buy each other's garbage.

◯ 5          ↑⏐ 5          ♡ 28          ⅰⅼⅰ 18K          ⊓          ↑

Case 2:24-cv-00175-DLC    Document 55-2    Filed 05/28/26    Page 75 of 270

MC 0017



**Marc Cohodes** ✔ @AlderLane... · 12/22/23  ✕

**Holbrook** is finished as well, good luck selling all of this garbage $RILY

**missrobbie67** ✔ 👤 @miss... · 12/22/23

Replying to @AlderLaneEggs @AureliusValue and 3 others

Here's Holbrook's Overlaps

## Holbrook Overlaps on 2 Large Riley Losing Position this QTR + owns a lot Riley's PFD!

| % Owned | PFD Security | Series | | Recent Price | Est. Yield $25 PAR | Rating | Rating Agency | Book Runner |
|---|---|---|---|---|---|---|---|---|
| 2.1% | B. Riley | 6.500% | | S 17.49 | 9.29% | BBB+ | EJR | Joint Leads |
| 10.1% | B. Riley | 5.000% | | S 16.14 | 7.74% | BBB- | EJR | Joint Leads |
| 23.4% | B. Riley | 5.500% | | S 17.78 | 7.73% | BBB+ | EJR | Joint Leads |
| 6.9% | Babcock & Wilcox | 6.500% | | S 17.25 | 9.42% | BB- | EJR | Joint Leads |
| 22.1% | Babcock & Wilcox | 8.125% | | S 20.03 | 10.14% | BB+ | EJR | Joint Leads |
| 18.5% | Synchronoss | 8.375% | | S 19.40 | 10.79% | ? | ? | B Riley |

💬 4        ⟲ 4        ♡ 17        13K        🔖        ⬆

MC 0018



MC 0019



**Marc Cohodes** ✅ @AlderLaneE... · 12/17/23

Asshat **Holbrook** best look in the mirror for his fund is just buried in all the toxic $Rily crap and he has been on Tilt all weekend.

 **The Friendly Bear** ✅ @Frie... · 12/17/23

More weekend reading

documentcloud.org/documents/2050...

1) There was a malpractice suit against deal counsel Brown Rudnick...

   2     11   15K

Case 2:24-cv-00175-DLC   Document 55-2   Filed 05/28/26   Page 78 of 270



**Marc Cohodes** ✔ @AlderLaneE... · 12/17/23  X
**Holbrook** has huge problems, like he is a complete Asshat for owning all this garbage.

💬          🔁          ❤ 2          📊 222          🔖          📤

MC 0020

# Holbrook Holdings

## HOLBROOK
### — HOLDINGS —

**Follow**

# Holbrook Holdings
@HolbrookHldgs

Views expressed in this forum are macro in nature. These views are subject to change and should NOT be taken as investment advice.

📍 Atlanta, GA   🔗 holbrookholdings.com

📅 Joined January 2016 >

**509** Following  **1.6K** Followers

**Posts**      **Replies**      **Videos**      **Photos**

---

**Marc Cohodes** ✅ @AlderLa... · 12/17/23      𝕏
@FriendlyBearSA @AureliusValue @joe_bananas9 any idea how much $RILY, $RILY Baby Bonds or other related party $RILY related Shit this Asshat @HolbrookHldgs owns in his funds? He is on Tilt so it must be a lot.. Amazing the idiots who are attracted to this Fraud.

💬 4        ⟲ 3        ♡ 10        �ili 3.2K        🔖        ⬆️

---

**Holbrook Holdings** @Holbr... · 12/17/23    Ø
😂😂😂😂

💬 3        ⟲        ♡ 1        ili 1.8K        🔖        ⬆️

---

**Thompson Clark** ✅ @rtclark · 12/15/23      𝕏
If true, Point 76 makes it sound like $RILY actually the victim here!

🏠        🔍        Ø        🔔²        ✉️

MC 0021



**Holbrook Holdings** @Holbro... · 2d

Replying to @FriendlyBearSA and @missrobbie67

The lawyers screwed up and paid the break fee so that there wasn't a malpractice suit which would have tainted the law firm for years.  In exchange everybody signed non disclosures – it's simple.  Law firms insurance probably ate most of it.

💬 1          🔁 1          ♡          📊 3,658          ⌟



**The Friendly Bear** ✓
@FriendlyBearSA

Replying to @HolbrookHldgs and @missrobbie67

Really?



law.com
After Botched $1.36B Deal, Judge Absolves Brown Rudnick of Malpractice Claims | Ne...

6:11 AM · 17 Dec 23 · **261** Views

MC 0022

 # Post

 **Holbrook Holdings**
@HolbrookHldgs

 **Follow**

Don't know the man – never met him. Lots of people go to Harvard.

9:52 AM · 12/17/23 · **22** Views

   

**This post has been deleted.**

MC 0023

← **Post**



**Holbrook Holdings**
@HolbrookHldgs


**Follow**

And what is @AlderLaneEggs anyways - a hypocrite who got wealthy off the backs of shareholders then shut down his hedge fund with massive shareholder losses...only to then create the narrative that he is cleaning up the world from greedy execs 😂😂😂😂😂

6:29 PM · 12/16/23 · **53** Views

   

**This post has been deleted.**

MC 0024



## Holbrook Holdings
@HolbrookHldgs



Sure did.  Also read the third party former SEC lawyer investigation saying no evidence of fraud in FRG - which is what RILY owns.  Also listened to the entire RILY presentation.  Also listened to @AlderLaneEggs run his mouth.

6:22 PM · 12/16/23 · **48** Views

**1** Like

**This post has been deleted.**

Case 2:24-cv-00175-DLC    Document 55-2    Filed 05/28/26    Page 83 of 270

MC 0025

← **Post**

 **Holbrook Holdings**
@HolbrookHldgs

 **Follow**

He even failed with $HOME - please read about how non other than Warren Buffett gave him a spanking

6:24 PM · 12/16/23 · **64** Views

MC 0026



**Holbrook Holdings**
@HolbrookHldgs

**Follow**

Replying to @FriendlyBearSA and @missrobbie6

The lawyers screwed up and paid the break fee so that there wasn't a malpractice suit which would have tainted the law firm for years.  In exchange everybody signed non disclosures – it's simple.  Law firms insurance probably ate most of it.

6:25 PM · 14 Dec 23 · **5,689** Views

**1** Quote   **1** Bookmark

MC 0027

12:52



**Holbrook Holdings**
@HolbrookHldgs

Quickly?  Next two baby bond maturities basically covered with cash.  Next maturity after that? March 31st 2026. Honestly, don't know why I engage on this platform.  I should just STFU and get back to managing $1.5 billion and quit wasting the energy.

4:58 PM · 11/19/23 from Earth · **82** Views

**1** Like

        



**DialecticThesis** @DialecticT... · 5h
Term loans are amortizing and they burn cash on an operating basis. But yeah clearly have it figured out. Managing 1.5b defending this stock for a year despite it down massively in an up market. Your LPs probably don't mind since you manage 1.5b.

      

  **Holbrook Holdings** @Holbro... · 5h
Hobix hosix - look them up... no lp's

MC 0028



**Wolfpack Research** ✔ @Wol... · 28 Jul 23

$APLD this looks like the clearest case of insider trading since Martha Stewart, let's hope it ends the same way. Having said that, on any given day it seems like all dirt roads lead back to $RILY

 **The Friendly Bear** ✔ @Fri... · 28 Jul 23

First article in a while. We are short $RILY and $APLD
– we surfaced evidence $RILY is controlling $APLD (to the detriment of $APLD shareholders) and view this as o...

💬 4          🔁 4          ♡ 15          ᵭᵭ 7.9K      🔖     ⤳

 **Holbrook Holdings** @Holbro... · 28 Jul 23

Keep rolling those puts big boy

ᵭᵭ 118

MC 0029



**Wolfpack Research** ✓ @W... · 05 May 23

1/

$RILY $43.5m of $15.1m net income ($1.50 per share) of earnings came from FV adjustments on loans receivable in 1Q23. This indicates operating cash flows were negative in Q1.

| Loans Receivable Balance Roll Forward – March 31, 2023 | | | | | | |
|---|---|---|---|---|---|---|
| *naudited, dollars in thousands)* | December 31, 2022 | Gross Loan Funding | Sales, Repayments, and Conversions | Fair Value Adjustments | Capitalized Interest and Other | March 3 2023 |
| ock Receivables, at Fair Value | $ 318,109 | $ 145,278 | $ (138,877) | $ (182) | $ — | $ 324, |
| Loans Receivable, at Fair Value | 383,543 | 111,883 | (92,308) | 43,458 | 1,181 | 447 |
| oans Receivable, at Fair Value | $ 701,652 | $ 257,161 | $ (231,185) | $ 43,276 | $ 1,181 | $ 772 |

 5     ⭫6     ♡14     ᴎᴵᴵ 12.5K



**Holbrook Holdings** @Holbr... · 05 May 23

So double and triple down on your short – and get your audience to follow. Please.

ᴎᴵᴵ 367

MC 0030



**Holbrook Holdings** @Holbr...  · 12 Mar 23

The amount of rubbish on fintwit this weekend is off the charts.  A bunch of people spewing nonsense without any knowledge about banking.  Fintwit should be renamed nitwit.

1.2K

MC 0031

Tips, Complaints, and Referrals
Summary Page - Submitted Externally

**Submission Number 17314-902-557-371 was submitted on Tuesday, November 12, 2024 at 05:03:48 PM EST**

**This PDF was generated on Tuesday, November 12, 2024 at 05:04:08 PM EST**

Thank you for contacting the United States Securities and Exchange Commission. This automated response confirms that your submission has been received successfully. We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

**Q: Please select the option that best describes your complaint.**
**A:** Other

**Q: Is this supplemental information to a previous complaint?**
**A:** Yes

**Q: What is the Submission Number of the previous complaint?**
**A:** TCR17013051624477

**Q: In your own words, describe the conduct or situation you are complaining about.**
**A:** Please see the attached PDF.

**Q: Are you having or have you had difficulty getting access to your funds or securities?**
**A:** Unknown

MC 0032

Page 1 of 9

**Tips, Complaints, and Referrals**

Summary Page - Submitted Externally

**Q: Did you suffer a loss?**

**A:** No

**Q: Is the conduct ongoing?**

**A:** Yes

**Q: Has the individual or firm acknowledged the conduct?**

**A:** No

## Who are you complaining about?

**Subject # 1**

**Q: Are you complaining about a person or a firm?**

**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**

**A:** Investment Adviser

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**

**A:** No

**Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**

**A:** No

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**

**A:** No

MC 0033

Page 2 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Firm Name**

**A:** HOLBROOK HOLDINGS, INC.

## Which investment products are involved?

**Q: Select the type of product involved in your complaint.**

**A:** Funds (e.g., ETFs, mutual funds, private equity funds, hedge funds)

**Q: Please select the category that best describes the security product.**

**A:** Mutual funds

## About you

**Submitter # 1**

**Q: Are you filing this tip under the SEC's whistleblower program?**

**A:** Yes

**Q: Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**

**A:** No

**Q: First Name**

**A:** Marc

**Q: Last Name**

**A:** Cohodes

MC 0034

Page 3 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Email Address**

**A:** mcohodes@gmail.com

**Q: What is the best way to reach you?**

**A:** Email

**Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**

**A:** Yes

**Q: Attorney Title**

**A:** Ms

**Q: Attorney First Name**

**A:** Leah

**Q: Attorney Last Name**

**A:** Judge

**Q: Attorney Firm Name**

**A:** The Norton Law Firm P.C.

**Q: Attorney Street Address**

**A:** 300 Frank H. Ogawa Plaza

**Q: Attorney Address (Continued)**

**A:** Suite 450

MC 0035

Page 4 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Attorney Zip / Postal Code**
**A:** 94612

**Q: Attorney City**
**A:** OAKLAND

**Q: Attorney State / Province**
**A:** CA

**Q: Attorney Country**
**A:** US

**Q: Attorney Work Telephone**
**A:** 510-906-4919

**Q: Attorney Email Address**
**A:** ljudge@nortonlaw.com

**Q: Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?**
**A:** No

**Q: Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?**
**A:** No

**Q: Has anyone taken steps to prevent you from reporting this violation to the SEC?**
**A:** Yes

MC 0036

Page 5 of 9

**Tips, Complaints, and Referrals**

Summary Page - Submitted Externally

**Q: If you answered "Yes," please provide details.**

**A:** Holbrook Holdings threatened to sue Mr. Cohodes for defamation in connection with Mr. Cohodes's criticisms of Holbrook. On November 8, 2024, Holbrook filed a lawsuit against Mr. Cohodes in the District of Montana, alleging defamation. The case is styled Holbrook Holdings, Inc. v. Marc Cohodes, Case No. CV-24-175-BU-ITJ (D. Mt.). Mr. Cohodes has not yet been served. Over the course of the last year, Mr. Cohodes has tweeted his concerns about Holbrook, directing the tweets to, among others, "@SECGov." As detailed in the attached substantive submission, Mr. Cohodes has also been discussing Holbrook with an SEC enforcement attorney since August 2024. Mr. Cohodes believes that Holbrook's threats of litigation--and now, actual litigation--is in part designed to silence Mr. Cohodes and prevent him from further cooperating with the SEC, both in connection with any investigation of Holbrook, and in connection with the SEC's ongoing investigation of B. Riley Financial.

**Q: Are documents or other information being submitted that could potentially identify the whistleblower?**

**A:** Yes

**Q: Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.**

**A:** The attached substantive submission identifies Mr. Cohodes by name. Mr. Cohodes does not request anonymity.

**Q: Does the whistleblower want to be eligible to apply for a whistleblower award?**

**A:** Yes

**Q: 1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?**

**A:** No

**Q: 2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(52))?**

**A:** No

**Tips, Complaints, and Referrals**

Summary Page - Submitted Externally

**Q: 3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**

**A:** No

**Q: 4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?**

**A:** No

**Q: 5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**

**A:** No

**Q: 6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?**

**A:** Yes

**Q: If the answer to the question is "Yes," please provide details.**

**A:** Mr. Cohodes has been informally discussing his concerns about Holbrook with SEC enforcement attorney Jennifer Calabrese since August 2024. This is unconnected to any formal "request, inquiry or demand," such as a subpoena, which is what Mr. Cohodes understands the question to ask.

**Q: 7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**

**A:** No

**Q: 8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?**

**A:** No

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

Q: I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.

A: Agree

MC 0039

Page 8 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

## Documents

| Document Name | Document Type |
|---|---|
| 2024.11.12 -TCR re Holbrook Holdings.pdf | application/pdf |

MC 0040



Leah Judge
ljudge@nortonlaw.com
510-906-4919

November 12, 2024

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, D.C. 20549

**Re:  TCR Concerning Holbrook Holdings, Inc. (Related to TCRs No. 17013-051-624-477 and 17253-741-928-245).**

To Whom It May Concern:

I make this submission concerning Holbrook Holdings, Inc. ("Holbrook") on behalf of my client Marc Cohodes.  The submission is related to two prior TCRs submitted jointly by Mr. Cohodes and James Gibson, also my client.  Those TCRs concern B. Riley Financial, Inc. (TCR No. 17013-051-624-477) and Marcum LLP (17253-741-928-245).  Both Messrs. Gibson and Cohodes hold short positions in B. Riley's stock.

Holbrook is a financial advisory firm that manages two mutual funds: the Holbrook Income Fund (HOBIX), launched in 2016, and the Holbrook Structured Income Fund, launched in 2022.  The Holbrook Income Fund holds unsecured bonds issued by B. Riley (Nasdaq: RILY). It also holds unsecured bonds issued by Babcock & Wilcox (NYSE: BW) and Synchronoss Technologies (Nasdaq: SNCR).  Until September 2024, BW comprised about 32% of B. Riley's portfolio and Synchronoss comprised about 12% of B. Riley's Portfolio.  In short, my client believes that Holbrook's concentrated position in unsecured bonds issued by RILY, BW, and SNCR, coupled with Holbrook's misleading representations to its investors about those securities, warrant investigation of Holbrook.

As detailed in previously lodged TCRs, since at least November 2023 Messrs. Gibson and Cohodes have been investigating B. Riley and its ties to Brian Kahn, an unindicted co-conspirator in the fraud perpetrated by Prophecy Asset Management.[1]  Among other transactions, the TCRs specifically detailed my clients' concerns with B. Riley's August 2023 leveraged buyout of The Franchise Group (FRG), where Kahn had served as CEO since 2019. The TCRs explained that FRG's assets were implicated in the Prophecy Fraud; that FRG's credit

---

[1] *See* SEC Press Release, *SEC Charges President/CCO of Prophecy Asset Management Advisory Firm with Multi-Year Fraud* (Nov. 2, 2023), *available at* https://www.sec.gov/newsroom/press-releases/2023-231; DOJ Press Release, *Former Top Executive of Investment Fund Admits $294 Million Securities Fraud Conspiracy* (Nov. 2, 2023), *available at* https://www.justice.gov/usao-nj/pr/former-top-executive-investment-fund-admits-294-million-securities-fraud-conspiracy

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612      MC 0041

November 12, 2024
Page 2

rating had been downgraded; and that B. Riley had pledged FRG receivables as collateral for major loans. All of this called into question the financial stability of B. Riley and the accuracy of its representations to shareholders.

Doubling down on the fraud, B. Riley issued materially misleading financial statements that *marked up* the value of its FRG assets in April 2024. Then in August 2024, B. Riley acknowledged that it would in fact report $435 to 475 million in quarterly losses related to FRG's performance. At the same time, B. Riley and its founder also disclosed that they had received subpoenas form the SEC. FRG declared bankruptcy last week. To date, B. Riley has not filed either its Q2 or Q3 earnings reports. As the financial implications of B. Riley's entanglement with the Kahn enterprise has become clear, the market has responded accordingly with RILY stock falling more than 70% since November 2023.

Notwithstanding B. Riley's public downward spiral, Holbrook Income Fund maintains outsized positions in B. Riley baby bonds. Bloomberg data from Q2 of 2024 shows that Holbrook held **35% of outstanding** Riley 5.50% Senior Notes due 2026 (Nasdaq: RILYK) and **13% of outstanding** Riley 5% Senior Notes due 2026 (Nasdaq: RILYG). The same data shows Holbrook holds **33.8% of outstanding** Babcock & Wilcox 8.125% Senior Notes due 2026 (NYSE: BWSN); **13.1% of outstanding** Babcock & Wilcox 6.50% Senior Notes due 2026 ((NYSE: BWNB); and **25.59% of outstanding** Synchronoss 8.375% Senior Notes due 2026 (Nasdaq: SNCRL).



Mr. Cohodes is a financial expert and professional investor. In his experience, it is highly unusual for a mutual fund to hold such large positions in the baby bonds of a company whose creditworthiness is obviously questionable. Baby bonds are unsecured; in the event of bankruptcy, B. Riley has at least $600 million of secured debt it would need to repay before baby bond holders received any sort of payment.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0042

November 12, 2024
Page 3

But Holbrook is not simply holding an unwisely large position in the unsecured debt of B. Riley and associated companies. It is also misleading its investors about the nature of these holdings. In both its 2023 and 2024 Forms N-CSR, Holbrook categorized its RILY, BW, and SNCR baby bonds as "corporate bonds" on its Schedule of Investments.[2] Although Holbrook discloses that it classifies baby bonds as corporate bonds,[3] a corporate bond is different in kind from a baby bond. Corporate bonds are secured corporate debt; it is much less risky to own secured corporate bonds than unsecured baby bonds. By hiding its significant baby bond holdings among its corporate bonds, Holbrook is intending to convey to its investors—retail investors—that its portfolio is less risky than it is.

This conclusion is reinforced by the fact that Holbrook has another category of investments in which it could appropriately group its baby bonds: preferred stock.[4] Holders of preferred stock—just like holders of baby bonds—are behind corporate bondholders during bankruptcy or liquidation. Like baby bonds, preferred stocks are higher risk securities than corporate bonds. By deceptively lumping in baby bonds with "corporate bonds," Holbrook can misleadingly convey to investors that its portfolio is less concentrated in high-risk securities. To wit, in 2023 Holbrook represented that preferred stock comprised only 3.7% of its portfolio, while "corporate bonds" comprised 53.4%.[5] And in 2024, Holbrook represented that preferred stock comprised only 4% of its portfolio, while "corporate bonds" comprised 48%.[6]

In fact, secured, corporate bonds comprised a far smaller portion of Holbrook's holdings in both 2023 and 2024. In 2023, Holbrook represented that it held approximately $575 million in "corporate bonds," but its misclassified RILY, BW, and SNCR baby bonds accounted for *$71 million of this total*—12%.[7] Likewise, in 2024 Holbrook represented that it held approximately $728 million in "corporate bonds," but its misclassified RILY, BW, and SNCR baby bonds accounted for *$146 million* of this total—20%.[8] And this accounts only for Holbrook's misclassification of RILY, BW, and SNCR baby bonds. A quick look shows that Holbrook has also improperly lumped unsecured debt from other issuers into the "corporate bond" Schedule of Investments in both its 2023 and 2024 Form N-CSRs.

Holbrook further tells on itself by stating the number of baby bonds it holds in the "Principal Amount ($)" column of its Schedule of Investments. In both Holbrook's 2023 and 2024 Forms N-CSR, the Schedule of Investments has six columns: "Principal Amount ($)"; asset name; "Spread"; "Coupon Rate (%)"; "Maturity"; and "Fair Value." For example, in its 2024

---

[2] Holbrook Holdings 2023 Form N-CSR at pp. 9-11 (Apr. 30, 2023), *available at* https://www.sec.gov/Archives/edgar/data/1552947/000158064223003586/holbrook_ncsr.htm; Holbrook Holdings 2024 Form N-CSR at pp. 10-12 (Apr. 30, 2024), *available at* https://www.sec.gov/Archives/edgar/data/1552947/000158064224005610/holbrook_ncsra.htm

[3] Holbrook 2023 Form N-CSR at p. 27; Holbrook 2024 Form N-CSR at p. 28.

[4] Holbrook 2023 Form N-CSR at p. 5; Holbrook 2024 Form N-CSR at p. 6.

[5] Holbrook 2023 Form N-CSR at pp. 5 & 9.

[6] Holbrook 2024 Form N-CSR at pp. 6 & 10.

[7] Holbrook 2023 Form N-CSR at pp. 9-12.

[8] Holbrook 2024 Form N-CSR at pp. 10-13.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0043

November 12, 2024
Page 4

Form N-CSR, Holbrook provides the following information about its RILY, BW, and SNCR unsecured bonds:[9]

| "Principal Amount ($)" | Asset | Spread | Coupon Rate (%) | Maturity | Fair Value |
|---|---|---|---|---|---|
| 2,063,398 | B Riley Financial, Inc | n/a | 5.5000 | 03/03/25 | 45,043,979 |
| 1,653,842 | Babcock & Wilcox Enterprises, Inc. | n/a | 8.1250 | 02/28/26 | 31,422,997 |
| 749,541 | Babcock & Wilcox Enterprises, Inc. | n/a | 6.5000 | 12/31/26 | 12,427,390 |
| 1,858,470 | B Riley Financial, Inc. | n/a | 5.000 | 12/31/26 | 35,756,962 |
| 1,121,767 | Synchronoss Technologies, Inc | n/a | 8.3750 | 06/30/26 | 23,557,107 |

The Q2 2024 Bloomberg data included above (incorporated in the chart below), confirms that the "Principal Amount ($)" actually represents the number of baby bonds held:

| Baby Bond | "Principal Amount ($)" (Holbrook 2024 Form N-CS; current through Apr. 30, 2024 | Bloomberg Q2 Data on HOBIX Position (current through June 30, 2024) |
|---|---|---|
| RILY - 5.5% Note | 2,063,398 | 2,100,636 |
| BW - 8.125% Note | 1,653,842 | 1,691,310 |
| BW - 6.5% Note | 749,541 | 793,069 |
| RILY - 5% Note | 1,858,470 | 1,669,483 |
| SNCR – 8.375% Note | 1,121,767 | 1,242,610 |

Moreover, a quick glance at Holbrook's 2023 and 2024 Schedule of Investments shows that when Holbrook in fact holds a corporate bond, it does not make the same "mistake" in the "Principal Amount ($)" column—it provides the value of the asset, not the quantity it holds.

In summary, based on my Mr. Cohodes's extensive experience with financial markets and the evidence of misrepresentation presented above, he believes it is extremely suspicious that 20% of Holbrook Income Fund's "corporate bonds" are, in fact, B. Riley-related junk bonds. Mr. Cohodes has been discussing Holbrook with SEC enforcement attorney Jennifer Calabrese since August 2024, when he first disclosed his concerns about Holbrook. Mr. Cohodes is

---

[9] Holbrook 2024 Form N-CSR at pp. 10-12.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0044

November 12, 2024
Page 5

prepared to provide further assistance to the SEC and any other law enforcement agency in an investigation of Holbrook.

Sincerely,

Leah Judge
THE NORTON LAW FIRM P.C.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0045



Leah Judge
ljudge@nortonlaw.com
510-906-4919

May 19, 2025

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, D.C. 20549

> ### Re: Supplemental TCR Concerning Holbrook Holdings, Inc. (Related to TCRs No. 17314-902-557-371; 17013-051-624-477; 17253-741-928-245; TCR No. 17358-507-891-255)

To Whom It May Concern:

I make this supplemental submission concerning Holbrook Holdings, Inc. ("Holbrook") on behalf of my client Marc Cohodes. The submission supplements TCR No. 17314-902-557-371, submitted on November 12, 2024 ("First Holbrook Submission"). The First Holbrook Submission is attached here as **Exhibit A**. Mr. Cohodes's Holbrook submissions are also related to three additional TCRs submitted jointly by Mr. Cohodes and James Gibson, also my client, concerning B. Riley Financial, Inc., Marcum LLP, and CBIZ, Inc.[1] Those submissions detailed B. Riley's questionable transactions with an unindicted co-conspirator in the fraud perpetrated by Prophecy Asset Management and B. Riley's issuance of materially misleading financial statements. Both Messrs. Gibson and Cohodes hold short positions in B. Riley's stock.

As explained in the First Holbrook Submission, Holbrook is a financial advisory firm that manages two mutual funds, including the Holbrook Income Fund (HOBIX). HOBIX holds large positions in B. Riley unsecured debt and at least two B. Riley-affiliated companies, Babcock & Wilcox (NYSE: BW) and Synchronoss Technologies (Nasdaq: SNCR). B. Riley owns nearly one-third of B&W's common stock,[2] and Synchronoss is also a B. Riley related party.[3]

The First Holbrook Submission explained why, based on my Mr. Cohodes's decades of experience in the industry, it was highly unusual for a mutual fund to hold such large positions in

---

[1] These three TCRs were submitted on November 30, 2023 (TCR No. 17013-051-624-477), September 3, 2024 (TCR No. 17253-741-928-245), and January 2, 2025 (TCR No. 17358-507-891-255).

[2] Babcock & Wilcox Annual Report at pp. 26-27 (Mar. 31, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001630805/000163080525000007/bw-20241231.htm

[3] Synchronoss Annual Report at p46 (Mar. 12, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001131554/000113155425000029/sncr-20241231.htm

May 19, 2025
Page 2

the unsecured debt of B. Riley, a company with obviously questionable creditworthiness. The submission also explained that Holbrook had misled its retail investors in its Form N-CSRs by lumping its unsecured debt in with corporate bonds, two securities with very different risk profiles. Indeed, at the time of the First Holbrook Submission in November 2024, approximately 20% of HOBIX's "corporate bonds" were, in fact, B. Riley-related junk bonds.

Events since November 2024 raise additional concerns about Holbrook's investments in, and relationship with, B. Riley and Riley-related parties. Evidence strongly suggests that Holbrook has manipulated the price of certain B. Riley unsecured bonds and the unsecured bonds issued by Riley-related B&W (and likely Synchronoss, too). To wit, it appears that Holbrook effectively cornered the market for RILYK, RILYG, BWSN, and BWNB unsecured bonds over the last 18 months, artificially propping up the price of this distressed debt and depressing its yield, only to be bailed out by B. Riley and Riley-backed B&W through private exchanges in March and May of this year.

As detailed in the First Holbrook Submission, HOBIX's position in four RILY and BW unsecured bonds—specifically RILYK, RILYG, BWSN, and BWNB—continued to grow through 2024. By January 31, 2025, HOBIX held **54.4% of outstanding RILYK**, up from 35% in Q3 2024, and **42.8% of outstanding BWSN**, up from 33.83% in Q3 2024. Attached as **Exhibit B** is a chart showing HOBIX's positions in RILYK, RILYG, BWSN, and BWNB from QI 2023 through March 31, 2025.

Extraordinarily, B. Riley announced on March 26, 2025 that an unidentified "investor" had agreed to exchange $123 million in outstanding unsecured bonds consisting of *$86 million in RILYK and $37 million RILYG* for $88 million in "newly issued 8.00% Senior Secured Second Lien Notes" and warrants to buy 351,000 common shares for $10.00 each over the next seven years.[4] Holbrook was the only "investor" with sufficient holdings in RILYG and RILYK to make this deal and B. Riley's April 1, 2025 8-K confirmed that HOBIX was, in fact, the counterparty to the transaction.[5] As shown in **Exhibit B**, HOBIX eliminated its position in RILYK and RILY G through the private placement.

Unsurprisingly, after Holbrook dumped its RILYK and RILYG holdings, the price of those securities fell dramatically. On March 26, the date of the private placement, RILYG closed at $12.61 and RILYK closed at $21.60. On May 16, RILYG closed at $7.70 and RILYK closed at $16.63—*a 39% and 25% loss in value, respectively.* By its terms, Riley offered the March 26 private placement only to Holbrook, leaving non-Holbrook investors holding securities worth significantly less with Holbrook out of the market it had propped up for so long.

---

[4] B. Riley Press Release, *B. Riley Financial Announces Private Bond Exchange to Reduce Debt by Approximately $35 Million* (Mar. 26, 2025), https://ir.brileyfin.com/2025-03-26-B-Riley-Financial-Announces-Private-Bond-Exchange-to-Reduce-Debt-by-Approximately-35-Million

[5] *See* B. Riley Form 8-K EX-10.4, Registration Rights Agreement (Marc. 26, 2025), https://www.sec.gov/Archives/edgar/data/1464790/000121390025027230/ea023597801ex10-4_briley.htm

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0047

May 19, 2025
Page 3

After closing its positions in RILYK and RILYG, Holbrook still held outsized positions in both BWSN and BWNB. However, as of May 12, 2025, it appears likely that this is no longer the case.

That day, B&W announced—just as Riley announced in March—that it had entered a private placement with "a limited number of noteholders" to exchange $131.8 million of B&W's existing unsecured debt for $100.8 million in newly issued notes.[6] The exchange consisted of $84 million in BWSN and $48 million in BWNB. Given Holbrook's disproportionately large positions in both BWSN and BWNB—holding 44.94% and 22.88%, respectively, of outstanding shares as of May 2—it is highly probable that Holbrook is one of the "noteholders" in the B&W private placement. As with RILYK and RILYG, Mr. Cohodes anticipates that the price of both BWSN and BWNB will fall dramatically once Holbrook is no longer propping them up.[7]

In short, based on his decades of experience and analysis of the data, Mr. Cohodes believes that Holbrook, together with B. Riley, has engaged in a market manipulation scheme to artificially inflate the prices of RILYK, RILYG, BWSN, and BWNB. As discussed, it is highly unusual for a mutual fund serving retail investors to hold outsized positions in baby bonds peddled by companies with obviously questionable creditworthiness. Indeed, B&W's auditors just issued a going concern opinion in the company's 2024 financials. Despite the obvious downward trajectory of both B. Riley and B&W over the past eighteen months, Holbrook continued to consolidate its position in the companies' unsecured debt while simultaneously misclassifying that debt in its SEC filings. *See* Exhibit A. Mr. Cohodes believes it is more than serendipitous that Holbrook has since scored exclusive private placements with Riley and (likely) B&W to offload those illiquid positions.

Holbrook's conduct with respect to the above-discussed securities should be investigated. Mr. Cohodes is prepared to provide further assistance to the SEC and any other law enforcement agency.

Sincerely,

Leah Judge
THE NORTON LAW FIRM P.C.

---

[6] Babcock & Wilcox Press Release, *Babcock & Wilcox Announces Private Bond Exchanges to Reduce Outstanding Debt, Lower Annual Interest Expense and Extend Debt Maturity to 2030* (May 12, 2025), https://www.babcock.com/home/about/corporate/news/babcock-and-wilcox-announces-private-bond-exchanges-to-reduce-outstanding-debt-lower-annual-interest-expense-and-extend-debt-maturity-to-2030

[7] Since May 12, the price of BWSN and BWNB have risen. The price of RILYK and RILYG also rose in the week following the March 26 announcement of the Holbrook private placement, before falling dramatically.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0048

# EXHIBIT A

MC 0049



Leah Judge
ljudge@nortonlaw.com
510-906-4919

November 12, 2024

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, D.C. 20549

> **Re:  TCR Concerning Holbrook Holdings, Inc. (Related to TCRs No. 17013-051-624-477 and 17253-741-928-245).**

To Whom It May Concern:

I make this submission concerning Holbrook Holdings, Inc. ("Holbrook") on behalf of my client Marc Cohodes.  The submission is related to two prior TCRs submitted jointly by Mr. Cohodes and James Gibson, also my client.  Those TCRs concern B. Riley Financial, Inc. (TCR No. 17013-051-624-477) and Marcum LLP (17253-741-928-245).  Both Messrs. Gibson and Cohodes hold short positions in B. Riley's stock.

Holbrook is a financial advisory firm that manages two mutual funds: the Holbrook Income Fund (HOBIX), launched in 2016, and the Holbrook Structured Income Fund, launched in 2022.  The Holbrook Income Fund holds unsecured bonds issued by B. Riley (Nasdaq: RILY). It also holds unsecured bonds issued by Babcock & Wilcox (NYSE: BW) and Synchronoss Technologies (Nasdaq: SNCR).  Until September 2024, BW comprised about 32% of B. Riley's portfolio and Synchronoss comprised about 12% of B. Riley's Portfolio.  In short, my client believes that Holbrook's concentrated position in unsecured bonds issued by RILY, BW, and SNCR, coupled with Holbrook's misleading representations to its investors about those securities, warrant investigation of Holbrook.

As detailed in previously lodged TCRs, since at least November 2023 Messrs. Gibson and Cohodes have been investigating B. Riley and its ties to Brian Kahn, an unindicted co-conspirator in the fraud perpetrated by Prophecy Asset Management.[1]  Among other transactions, the TCRs specifically detailed my clients' concerns with B. Riley's August 2023 leveraged buyout of The Franchise Group (FRG), where Kahn had served as CEO since 2019. The TCRs explained that FRG's assets were implicated in the Prophecy Fraud; that FRG's credit

---

[1] *See* SEC Press Release, *SEC Charges President/CCO of Prophecy Asset Management Advisory Firm with Multi-Year Fraud* (Nov. 2, 2023), *available at* https://www.sec.gov/newsroom/press-releases/2023-231; DOJ Press Release, *Former Top Executive of Investment Fund Admits $294 Million Securities Fraud Conspiracy* (Nov. 2, 2023), *available at* https://www.justice.gov/usao-nj/pr/former-top-executive-investment-fund-admits-294-million-securities-fraud-conspiracy

November 12, 2024
Page 2

rating had been downgraded; and that B. Riley had pledged FRG receivables as collateral for major loans. All of this called into question the financial stability of B. Riley and the accuracy of its representations to shareholders.

Doubling down on the fraud, B. Riley issued materially misleading financial statements that *marked up* the value of its FRG assets in April 2024. Then in August 2024, B. Riley acknowledged that it would in fact report $435 to 475 million in quarterly losses related to FRG's performance. At the same time, B. Riley and its founder also disclosed that they had received subpoenas form the SEC. FRG declared bankruptcy last week. To date, B. Riley has not filed either its Q2 or Q3 earnings reports. As the financial implications of B. Riley's entanglement with the Kahn enterprise has become clear, the market has responded accordingly with RILY stock falling more than 70% since November 2023.

Notwithstanding B. Riley's public downward spiral, Holbrook Income Fund maintains outsized positions in B. Riley baby bonds. Bloomberg data from Q2 of 2024 shows that Holbrook held **35% of outstanding** Riley 5.50% Senior Notes due 2026 (Nasdaq: RILYK) and **13% of outstanding** Riley 5% Senior Notes due 2026 (Nasdaq: RILYG). The same data shows Holbrook holds **33.8% of outstanding** Babcock & Wilcox 8.125% Senior Notes due 2026 (NYSE: BWSN); **13.1% of outstanding** Babcock & Wilcox 6.50% Senior Notes due 2026 ((NYSE: BWNB); and **25.59% of outstanding** Synchronoss 8.375% Senior Notes due 2026 (Nasdaq: SNCRL).



Mr. Cohodes is a financial expert and professional investor. In his experience, it is highly unusual for a mutual fund to hold such large positions in the baby bonds of a company whose creditworthiness is obviously questionable. Baby bonds are unsecured; in the event of bankruptcy, B. Riley has at least $600 million of secured debt it would need to repay before baby bond holders received any sort of payment.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0051

November 12, 2024
Page 3

        But Holbrook is not simply holding an unwisely large position in the unsecured debt of B. Riley and associated companies. It is also misleading its investors about the nature of these holdings. In both its 2023 and 2024 Forms N-CSR, Holbrook categorized its RILY, BW, and SNCR baby bonds as "corporate bonds" on its Schedule of Investments.[2] Although Holbrook discloses that it classifies baby bonds as corporate bonds,[3] a corporate bond is different in kind from a baby bond. Corporate bonds are secured corporate debt; it is much less risky to own secured corporate bonds than unsecured baby bonds. By hiding its significant baby bond holdings among its corporate bonds, Holbrook is intending to convey to its investors—retail investors—that its portfolio is less risky than it is.

        This conclusion is reinforced by the fact that Holbrook has another category of investments in which it could appropriately group its baby bonds: preferred stock.[4] Holders of preferred stock—just like holders of baby bonds—are behind corporate bondholders during bankruptcy or liquidation. Like baby bonds, preferred stocks are higher risk securities than corporate bonds. By deceptively lumping in baby bonds with "corporate bonds," Holbrook can misleadingly convey to investors that its portfolio is less concentrated in high-risk securities. To wit, in 2023 Holbrook represented that preferred stock comprised only 3.7% of its portfolio, while "corporate bonds" comprised 53.4%.[5] And in 2024, Holbrook represented that preferred stock comprised only 4% of its portfolio, while "corporate bonds" comprised 48%.[6]

        In fact, secured, corporate bonds comprised a far smaller portion of Holbrook's holdings in both 2023 and 2024. In 2023, Holbrook represented that it held approximately $575 million in "corporate bonds," but its misclassified RILY, BW, and SNCR baby bonds accounted for *$71 million of this total*—12%.[7] Likewise, in 2024 Holbrook represented that it held approximately $728 million in "corporate bonds," but its misclassified RILY, BW, and SNCR baby bonds accounted for *$146 million* of this total—20%.[8] And this accounts <u>only</u> for Holbrook's misclassification of RILY, BW, and SNCR baby bonds. A quick look shows that Holbrook has also improperly lumped unsecured debt from other issuers into the "corporate bond" Schedule of Investments in both its 2023 and 2024 Form N-CSRs.

        Holbrook further tells on itself by stating the <u>number</u> of baby bonds it holds in the "Principal Amount ($)" column of its Schedule of Investments. In both Holbrook's 2023 and 2024 Forms N-CSR, the Schedule of Investments has six columns: "Principal Amount ($)"; asset name; "Spread"; "Coupon Rate (%)"; "Maturity"; and "Fair Value." For example, in its 2024

---

[2] Holbrook Holdings 2023 Form N-CSR at pp. 9-11 (Apr. 30, 2023), *available at* https://www.sec.gov/Archives/edgar/data/1552947/000158064223003586/holbrook_ncsr.htm; Holbrook Holdings 2024 Form N-CSR at pp. 10-12 (Apr. 30, 2024), *available at* https://www.sec.gov/Archives/edgar/data/1552947/000158064224005610/holbrook_ncsra.htm

[3] Holbrook 2023 Form N-CSR at p. 27; Holbrook 2024 Form N-CSR at p. 28.

[4] Holbrook 2023 Form N-CSR at p. 5; Holbrook 2024 Form N-CSR at p. 6.

[5] Holbrook 2023 Form N-CSR at pp. 5 & 9.

[6] Holbrook 2024 Form N-CSR at pp. 6 & 10.

[7] Holbrook 2023 Form N-CSR at pp. 9-12.

[8] Holbrook 2024 Form N-CSR at pp. 10-13.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0052

November 12, 2024
Page 4

Form N-CSR, Holbrook provides the following information about its RILY, BW, and SNCR unsecured bonds:[9]

| "Principal Amount ($)" | Asset | Spread | Coupon Rate (%) | Maturity | Fair Value |
|---|---|---|---|---|---|
| 2,063,398 | B Riley Financial, Inc | n/a | 5.5000 | 03/03/25 | 45,043,979 |
| 1,653,842 | Babcock & Wilcox Enterprises, Inc. | n/a | 8.1250 | 02/28/26 | 31,422,997 |
| 749,541 | Babcock & Wilcox Enterprises, Inc. | n/a | 6.5000 | 12/31/26 | 12,427,390 |
| 1,858,470 | B Riley Financial, Inc. | n/a | 5.000 | 12/31/26 | 35,756,962 |
| 1,121,767 | Synchronoss Technologies, Inc | n/a | 8.3750 | 06/30/26 | 23,557,107 |

The Q2 2024 Bloomberg data included above (incorporated in the chart below), confirms that the "Principal Amount ($)" actually represents the number of baby bonds held:

| Baby Bond | "Principal Amount ($)" (Holbrook 2024 Form N-CS; current through Apr. 30, 2024 | Bloomberg Q2 Data on HOBIX Position (current through June 30, 2024) |
|---|---|---|
| RILY - 5.5% Note | 2,063,398 | 2,100,636 |
| BW - 8.125% Note | 1,653,842 | 1,691,310 |
| BW - 6.5% Note | 749,541 | 793,069 |
| RILY - 5% Note | 1,858,470 | 1,669,483 |
| SNCR – 8.375% Note | 1,121,767 | 1,242,610 |

Moreover, a quick glance at Holbrook's 2023 and 2024 Schedule of Investments shows that when Holbrook in fact holds a corporate bond, it does not make the same "mistake" in the "Principal Amount ($)" column—it provides the value of the asset, not the quantity it holds.

In summary, based on my Mr. Cohodes's extensive experience with financial markets and the evidence of misrepresentation presented above, he believes it is extremely suspicious that 20% of Holbrook Income Fund's "corporate bonds" are, in fact, B. Riley-related junk bonds. Mr. Cohodes has been discussing Holbrook with SEC enforcement attorney Jennifer Calabrese since August 2024, when he first disclosed his concerns about Holbrook. Mr. Cohodes is

---

[9] Holbrook 2024 Form N-CSR at pp. 10-12.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0053

November 12, 2024
Page 5

prepared to provide further assistance to the SEC and any other law enforcement agency in an investigation of Holbrook.

Sincerely,

Leah Judge
THE NORTON LAW FIRM P.C.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0054

# EXHIBIT B

MC 0055

| HOLBROOK'S HOLDINGS OF RELEVANT UNSECURED BONDS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | 1/31/25[1] | 3/26/25[2] | Q1 2025 |
| RILYK (B. RILEY FINANCIAL INC.) | % Out | 23.52% | 24.79% | 18.25% | 29.27% | 31.15% | 35.01% | 35.01% | 50.18% | 54.4% | 58.5% | 0% |
| | Position | 1,411,224 | 1,487,190 | 1,094,823 | 1,755,978 | 1,869,277 | 2,100,636 | 2,100,636 | 3,011,018 | 3,267,602 | ~3.51m | 0 |
| BWSN (BABCOCK & WILCOX ENTERPRISES INC.) | % Out | 6.18% | 8.27% | 7.83% | 24.11% | 24.78% | 33.83% | 33.83% | 40.84% | 42.8% | n/a | ~44.9% |
| | Position | 308,765 | 413,748 | 391,606 | 1,205,701 | 1,239,101 | 1,691,310 | 1,691,310 | 2,042,160 | 2,140,770 | n/a | 2,246,869 |
| SNCRL (SYNCHRONOSS TECHNOLOGIES INC.) | % Out | 8.27% | 10.62% | 12.33% | 19.71% | 20.87% | 25.59% | 25.59% | 36.39% | 38.5% | n/a | ~40.4% |
| | Position | 401,383 | 515,693 | 598,651 | 956,910 | 1,013,129 | 1,242,610 | 1,242,610 | 1,766,756 | 1,872,853 | n/a | 1,938,200 |
| RILYG (B. RILEY FINANCIAL INC.) | % Out | 8.45% | 8.32% | 6.98% | 12.09% | 13.83% | 13.91% | 13.91% | 8.22% | 10.1% | 12.2% | 0% |
| | Position | 1,013,874 | 997,951 | 837,041 | 1,451,365 | 1,659,443 | 1,669,483 | 1,669,483 | 986,507 | 1,220,043 | ~1.47m | 0 |
| BWNB (BABCOCK & WILCOX ENTERPRISES INC.) | % Out | 1.25% | 1.86% | 2.76% | 8.31% | 8.74% | 13.10% | 13.10% | 18.67% | 21.3% | n/a | ~23.1% |
| | Position | 75,569 | 112,687 | 167,260 | 503,109 | 529,384 | 793,069 | 793,069 | 1,130,756 | 1,281,323 | n/a | 1,385,455 |

---

[1] HOBIX's Unaudited Schedule of Investments (Form NQ) dated 1/31/25 is the source of the 1/31/25 data (sec.gov/Archives/edgar/data/1552947/000175272425072320/holbrook_nq.htm)
[2] 3/26/25 is the date of the Riley-Holbrook private placement; position assumes $25 par value of both RILYK and RILYG.

MC 0056



**U.S. Securities and Exchange Commission**

# Tips, Complaints, and Referrals

## Summary Page - After Submission

### This export was generated on Mon, May 19, 2025 at 06:36:32 PM EDT

The Complaint Form questions that you responded to, the answers you entered for those questions, and any documents that you have uploaded to this TCR are listed below.

### Submission Number: 17476-941-913-307

Thank you for contacting the United States Securities and Exchange Commission. This automated response with your Submission Number confirms that your submission has been received successfully. Please write down your Submission Number or print/save a copy of your submission for future reference. Once you navigate away from this page you will not be able to get back to your submission.

We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

MC 0057

## What is your complaint about?

**Please select the option that best describes your complaint.**
Manipulation of a security

**Is this supplemental information to a previous complaint?**
Yes

**What is the Submission Number of the previous complaint?**
17314-902-557-371

**In your own words, describe the conduct or situation you are complaining about.**
Please see attached summary.

# Who are you complaining about?

## Person or Firm 1

**Are you complaining about a person or a firm?**
Firm

**Firm Name**
Holbrook Holdings, Inc.

# Which investment products are involved?

**Select the type of product involved in your complaint.**
Funds (e.g., ETFs, mutual funds, private equity funds, hedge funds)

# About you

**Are you filing this tip under the SEC's whistleblower program?**
Yes

**Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**
No

MC 0058

**Title**
Mr

**First Name**
Marc

**Last Name**
Cohodes

**Email Address**
mcohodes@gmail.com

**What is the best way to reach you?**
Email

**Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**
Yes

**Attorney Title**
Ms

**Attorney First Name**
Leah

**Attorney Last Name**
Judge

**Attorney Firm Name**
The Norton Law Firm PC

**Attorney Street Address**
300 Frank H. Ogawa Plaza

**Attorney Address (Continued)**
Suite 450

**Attorney Country**
United States

**Attorney Zip / Postal Code**
94612

**Attorney City**
OAKLAND

MC 0059

**Attorney State / Province**
CA

**Attorney Work Telephone**
510-906-4919

**Attorney Email Address**
ljudge@nortonlaw.com

**Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?**
No

**Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?**
No

**Has anyone taken steps to prevent you from reporting this violation to the SEC?**
Yes

**If you answered "Yes," please provide details.**
Holbrook Holdings threatened to sue Mr. Cohodes for defamation in connection with Mr. Cohodes's criticisms of
Holbrook. On November 8, 2024, Holbrook filed a lawsuit against Mr. Cohodes in the District of Montana, alleging
defamation. The case is styled Holbrook Holdings, Inc. v. Marc Cohodes, Case No. CV-24-175-BU-ITJ (D. Mt.). Over the course of the 18 months, Mr. Cohodes has tweeted his concerns about Holbrook, directing at least some of the tweets to, among others, "@SECGov." Mr. Cohodes has also been discussing Holbrook with an SEC enforcement attorney since August 2024. Mr. Cohodes believes that Holbrook's lawsuit is designed to silence him and prevent him from further cooperating with the SEC, both in connection with any investigation of Holbrook, and in connection with the SEC's ongoing investigation of B. Riley Financial.

**Are documents or other information being submitted that could potentially identify the whistleblower?**
Yes

MC 0060

**Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.**

The attached substantive submission identifies Mr. Cohodes by name. Mr. Cohodes does not request anonymity.

**Does the whistleblower want to be eligible to apply for a whistleblower award?**

Yes

**1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?**

No

**2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section §78c(a)(52))?**

No

**3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**

No

**4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?**

No

**5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**

No

MC 0061

**6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?**

Yes

**If the answer to the question is "Yes," please provide details.**

Mr. Cohodes has been informally discussing his concerns about Holbrook with SEC enforcement attorney Jennifer Calabrese since August 2024. However, this is unconnected to any formal "request, inquiry or demand," such as a subpoena, which is what Mr. Cohodes understands the question to ask.

**7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**

No

**8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?**

No

**I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.**

Agree

## Attach Files

MC 0062

## Upload Document(s)

- *2025.05.19 - Supplemental TCR re Holbrook.pdf* (160.92 KB)

- *Exhibit A - 2024.11.12 - TCR re Holbrook (No. 17314-902-557-371).pdf* (479.57 KB)

- *Exhibit B - Holbrook relevant bond holdings.pdf* (144.4 KB)

MC 0063

the
NORTON
law firm pc

Leah Judge
ljudge@nortonlaw.com
510-906-4919

September 3, 2024

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, D.C. 20549

**Re:  Supplemental TCR Concerning Marcum LLP (Related to TCR No. 17013-051-624-477)**

To Whom It May Concern:

On behalf of my clients James Gibson and Marc Cohodes, I have enclosed a Supplemental Submission that describes the concerning actions of Marcum LLP in connection with its 2023 audit of B. Riley Financial, Inc. ($RILY).  Both Messrs. Gibson and Cohodes hold short positions in B. Riley's stock.

The enclosed Supplemental Submission consists of a detailed letter provided by Messrs. Gibson and Cohodes to Marcum's executive leadership and B. Riley audit team via email on August 18, 2024.  The letter outlines Marcum's complicity in the issuance of B. Riley's misleading annual financial statements on April 24, 2024, recounting in detail the myriad red flags that Messrs. Gibson, Cohodes, and others repeatedly brought to Marcum's attention over the course of the last nine months.  Those Marcum-audited statements vastly overstated the value of certain B. Riley assets associated with Brian Kahn, an unindicted co-conspirator in a large-scale fraud involving Prophecy Asset Management.  As the Supplemental Submission details, Marcum could not have approved these valuations had it discharged its audit responsibilities consistently with fundamental PCAOB accounting procedures.

This submission supplements Messrs. Gibson and Cohodes's original submission dated November 30, 2023 (TCR No. 17013-051-624-477).  The Original Submission consisted of a letter sent by my clients on November 28, 2023 to James LaRocca, Marcum's then partner-in-charge of B. Riley's 2023 audit.  Four weeks before Messrs. Gibson and Cohodes wrote to Marcum, John Hughes—a former compliance officer at the hedge fund Prophecy Asset Management—pled guilty to conspiring to defraud investors of at least $294 million in a massive Ponzi scheme.  Bloomberg quickly reported that Kahn was one of Hughes's unindicted co-conspirators referenced throughout both DOJ and SEC charging documents.  Messrs. Gibson and Cohodes's November 2023 letter sought to alert Marcum to the risks of serious fraud and material misstatements or omissions affecting the audit arising from B. Riley's significant financial dealings with Kahn and Kahn-affiliated entities.

September 3, 2024
Page 2

Among other suspect transactions, the November 2023 letter specifically directed Marcum's attention to B. Riley's August 2023 leveraged buyout of The Franchise Group (FRG), where Kahn had served as CEO since 2019. My clients warned Marcum that FRG's assets were implicated in the Prophecy Fraud; that FRG's credit rating had recently been downgraded; and that B. Riley had pledged FRG receivables as collateral for major loans. The November 2023 letter also highlighted B. Riley's dealings with Vintage Capital Management—a hedge fund specifically identified in the Hughes SEC charges as receiving ill-gotten proceeds from the Prophecy Fraud and engaging in sham transactions and round tripping designed to fool Prophecy's auditors.

In the months following the November 2023 letter (and Original Submission), Messrs. Gibson and Cohodes continued to provide information to Marcum that both substantiated and compounded the risks Marcum needed to assess to ensure the adequacy of its audit. For example, in December 2023 B. Riley disclosed to investors that it loaned $201 million to Vintage Capital—a loan B. Riley had previously concealed as simply a "Consumer / Retail" loan. In February 2024, Messrs. Gibson and Cohodes flagged to Marcum that reputable financial news outlets had reported that B. Riley made ten additional previously undisclosed loans to Kahn and Kahn-controlled entities between 2018 and 2023, and that a major B. Riley lender (Nomura) had been advised to write down a large loan to B. Riley because the collateral used to secure that loan was likely tainted by the Prophecy Fraud. And in March 2024, Messrs. Gibson and Cohodes provided Marcum with evidence showing that the former COO of Vintage Capital had simultaneously been employed by B. Riley, and that B. Riley had made undisclosed loans to Samjor Family LLP—an entity described by the SEC in its charges against Hughes as having "no assets or operations," merely serving as a vehicle for sham, round-trip transactions.

Messrs. Gibson and Cohodes provided all the preceding information to the SEC and various SEC attorneys, including enforcement attorney Jennifer Calabrese. Ms. Calabrese interviewed Messrs. Gibson and Cohodes on May 21, 2024.

It is implausible that Marcum properly considered any of this information when it signed off on B. Riley's 2023 financial statements. Those statements—belatedly filed on April 24, 2024—*marked up the value of FRG assets*. On August 12, 2024—a mere four months later—B. Riley warned it would likely *report $435 to 475 million in quarterly losses* "the overwhelming majority of which relate to performance of our investment in Franchise Group, Inc. ("FRG") and our Vintage Capital loan receivable, which is primarily collateralized by equity interests in FRG."[1]

Investors continue to rely on Marcum's deficient audit opinion because B. Riley has yet to issue corrected financial statements or even a 10-Q. Just last year, both the Commission and

---

[1] B. Riley, Form 8-K (Aug. 12, 2024)
https://www.sec.gov/ix?doc=/Archives/edgar/data/1464790/000121390024067363/ea0210917-8k_briley.htm

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612          MC 0065

September 3, 2024
Page 3

the PCAOB sanctioned Marcum for "systemic quality control failures and violations of audit standards" throughout the firm.  Marcum's reckless (at best) audit of B. Riley demonstrates that quality control deficiencies remain unaddressed.  It is imperative that the Commission continue investigating Marcum's dealings with B. Riley.  Messrs. Gibson and Cohodes stand ready to assist the Commission's investigation.

Sincerely,

Leah Judge
THE NORTON LAW FIRM, P.C.

300 Frank H. Ogawa Plaza, Suite 450, Oakland, California 94612

MC 0066

# Supplemental Submission

MC 0067

**August 18, 2024**

*Via E-Mail*

Dear Marcum Executives & Audit Team,

We are writing to you with material information relevant to your firm's audits and interim reviews of B. Riley Financial including the ongoing risks of serious fraud, material misstatements, and/or omissions impacting your audits of this issuer.   This letter provides additional information that merits your urgent consideration under PCAOB audit standards including AS 2401 (Consideration of Fraud in a Financial Statement Audit), AS 2405 (Illegal Acts by Clients), AS 2410 (Related Parties), AS2805 (Management Representations), AS2905 (Subsequent Discovery of Facts Existing at the Date of the Auditor's Report) and AS 2415 (Consideration of an Entity's Ability to Continue as a Going Concern).

Last week, B. Riley warned it would likely report ***$435-475 million*** in quarterly losses largely stemming from its investment in Franchise Group and its giant related loans to the Kahn Enterprise.  Bloomberg news reported that B. Riley is now the subject of federal investigations into wide ranging issues including B. Riley's disclosures, "movement between companies of receivables due from cash strapped retail customers whose repayment might be doubtful", as well as securities trading and interactions with the Kahn Enterprise. B. Riley stated it has received subpoenas from the SEC and that it would not be able to provide investors with its financials or make its 10-Q filing on a timely basis because it was still struggling to value its assets.  S&P further downgraded the Franchise Group debt in late July citing deteriorating operating performance, a potential covenant breach, and issued an "expectation of negligible recovery" for the 2nd lien term loan in the event of default (which suggests to us that Franchise Group equity is probably worthless).  The quotational value of both the Franchise Group's first and second lien debt have plunged dramatically in value, both of which are observable inputs reinforcing the likelihood that B. Riley's investment in Franchise Group and its related loan to Kahn likely have little, if any, value.

These developments are extremely problematic because we specifically and repeatedly warned your firm about these exact circumstances via voluminous letters and documents that we sent to you during the course of your FY 2023 audit of B. Riley.   Overwhelming evidence and observable inputs available to Marcum during its audit demonstrated that the Franchise Group and B. Riley's loan to the Kahn Enterprise was distressed and impaired --- several examples include:

1. S&P's November 2023 downgrade of Franchise Group which cited "significant margin deterioration", "weakening cash flow", "interested coverage is very thin", "we believe the capital structure is unsustainable".

2. The falling quotational value of Franchise Group's first lien term loan in the market.

3. Kahn's status as an alleged co-conspirator in a giant Ponzi scheme and his subsequent exit as CEO of the Franchise Group

4. Multiple reports and documents alleging that Kahn was in default to financial promises made to victims of the Prophecy Ponzi Scheme involving the same collateral purportedly securing B. Riley's loans to Kahn.

1

MC 0068

5. Evidence that B. Riley had engaged in a series of previously undisclosed transactions with the Kahn Enterprise that B. Riley's management concealed from investors in materials and that the Kahn Enterprise may have functioned as an undisclosed related party of B. Riley.

Yet B. Riley's audited 2023 financials actually ***marked up*** the purported value of the company's Franchise Group investment (i.e recorded a gain on this collapsing company) and reported no losses on its giant and previously undisclosed Payment-in-Kind loan to the Kahn Enterprise which even included an additional $10 million uncollateralized loan that B. Riley extended to Kahn in December 2023.  Shockingly, **Marcum signed off on these clearly fictitious asset valuations** by issuing an audit opinion dated April 23, 2024 claiming that "we conducted our audits in accordance with the standards of the PCAOB" and concluding that "the financial statements present fairly, in all material respects, the financial position of the company".

Unfortunately, unsuspecting investors who relied on Marcum's audit opinion have now *suffered devastating losses in B. Riley securities* triggered by revelations of the truth that B. Riley's investments in the Franchise Group and loans to the Kahn Enterprise are potentially worthless. **We therefore struggle to understand how Marcum could have possibly followed all required PCAOB procedures during its audits of B. Riley because, had it done so, your firm never would have endorsed B. Riley's wildly inflated valuations several months ago despite overwhelming evidence these assets had become troubled by rapidly deteriorating operating performance and impairments created by Kahn's status as an alleged Ponzi Scheme Co-Conspirator.** Because some of the information that we sent Marcum was submitted to Marcum's attorneys, we are sending this letter to numerous Marcum parties to ensure that all appropriate parties at your firm have possession of the relevant facts and information to address this extremely important matter and urgent investor protection issue.

Even though Marcum's apparent failed audits of B. Riley may expose your firm to large potential open-ended liabilities from investors who have been damaged, Marcum remains a key gatekeeper with important professional responsibilities to follow all PCAOB procedures and prevent investors from suffering further harm. It also must comply with the terms of its settlement agreements related to the 2023 SEC and PCAOB enforcement actions against it as well as Marcum's probation with the California Board of Accountancy.  We believe recent events have now triggered a series of PCAOB audit procedures that Marcum **must act promptly to follow**.

First, AS 4105 (Reviews of Interim Financial Information) requires the auditor to perform inquiries "concerning an entity's ability to continue as a going concern" as part of its required quarterly interim reviews. **The combination of B. Riley's massive recent losses, giant debt load relative to declining operating cash flows, decisively negative tangible equity, and the company's own admission it has fallen outside of its leverage ratios renders it self-evident that there is substantial doubt about B. Riley's ability to continue operating as a going concern**.  Indeed AS 2415 (Consideration of an Entity's Ability to Continue as a Going Concern) outlines a series of conditions and events that appear to have been triggered by recent developments including various items described in "negative trends" , "indications of possible financial difficulties", "internal matters", and "external matters" . We therefore believe Marcum must conduct a detailed review into B. Riley's ability to continue as a going concern consistent with AS 2415 and, in particular,

2

MC 0069

**"consider the adequacy of the disclosure of such matters in the interim financial information" (emphasis ours).** It is therefore critical that Marcum ensures investors are adequately notified about B. Riley's ability to continues as a going concern as promptly as possible.

Second, pursuant to AS 2401 (Consideration of Fraud in a Financial Statement Audit), AS 2405 (Illegal Acts by Clients), AS 2410 (Related Parties), and AS2805 (Management Representations) we believe Marcum must complete an exhaustive review of all representations from Bryant Riley and the B. Riley Board to your firm that may have contributed to Marcum issuing its 2023 audit opinion that included the fictious valuations of the Franchise Group and loans to the Kahn Enterprise. We are troubled by a variety of false statements Bryant Riley made to investors during the audit period falsely touting the purported value of the Franchise Group and B. Riley's relationship with Kahn—including, for example, "we're going to make a lot of money for our shareholders and franchise group", "we've done great with our great partnership with Brian [Kahn]", and "we would have bought all of the franchise group.. they have great sturdy EBITDA" (below):

## A - Bryant Riley  {BIO 1702619 <GO>}

Thanks, operator. I want to be -- I want to actually answer some questions that I don't think were asked and I think there's noise out there. So, I want to address it and be crystal clear.

We would have bought all of the franchise group. We are a huge fan of that business and it's a really simple analysis. They have a great study EBITDA in Vitamin Shoppes'. Pet Supplies Plus, which is bought for $900 million is going to get to $140 million in the next couple of years. American Freight is an unbelievable business that faces the same challenges of targets. That's a business that was doing $110 million in 2021 and went down along with that graph.

That was our opportunity and we would buy that over and over again. We were a founder in that business. We have been, we've done a great -- with our great partnership with Brian. We have great partners with other management teams. We've helped fund that Badcock. We sold the real estate. We made 27% IRR on our receivables. We made -- on the first patch, who made over 40% on the second batch. We have $50 million exposure there now, which is money good and we over time determined that the better path was to allow shareholders that were involved in franchise group, many of which rolled as well as management, many of which purchased in the deal to participate.

So, there should be no confusion where that is and I know that today, a statement came out from Brian, denying any involvement and what happened with prophecy and that's good enough for me. So, I don't -- I want to just be crystal clear. What I believe, we're going to make a lot of money for our shareholders and franchise group just like we did in the first investment when we bought a big chunk of Liberty Tax at eight [ph] and just like we did in Badcock and just like -- and we will continue to do so. So, want to answer that question and we'll go back to decoding the South.

3

MC 0070

Importantly, we believe B. Riley used Marcum's audit opinion containing the wildly inflated asset values as a means to bolster the credibility of Bryant Riley's false statements to investors concerning the Franchise Group in order to entice investors into purchasing B. Riley securities. Determining whether Bryant Riley also made false statements to Marcum during the course of your audit has important implications outlined in PCAOB Audit Procedures. For example, AS 2805 states:

"if a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made. Based on the circumstances, **the auditor should consider whether his or her reliance on management's representations relating to other aspects of the financial statements is appropriate and justified**."

[page 365, emphasis ours]

Third, Marcum should promptly require notification to investors and regulatory agencies and exchanges that the clearly deficient and erroneous 2023 audited financials of B. Riley can no longer be relied upon. Since much of the recently reported information concerning the Franchise Group and B. Riley's loans to the Kahn Enterprise existed at the date of Marcum's audit opinion, the recent developments appear to fall squarely under AS 2905 (Subsequent Discovery of Facts Existing at the Date of the Auditors Report) which mandates that "when the subsequently discovered information is found both to be reliable and to have existed at the date of the auditor's report, **the auditor should take action**" when "**he believes there are persons currently relying or likely to rely on the financial statements who would attach importance to the information**" (emphasis ours). It is therefore imperative that Marcum follow the below audit procedures to prevent additional investors from being harmed by relying on Marcum's previously issued audit opinions containing these wildly inflated and fictitious asset values. This is especially urgent since B. Riley has informed investors that both it and Bryant Riley are the subject of wide ranging Federal investigations and it is unable to file current financial statements or make a timely 10-Q filing that would otherwise contain important updated disclosures and financial information.

4

MC 0071

.05    When the subsequently discovered information is found both to be reliable and to have existed at the date of the auditor's report, the auditor should take action in accordance with the procedures set out in subsequent paragraphs if the nature and effect of the matter are such that (a) his report would have been affected if the information had been known to him at the date of his report and had not been reflected in the financial statements and (b) he believes there are persons currently relying or likely to rely on the financial statements who would attach importance to the information. With respect to (b), consideration should be given, among other things, to the time elapsed since the financial statements were issued.

.06    When the auditor has concluded, after considering (a) and (b) in paragraph .05, that action should be taken to prevent future reliance on his report, he should advise his client to make appropriate disclosure of the newly discovered facts and their impact on the financial statements to persons who are known to be currently relying or who are likely to rely on the financial statements and the related auditor's report. When the client undertakes to make appropriate disclosure, the method used and the disclosure made will depend on the circumstances.

    a.    If the effect on the financial statements or auditor's report of the subsequently discovered information can promptly be determined, disclosure should consist of issuing, as soon as practicable, revised financial statements and auditor's report. The reasons for the revision usually should be described in a note to the financial statements and referred to in the auditor's report. Generally, only the most recently issued audited financial statements would need to be revised, even though the revision resulted from events that had occurred in prior years.[3]

    b.    When issuance of financial statements accompanied by the auditor's report for a subsequent period is imminent, so that disclosure is not delayed, appropriate disclosure of the revision can be made in such statements instead of reissuing the earlier statements pursuant to subparagraph (a).[4]

    c.    When the effect on the financial statements of the subsequently discovered information cannot be determined without a prolonged investigation, the issuance of revised financial statements and auditor's report would necessarily be delayed. In this circumstance, when it appears that the information will require a revision of the statements, appropriate disclosure would consist of notification by the client to persons who are known to be relying or who are likely to rely on the financial statements and the related report that they should not be relied upon, and that revised financial statements and auditor's report will be issued upon completion of an investigation. If applicable, the client should be advised to discuss with the Securities and Exchange Commission, stock exchanges, and appropriate regulatory agencies the disclosure to be made or other measures to be taken in the circumstances.

MC 0072

.07     The auditor should take whatever steps he deems necessary to satisfy himself that the client has made the disclosures specified in paragraph .06.

.08     If the client refuses to make the disclosures specified in paragraph .06, the auditor should notify each member of the board of directors of such refusal and of the fact that, in the absence of disclosure by the client, the auditor will take steps as outlined below to prevent future reliance upon his report. The steps that can appropriately be taken will depend upon the degree of certainty of the auditor's knowledge that there are persons who are currently relying or who will rely on the financial statements and the auditor's report, and who would attach importance to the information, and the auditor's ability as a practical matter to communicate with them. Unless the auditor's attorney recommends a different course of action, the auditor should take the following steps to the extent applicable:

a.  Notification to the client that the auditor's report must no longer be associated with the financial statements.

b.  Notification to regulatory agencies having jurisdiction over the client that the auditor's report should no longer be relied upon.

c.  Notification to each person known to the auditor to be relying on the financial statements that his report should no longer be relied upon. In many instances, it will not be practicable for the auditor to give appropriate individual notification to stockholders or investors at large, whose identities ordinarily are unknown to him; notification to a regulatory agency having jurisdiction over the client will usually be the only practicable way for the auditor to provide appropriate disclosure. Such notification should be accompanied by a request that the agency take whatever steps it may deem appropriate to accomplish the necessary disclosure. The Securities and Exchange Commission and the stock exchanges are appropriate agencies for this purpose as to corporations within their jurisdictions.

Fourth, we remain concerned about a wide variety of previously undisclosed transactions between B. Riley and the Kahn Enterprise and whether they have a nexus with the Prophecy Ponzi Scheme, contaminate B. Riley's financial statements, or involved related parties undisclosed to Marcum.  For example, documents we obtained prove that B. Riley directly financed Prophecy's Sub-Advisory entity which is at the very center of this giant fraud (Samjor Family LP):

6

MC 0073

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| Mary Ann Kramer            617-856-8231 | |
| B. E-MAIL CONTACT AT FILER (optional) | |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Return acknowledgment to:

★

Capitol Corporate Services, Inc.
P.O. Box 3100    Carson City, NV 89702
800/899-0490

| Filed in the Office of | Initial Filing Number |
|---|---|
| *Barbara K. Cegavske* | 2018025433-5 |
| | Filed On |
| | 08/30/2018 03:37 PM |
| Secretary of State | Number of Pages |
| State Of Nevada | 2 |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Samjor Family Limited Partnership | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9935 Lake Louise Dr. | Windermere | FL | 34786 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Samjor Family LP | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9935 Lake Louise Dr. | Windermere | FL | 34786 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| B. Riley FBR, Inc. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 299 Park Avenue | New York | NY | 10171 | USA |

4. COLLATERAL: This financing statement covers the following collateral

Debtor grants to Secured Party a security interest in all of its stock, equity and other ownership interest in Babcock and Wilcox Enterprises, Inc., a Delaware corporation, and all additions, exchanges, substitutions and replacements thereof and all cash and non-cash proceeds thereof, including, without limitation, distributions thereon. To the extent the foregoing collateral constitutes investment property, general intangibles or other terms defined under the Uniform Commercial Code, then those are also covered hereby. The Collateral is further described on Exhibit A attached hereto and incorporated herein.

Samjor Family LP is described in Hughes SEC charges as a "sub-adviser" that engaged in a variety of sham "round-trip" transactions involving a Kahn entity "with no assets or operations" in an attempt to fool the auditors. The above document shows B. Riley made undisclosed transactions with Samjor during the Ponzi Scheme involving pledges of Babcock & Wilcox stock (a related party of B. Riley).

7

MC 0074

72.    For example, by October 2017, Individual 2 had a negative cash collateral deposit of approximately $19 million. Individual 2 did not contribute additional cash to cure the deficit. Rather than restrict his trading until he contributed additional cash collateral, Hughes caused Prophecy to engage in a "round-trip" transaction with Individual 2 designed to artificially replenish Individual 2's cash collateral deposit. The below diagram illustrates this round-trip transaction:



73.    Specifically, Prophecy entered into an agreement with Individual 2 whereby Prophecy "loaned" $11 million of investor funds to AGS Enterprises LLC ("AGS Enterprises"), an entity with no assets or operations that was owned by Individual 2. Through a series of transactions, AGS Enterprises returned $10 million of that amount to Prophecy masked as collateral contributions by Individual 2.

74.    First, on November 22, 2017, Prophecy wired $5 million to AGS Enterprises. That same day, AGS Enterprises wired $5 million to Samjor Family, Individual 2's sub-adviser entity. Then, Samjor Family immediately wired that money back to Prophecy, which recorded

Furthermore, the Hughes SEC Charges also describe how Kahn (Individual 2) began creating bogus collateral and fake securities as his losses began to mount. B. Riley financed Samjor the EXACT same day as two of the below collateral agreements and personal guarantees "to cover losses sustained by Samjor":

8

MC 0075

CONFIDENTIAL                                                    fDARF-00000397

| Category | Description | Notes |
|---|---|---|
| Receivable | Redemption of Panther LP interest | Investment of $19,000,000 in or about April 2019. Paying preferred rate of return of 8.00% per annum. Redemption request submitted in 2019. Value of $19,886,666.67 as of November 30, 2019 statement |
| Guarantee | March 4, 2016 Personal Guaranty by Brian Kahn in favor of Prophecy Asset Management, LP | Brian Kahn personal guarantee to cover losses sustained by Samjor Family, LP as sub advisor for Prophecy Asset Management, LP |
| Collateral Agreement | May 26, 2017 Collateral Agreement between Samjor Family LP and Prophecy Trading Advisors, LP | Samjor Family LP assigning security interest to Prophecy Trading Advisors, LP in notes owned by Samjor Family LP then-valued at approximately $30 million |
| Guarantee and Pledge Agreement | August 10, 2018 Guaranty and Pledge Agreement between Samjor Family LP and Prophecy Trading Advisors, LP | Samjor Family LP pledging over 1 million shares of Liberty Tax, Inc. as collateral for debts owed by Samjor Family LP to Prophecy Trading Advisors, LP |
| Collateral Agreement | August 30, 2018 Collateral Agreement between Samjor Family LP and Prophecy Trading Advisors Master Fund, LP | Samjor Family LP assigning security interest to Prophecy Trading Advisors, LP in notes owned by Samjor Family LP then-valued at approximately $115 million |
| Guarantee | August 30, 2018 Personal Guaranty by Brian Kahn in favor of Prophecy Asset Management, LP | Brian Kahn personal guarantee to cover losses sustained by Samjor Family, LP as sub advisor for PTAM and Prophecy Trading Advisors, LP |
| Investment Advisory Agreement | October 21, 2019 Account Investment Advisory Agreement between PTAM and Vintage Capital Management, LLC | Providing, among other things, that sub advisor will be responsible for 100% of all losses |
| Investment Advisory Agreement | June 30, 2016 and October 1, 2017 Account Investment Advisory Agreements between Prophecy Asset Management, LP and Samjor Family, LP | Initial term sheet providing, among other things, that sub advisor will be responsible for 100% of all losses up to $17.5 million. Later term sheet providing, among other things, that sub advisor will be responsible for 100% of all losses. |

B. Riley's Prophecy-related exposure appears to have been subsequently rolled into Kahn's Vintage entities and concealed as a $200+ million "consumer/retail" loan in materials created by B. Riley and widely disseminated to investors.   With FRG now in an apparent state of collapse, these findings amplify allegations contained in a recent lawsuit alleging that B. Riley "has aided and abetted Kahn in defrauding investors in the Prophecy fraud".

## RILY Listed Large "Consumer / Retail" Loan in Q3 2023 Slide



## New Slide Admits Giant $200 Million Loan is Actually to Kahn's Vintage Fund



MC 0076

### iii.    Franchise Group Did Not Acknowledge the Criminal Legal Issues Facing Kahn and B. Riley

162.    Worse still, Franchise Group did not disclose—and is likely trying to conceal—the fact that B. Riley has aided and abetted Kahn in defrauding investors in the Prophecy fund.

163.    Kahn managed 86% of the Prophecy investments. He illegally covered up $294 million in lost Prophecy funds.

164.    In fact, Kahn's impetus for Franchise Group's take-private Merger may have been to avoid public company scrutiny of his fraudulent transactions. The Proxy does not provide information regarding this key issue.

165.    Also, new details of loans by B. Riley to Kahn show a longer and closer relationship than previously known. They also raise questions about whether Franchise Group should have disclosed more details about some of the loans years ago, when the Company's board included two B. Riley executives as directors.

166.    B. Riley's loans to Kahn also date back longer than previously known. B. Riley made at least 10 different loans to Kahn and entities he controlled from 2018 through 2023, according to UCC financing statements filed with state agencies in Nevada, Delaware and Florida. The UCC filings do not show the amounts borrowed, but a presentation generated by an investment bank that provided financing to B. Riley as part of the Merger indicated that the principal balance on

71

Kahn's loans was $154 million by mid-2023. The Proxy does not disclose the existence of these loans.

167.    Kahn has agreed to pay more than $200 million, including cash and Franchise Group stock, to compensate Prophecy's investors. At the same time, Kahn has pledged Franchise Group stock as collateral for a $200 million loan from B. Riley to Vintage. Unsurprisingly, Kahn's double-pledging of Franchise Group stock also was not disclosed in the Proxy.

10

MC 0077

This fact pattern is worsened by findings previously supplied to your firm and/or its attorneys describing concerns about whether B. Riley has maintained an undisclosed related party relationship with Vintage Capital. Among other items, we specifically highlighted SEC and FINRA filings show that Jeremy Nowak was simultaneously working as a registered representative of B. Riley while also acting as Vintage Capital's Chief Operating Officer and minority partner. Nowak's own Linkedin profile listed himself as a "trader" at Caiman Partners, an entity described in the Hughes SEC Charges as a sham entity "with no assets or operations" that engaged in fraudulent transactions designed to fool the Prophecy auditors:

## Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 11/2017 - 07/2020 | B. RILEY FBR, INC. | 25027 | LOS ANGELES, CA |
| 04/2016 - 11/2017 | B. RILEY & CO., LLC | 40355 | LOS ANGELES, CA |
| 08/1999 - 09/2006 | B. RILEY AND CO. INC. | 40355 | NEW YORK, NY |
| 01/1998 - 05/1999 | TARPON SCURRY INVESTMENTS, INC. | 34635 | NEW YORK, NY |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 11/2017 - Present | FBR CAPITAL MARKETS & CO. | Mass Transfer | Y | Los Angeles, CA, United States |
| 02/2016 - Present | B. Riley & Co., LLC | Proprietary Trader | Y | Windermere, FL, United States ⟵ |
| 09/2006 - 01/2016 | Vintage Capital Management | Investment Adviser | Y | Orlando, FL, United States |

Jeremy R. Nowak
Age: 45
Chairman and Director since: 2015

Mr. Nowak has been the Managing Member of Gator Elite RTO LLC, a private investment partnership, since December 2019. From July 2010 to December 2019, he was a partner and the Chief Operating Officer of Vintage Capital Management LLC, a private equity firm. Mr. Nowak joined Kahn Capital Management, LLC, a predecessor to Vintage, in September 2006.

11

MC 0078



MC 0079



109.    Specifically, on March 28, 2019, Prophecy "loaned" $21 million to Caiman

Partners ("Caiman"), an entity controlled by Individual 2, which had no assets or operations.

The following day, Individual 2 wired this money, plus approximately $2.2 million of his own

funds, to Clearview Distribution Services LLC ("Clearview Distribution"), a newly created

entity controlled by Smith, for the purported purchase from Clearview of the defaulted loan

Despite these findings, B. Riley has claimed that two internal investigations have exonerated the company from any wrongdoing related to the Kahn Enterprise. Yet both are tainted by conflicts of interest that render them irrelevant as audit evidence. In our earlier correspondence we explained why the initial internal investigation into B. Riley's dealings with Kahn Enterprise conducted by Sullivan & Cromwell was tainted by Sullivan & Cromwell's pre-existing status as a defense attorney of B. Riley's and was therefore not valid audit evidence. The company subsequently commissioned a second internal investigation conducted by Winston & Strawn which it has touted in 8-K filings and disclosures as "indepedent". However, evidence shows that Winston & Strawn is tainted by similar conflicts of interest because it has extensive pre-existing ties to B. Riley. Winston & Strawn, for example, has advised B. Riley on multiple SPAC transactions during 2020-21, previously sponsored a B. Riley conference, and has an attorney, Sanjay Thapar, that has represented B. Riley entities dating back to at least 2016. During his tenure at the Division of Enforcement at the SEC, Marcum's own attorney, Andrew Ceresney, stated (emphasis ours):

> First, like audit committee members, **auditors need to demand objective evidence and investigation when they come across situations which suggest inaccuracies in the company filings.** Second, national office personnel need to be the bulwark against client pressure. We charged three national office personnel in this case who failed in their roles. **And finally, audit firms must not retreat from demanding an internal investigation unless they obtain evidence that dispels the issues that led them to request such an investigation in the first place.**

**We completely agree with Mr. Ceresney's past comments and believe it is absolutely imperative that Marcum initiate an exhaustive and truly independent forensic investigation into all of the facts and circumstances we earlier highlighted regarding B. Riley's dealings with**

13

MC 0080

**the Kahn Enterprise. Especially considering it has become abundantly clear that B. Riley's past filings contain inaccuracies. Example topics should include:**

1. Whether transactions between B. Riley and the Kahn Enterprise have any current or prior connection to the Prophecy Fraud or are otherwise contaminated by illegal acts, misrepresentations, or undisclosed related party dealings. This examination should involve detailed testing of all significant and unusual activity, the terms of all contracts between B. Riley and the Kahn Enterprise, and whether any verbal agreements modified such terms, related party testing and analysis, an analysis of potential contingent and regulatory liabilities, and whether management representations of these transactions was accurate.

2. The economic substance and purpose of each of B. Riley's equity investments with the Kahn Enterprise and whether these have been valued, accounted for, and disclosed accurately in both current and past financial statements. This examination should include a detailed review of the facts and circumstances surrounding all takeover/buyout proposals issued by the Kahn Enterprise that were backed by B. Riley as well as all takeover/buyout proposals issued by B. Riley on companies beneficially owned or controlled by the Kahn Enterprise

3. The integrity, authenticity, and source of the collateral securing all loans from B. Riley to the Kahn Enterprise, including Brian Kahn and his wife personally, since inception and whether all such loans have been valued, accounted for, and disclosed accurately in B. Riley's financial statements. This examination should include a review of whether these loans and the collateral securing them has had a current or past connection to the Prophecy Fraud or is otherwise contaminated by illegal acts or misrepresentations.

4. The economic substance and purpose of all fees paid to B. Riley from the Kahn Enterprise, including any fee or revenue sharing arrangements with Kahn's hedge funds or businesses. This should also include a detailed review of any/all circumstances in which B. Riley raised money from third party investors on behalf of the Kahn Enterprise and/or placed securities in B. Riley Client accounts that were issued by members or companies affiliated with the Kahn Enterprise.

Finally, we are deeply troubled by irregularities involving Marcum's 2023 B. Riley audit including the apparent sudden hiatus of the audit partner in charge, James LaRocca, late in the audit period and his replacement with a partner, Richard Lawrence Cooke, who appears to be primarily responsible for auditing various SPAC and penny stock issuers rather than complex financial companies like B. Riley. This compounds our concerns about the June 2023 actions that the SEC and PCOAB filed against Marcum for "widespread quality control deficiencies" and violations of audit standards for numerous audits. We are equally concerned about the September 2023 SEC charges filed against Alfonse Gregory Giugliano, Marcum's former National Assurance Services Leader. We also learned that the PCAOB earlier sanctioned Marcum and Giugliano for Auditor Independence Violations in 2019. Form AP filings we reviewed show that Giugliano has personally signed for numerous B. Riley audits. Marcum has previously sponsored conferences hosted by B. Riley and also audits other companies that were owned or financed by B. Riley such as Applied Digital, Faze Holdings, and Arena Group Holdings. We also obtained the documents previously shared with you in which a principal of the Prophecy Fraud claims that Marcum was engaged to perform a "re-audit" of

14

MC 0081

Prophecy's financial statements although it is unclear to us if this work was ever performed or completed.  We believe your firm should conduct an internal investigation into all of Marcum's audits of B. Riley since inception and **encourage your firm to self-report any violations of either PCAOB independence requirements, your firm's remediation and quality control agreements with the SEC and PCAOB, or Marcum's probation with the California Board of Accountancy.**

**<u>We request that this letter be immediately forwarded in its entirety to the independent consultant and quality control officer that Marcum engaged as part of your firm's remediation agreement with the SEC.</u>**

Please kindly confirm receipt of this letter and thank you.

Sincerely,


James Gibson and Marc Cohodes

15

MC 0082

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Submission Number 17253-741-928-245 was submitted on Tuesday, September 03, 2024 at 05:03:31 PM EDT**

**This PDF was generated on Tuesday, September 03, 2024 at 05:05:46 PM EDT**

Thank you for contacting the United States Securities and Exchange Commission. This automated response confirms that your submission has been received successfully. We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

**Q: Please select the option that best describes your complaint.**
**A:** Material misstatement or omission in a company's public filings or financial statements, or a failure to file

**Q: Please select the specific category that best describes your complaint.**
**A:** False/misleading financial statements

**Q: Is this supplemental information to a previous complaint?**
**A:** Yes

**Q: What is the Submission Number of the previous complaint?**
**A:** TCR17013051624477

**Q: In your own words, describe the conduct or situation you are complaining about.**

MC 0083

Page 1 of 8

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** Marcum LLP's failure to follow proper audit procedures in its audit of B. Riley Financial's 2023 financial statements; complicity in the issuance of materially misleading financial statements. Please see attached for detailed discussion.

## Who are you complaining about?

**Subject # 1**

**Q: Are you complaining about a person or a firm?**
**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**
**A:** Accounting Firm

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**
**A:** No

**Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**
**A:** No

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**
**A:** No

**Q: Firm Name**
**A:** Marcum LLP

**Q: Street Address**
**A:** 730 3rd Ave, 11th Floor

**Q: Zip / Postal Code**

A: 10017

**Q: City**

A: NEW YORK

**Q: State / Province**

A: NY

**Q: Country**

A: US

## About you

**Submitter # 1**

**Q: Are you filing this tip under the SEC's whistleblower program?**

A: Yes

**Q: Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**

A: No

**Q: First Name**

A: Marc

**Q: Last Name**

A: Cohodes

MC 0085



**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Email Address**
**A:** mcohodes@gmail.com


**Q: What is the best way to reach you?**
**A:** Email


**Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**
**A:** Yes


**Q: Attorney Title**
**A:** Ms


**Q: Attorney First Name**
**A:** Leah


**Q: Attorney Last Name**
**A:** Judge


**Q: Attorney Firm Name**
**A:** The Norton Law Firm


**Q: Attorney Street Address**
**A:** 300 Frank H. Ogawa Plaza


**Q: Attorney Address (Continued)**
**A:** Ste 450

MC 0086

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Attorney Zip / Postal Code**
**A:** 94612

**Q: Attorney City**
**A:** OAKLAND

**Q: Attorney State / Province**
**A:** CA

**Q: Attorney Country**
**A:** US

**Q: Attorney Work Telephone**
**A:** 510-906-4919

**Q: Attorney Email Address**
**A:** ljudge@nortonlaw.com

**Q: Are documents or other information being submitted that could potentially identify the whistleblower?**
**A:** Yes

**Q: Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.**
**A:** The submission is signed by Mr. Cohodes and Mr. Gibson.

**Q: Does the whistleblower want to be eligible to apply for a whistleblower award?**
**A:** Yes

MC 0087

Page 5 of 8

**Tips, Complaints, and Referrals**

Summary Page - Submitted Externally

**Q: 1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?**

**A:** No

**Q: 2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(52))?**

**A:** No

**Q: 3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**

**A:** No

**Q: 4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?**

**A:** No

**Q: 5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**

**A:** No

**Q: 6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?**

**A:** Yes

MC 0088

Page 6 of 8

**Tips, Complaints, and Referrals**

Summary Page - Submitted Externally

**Q: If the answer to the question is "Yes," please provide details.**

**A:** Mr. Cohodes and Mr. Gibson have been voluntarily communicating with SEC Enforcement Attorney Jennifer Calabrese about the allegations contained in this supplemental submission since approximately May 2024. Mr. Cohodes initiated the contact with Ms. Calabrese after he and Mr. Gibson lodged in November 2023 their original TCR concerning B. Riley and Marcum.

**Q: 7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**

**A:** No

**Q: 8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?**

**A:** No

**Q: I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.**

**A:** Agree

MC 0089

Page 7 of 8

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

## Documents

| Document Name | Document Type |
|---|---|
| 2024.09.03 - Complete TCR Marcum.pdf | application/pdf |

November 30, 2023

To Whom It May Concern at the Securities and Exchange Commission:

Below please find a letter that we provided to Marcum LLP, the auditors serving B. Riley Financial, Inc., on November 28, 2023. The letter outlines significant concerns regarding transactions between B. Riley and Brian Kahn, as well as entities affiliated with Brian Kahn, and calls for a thorough investigation of these transactions. It also addresses our concerns regarding Marcum's ability to serve as an independent auditor to B. Riley.

We hope you investigate these matters. We are happy to provide any additional information or assistance.

Sincerely,

James Gibson & Marc Cohodes

---

November 28, 2023

James LaRocca
Marcum LLP
10 Melville Park Road
Melville, NY 11747
James.larocca@marcumllp.com

Dear Mr. LaRocca,

We are writing to alert you to the risks of serious fraud, material misstatements, and/or omissions impacting your audit of B. Riley Financial, Inc. ("B. Riley"). Both authors of this letter, James Gibson and Marc Cohodes, are investors who have specialized in investigating fraudulent companies and currently hold short positions in B. Riley stock. We have collectively authored letters to auditors or submitted whistleblower information regarding companies such as Mimedx, Silvergate Bank, Signature Bank, Pareteum, Lernout & Hauspie, Media Vision Technology, NovaStar Financial, AremiSoft, California Micro Devices, Network Associates, Krispy Kreme Donuts, Boston Chicken, and others. We believe it is imperative that your firm's audit of B. Riley thoroughly examine and test a variety of risks and irregularities, especially considering recent criminal and SEC charges as well as certain public statements made by B. Riley's CEO, Bryant Riley.

On November 2, 2023, John Hughes, a former compliance officer of a hedge fund named Prophecy Asset Management pled guilty for his role in an elaborate multi-year fraud that bilked investors out of at least $294 million along with two unindicted co-conspirators (referred to herein as the "Prophecy Fraud"). Bloomberg News has subsequently <u>confirmed</u> that ***<u>Brian Kahn, a large and longtime partner of B. Riley,</u>*** is the unindicted "Co-Conspirator 2" and "Individual

1

MC 0091

2" repeatedly referenced in the respective Prophecy criminal information and parallel SEC charges (the "Hughes DOJ Criminal Information and SEC Charges"). According to the government, Hughes and Prophecy retained Kahn as a sub-advisor who then incurred hundreds of millions of dollars in trading losses which Hughes, Kahn, and a third conspirator sought to conceal from Prophecy's auditors and investors through a variety of sham transactions. The DOJ press release states that:

> *"Hughes, his co-founder, and the sub-advisor also actively covered up these spiraling losses and collateral deficiencies by using, among other things, bogus transactions and forged documents. In turn, the sub-advisor helped Hughes and his co-founder conceal millions of dollars in losses they caused Prophecy's funds through bad investments. They used fake documents and money that the sub-advisor provided to paper over and hide these bad investments from victim investors and Prophecy's auditor."*

Specific examples of various alleged forgeries, fake securities, and sham transactions involving Co-Conspirator 2 (Kahn) include:

- "engaging in secret 'round-trip' transactions that siphoned off cash from the Funds and gave it to Co-conspirator-2 who then fraudulently used it as 'collateral' in order to obtain more investment money from the Fund." (Page 6, Hughes DOJ Criminal Information)
- "Conspirator-2 created a fake preferred stock agreement that purported to grant Prophecy ownership of approximately $125 million of stock in a company ("Company-2") that Co-conspirator-2 controlled…Co-conspirator-2 falsely told the auditor that Co-conspirator-2 had authority to issue the preferred stock…In reality, Company-2 never issued the preferred stock, and the certificates were a complete fabrication." (Page 9, Hughes DOJ Criminal Information)
- "Prophecy entered into an agreement with Individual 2 whereby Prophecy 'loaned' $11 million of investor funds to AGS Enterprises LLC ('AGS Enterprises'), an entity with no assets or operations that was owned by Individual 2. Through a series of transactions, AGS Enterprises returned $10 million of that amount to Prophecy masked as collateral contributions by Individual 2." (page 15, Hughes SEC Charges)
- "Hughes relayed this decision to Individual 2, who then forged the signature of a former colleague as the signer of the agreement between Prophecy and AGS Enterprises on behalf of AGS Enterprises (thus masking the involvement of Individual 2)." (page 16, Hughes SEC Charges)
- "To overcome these hurdles, Individual 2 forged the signature of his 13 year-old son on the document, using his son's first and middle name but omitting his last name; and Hughes and Individual 1 altered the limited partnership agreement before sending it to Prophecy's auditors in such a way that purportedly allowed Prophecy to assign its limited partnership interest in Broad Reach." (page 24, Hughes SEC Charges)
- "In response to a series of questions from Prophecy's auditor to Individual 2, which he forwarded to Hughes, Individual 2 falsely confirmed that Individual 2 had authority to issue the preferred stock to Prophecy and that the preferred stock was collateral used to secure Individual 2's 2018 trading losses, was issued and outstanding as of December 31, 2018, and was issued in Prophecy's name." (page 18, Hughes SEC Charges

2

MC 0092

We also have attached as Exhibit A a court transcript of Hughes himself stating under oath that Co-Conspirator 2 (Kahn) engaged in a variety of acts described by prosecutors, several of which we have included below as examples. The transcript also states **Hughes is now cooperating with Prosecutors**.

MR. COPPOTELLI: Did you and Co-conspirator-1 and Co-conspirator-2 also fraudulently conceal Co-conspirator-2's losses and collateral deficits by allowing Co-conspirator-2 to use purported non-cash collateral, such as personal guaranties or stocks, to secure allocations from the funds without disclosing this to the victims or taking steps to verify that non-cash collateral was legitimate and had actual value?

THE DEFENDANT: Yes.

MR. COPPOTELLI: For example, in and around April 2019, did Co-conspirator-2 create a fake preferred stock agreement that purportedly granted Prophecy ownership of approximately 125 million of stock in a company, as referenced in the information Company 2, that Co-conspirator-2 controlled?

THE DEFENDANT: Yes.

MR. COPPOTELLI: In furtherance of that agreement, on or about May 23, 2019, did Co-conspirator-2 wire $17,579,885.15 to the fund, the exact amount of the outstanding Company 3 investment?

THE DEFENDANT: Yes.

MR. COPPOTELLI: To conceal Co-conspirator-2's purchase, did Co-conspirator-2 have the investment transferred to Company 1?

THE DEFENDANT: Yes.

MR. COPPOTELLI: Did Co-conspirator-2 forge the signature on the agreement using the first and middle names of his son, who was a minor?

THE DEFENDANT: Yes.

The DOJ Criminal Information and SEC Charges are highly material to your audit, in our view, because B. Riley has extensive and longstanding ties to Kahn, hedge fund entities managed by Kahn such as Vintage Capital, companies he controls, and members of his immediate family (collectively referred to herein as the "Kahn Enterprise"). B. Riley has frequently transacted, financed, earned fees, or otherwise sponsored the Kahn Enterprise. B. Riley has accumulated large financial exposure on its balance sheet to the Kahn Enterprise via hundreds of millions of dollars in purported equity investments, business and personal loans, and other agreements with companies and entities controlled or beneficially owned by the Kahn Enterprise. In a 2018 press release, Bryant Riley even touted his firm's deep relationship with the Kahn Enterprise, stating "We have worked with the Vintage Capital [a hedge fund controlled by Kahn] team for over two decades and have seen firsthand their experience" and "the ability to team up with strong managers with a history of success utilizing both our balance sheet and advisory capabilities is what is most exciting." Kahn himself was quoted in the press release, declaring that "Having worked with the B. Riley team on multiple deals, I have a great deal of respect for their willingness to ***think differently to get deals done.***" [emphasis ours]

We believe that the totality of the relationship between B. Riley and the Kahn Enterprise requires your full attention under PCAOB audit standards including AS 2401 (Consideration of Fraud in a Financial Statement Audit), AS 2405 (Illegal Acts by Clients), AS 2410 (Related Parties), AS2805 (Management Representations), and AS 2415 (Consideration of an Entity's Ability to Continue as a Going Concern). We find a recent report issued by *FriendlyBear Research* (here) particularly relevant to your consideration of these audit standards because it details a series of specific and oftentimes undisclosed transactions between B. Riley and the Kahn Enterprise that seem to have interconnectedness with the Prophecy Fraud. Examples of transactions we find particularly pertinent to your audit include:

3

MC 0093

- **Vintage Capital.**

This is Kahn's hedge fund that was *specifically named in the SEC complaint as receiving funds from the Prophecy Fraud* to provide "rescue financing" to one of Kahn's investments (page 25, Hughes SEC Charges). B. Riley has completed numerous complex transactions with Vintage over an extensive period of time as disclosed in a variety of B. Riley's SEC filings and press releases. Importantly, documents referenced by *FriendlyBear* suggest *B. Riley may even serve as a placement agent for Vintage and have a revenue sharing agreement with it.* This is highly problematic, in our view, because it links B. Riley directly to the hedge fund that was allegedly integral to the Prophecy Fraud.

### 3. Vintage Capital Management LLC

122. Although Individual 2 had a cash collateral deficit in excess of $50 million during the fall of 2018, Prophecy provided a $36 million unsecured loan to Vintage Capital Management LLC ("Vintage"), an asset management company controlled by Individual 2.

123. Hughes and Individual 1 understood that Individual 2 was going to use the loan proceeds to provide rescue financing to a company in which Vintage was heavily invested. Prophecy included this new "allocation" on the December 2018 Portfolio Breakdown Report sent to investors as "Manager 33", masking that it was going to an entity controlled by Individual 2.

124. Hughes and Individual 1 failed to disclose the true nature of this large off-platform loan to investors, falsely classifying it as a "Fixed Income" trading strategy on the Portfolio Breakdown Report.

- **Undisclosed Loans to the Kahn Enterprise.**

Documents presented in the *FriendlyBear* report reveal that B. Riley has made a series of loans to hedge funds controlled by Kahn as well as Kahn and his wife personally. **Many of these loans are completely undisclosed in B. Riley's financial statements** and are also secured by non-cash collateral consisting of various illiquid companies controlled by the Kahn Enterprise that are also financed or beneficially owned by B. Riley. We view these dealings as especially important for your audit because the criminal information alleges that *"Prophecy made no effort to verify that Co-conspirator-2's purported non-cash collateral had any actual value. In fact, virtually all of the non-cash collateral was fabricated and worthless"* (Page 8, Hughes DOJ Criminal Information, emphasis ours). The SEC charges allege that *"Prophecy and Individual 2 entered into at least six agreements consisting of, among other things, personal guaranties, promissory notes, and other pledged "assets," which did not exist or had questionable value… the non-cash collateral provided by Individual 2, some of which was wholly fabricated"* (Page 17, Hughes SEC Charges, emphasis ours).

4

MC 0094

• **Rent-A-Center.**

Vintage reportedly made a $92.5 million settlement payment in April/May 2019 to Rent-A-Center in a deal that apparently absolved B. Riley of its $34 million share of the financial liability that was jointly incurred because of paperwork errors associated with this failed acquisition attempt (background discussed at length here and by *FriendlyBear*). However, a table included by the SEC in its charges against Hughes (below) states that **Kahn's trading losses ballooned by more than $100 million between the end of March 2019 and May 2019– which was the exact same time period that Vintage paid the settlement to Rent-A-Center.**

| Month | Reported Assets Under Management (Prophecy only) | Undisclosed Individual 2 Cumulative Trading Losses |
|---|---|---|
| Jan '18 | $193,262,221 | ($68,796,437) |
| Feb '18 | $206,680,330 | ($89,272,107) |
| Mar '18 | $210,514,769 | ($73,855,675) |
| Apr '18 | $231,581,824 | ($84,973,086) |
| May '18 | $231,296,977 | ($99,856,774) |
| Jun '18 | $238,882,887 | ($55,769,941) |
| Jul '18 | $251,960,512 | ($86,149,501) |
| Aug '18 | $278,391,448 | ($99,029,274) |
| Sep '18 | $281,328,749 | ($133,547,197) |
| Oct '18 | $291,278,303 | ($92,770,160) |
| Nov '18 | $300,145,549 | ($126,465,092) |
| Dec '18 | $309,940,471 | ($85,457,632) |
| Jan '19 | $316,671,028 | ($110,945,903) |
| Feb '19 | $352,256,146 | ($141,049,323) |
| Mar '19 | $363,039,646 | ($164,932,011) |
| Apr '19 | $351,669,307 | ($193,341,589) |
| May '19 | $334,611,151 | ($270,389,293) |
| Jun '19 | $338,605,040 | ($274,697,896) |
| Jul '19 | $346,130,025 | ($277,349,650) |
| Aug '19 | $371,751,174 | ($272,194,183) |
| Sep '19 | $395,227,258 | ($260,971,957) |
| Oct '19 | $361,330,212 | ($278,964,629) |
| Nov '19 | $367,180,474 | ($288,855,554) |
| Dec '19 | $363,079,864 | ($264,739,409) |
| Jan '20 | $363,042,750 | ($270,944,717) |
| Feb '20 | $380,877,805 | ($294,952,814) |
| Mar '20 | $386,127,805 | ($401,210,782) |

## Rent-A-Center Reaches Settlement Over Failed Merger

Published April 22, 2019

Lauren Muskett
Managing Editor

Rent-A-Center announced it has reached a settlement agreement with Vintage Capital Management and its financial partner B. Riley Financial over the breakup of their merger agreement last year.

Rent-A-Center said the settlement payment would be made within 28 days.

This is an unlikely coincidence, in our view, and suggests a clear linkage between the Rent-A-Center dealings and the Prophecy Fraud. We find this transaction especially problematic because it also appears to have *extinguished a large financial liability of B. Riley's that would have otherwise created large operating losses that could have damaged B. Riley's share price and liquidity position.*

• **Franchise Group**

On B. Riley's most recent earnings call, Bryant Riley characterized his firm as a "founder" of the Franchise Group "*with our great partnership with Brian* [Kahn]." Franchise Group has functioned as a related party of B. Riley's – Bryant Riley was a Board Member and Kahn himself became the CEO in October 2019, a time period that overlaps with the Prophecy Fraud. Indeed, the SEC alleges that Kahn created fake preferred stock certificates of Buddy's Newco, a company that the Franchise Group acquired from Kahn. B. Riley engaged in numerous large and complex

5

MC 0095

financings, equity investments, capital raises, and receivables purchases involving the Franchise Group. These dealings culminated in B. Riley and Kahn's August 2023 leveraged buyout of the Franchise Group that has left B. Riley with hundreds of millions in balance sheet exposure consisting of its equity stake, loans backed by franchise group receivables, and undisclosed loans to the Kahn Enterprise purportedly backed by Franchise Group stock. A recent credit downgrade by S&P suggests the Franchise Group business is now deteriorating rapidly, receivables are ballooning, and that free cash flow has fallen to the point that "interest coverage is very thin". **Importantly, the Franchise Group informed S&P that its lawyers are now conducting an internal investigation into Kahn.**

We believe B. Riley's dealings with the Kahn Enterprise include numerous and repeated instances of what PCAOB guidance describes as "significant unusual transactions." AS 2401 (Consideration of Fraud in a Financial Statement Audits) requires an evaluation of "*whether the business purpose for significant unusual transactions indicates that the transactions may have been entered to engage in fraud.*" Furthermore, "*The auditor must evaluate whether significant unusual transactions that the auditor has identified have been properly accounted for and disclosed in the financial statements*" and "*The auditor has a responsibility, under certain conditions, to disclose possible fraud to the Securities and Exchange Commission to comply with certain legal and regulatory requirements.*"

 The guidance goes on to prescribe specific audit procedures for *each* significant unusual transaction (page 222), which we have captured below and highlighted those that seem especially applicable:

6

MC 0096

.66A The auditor should design and perform procedures to obtain an understanding of the business purpose (or the lack thereof) of each significant unusual transaction that the auditor has identified. The procedures should include:

a. Reading the underlying documentation and evaluating whether the terms and other information about the transaction are consistent with explanations from inquiries and other audit evidence about the business purpose (or the lack thereof) of the transaction;

b. Determining whether the transaction has been authorized and approved in accordance with the company's established policies and procedures;

c. Evaluating the financial capability of the other parties with respect to significant uncollected balances, loan commitments, supply arrangements, guarantees, and other obligations, if any;[24A] and

d. Performing other procedures as necessary depending on the identified and assessed risks of material misstatement.

Note: AS 2301.11A requires the auditor to take into account the types of potential misstatements that could result from significant unusual transactions in designing and performing further audit procedures.

.67 The auditor should evaluate whether the business purpose (or the lack thereof) indicates that the significant unusual transaction may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets. In making that evaluation, the auditor should evaluate whether:

- The form of the transaction is overly complex (e.g., the transaction involves multiple entities within a consolidated group or unrelated third parties);

- The transaction involves unconsolidated related parties, including variable interest entities;

7

MC 0097

The transaction involves related parties or relationships or transactions with related parties previously undisclosed to the auditor;[25A]

■ The transaction involves other parties that do not appear to have the financial capability to support the transaction without assistance from the company, or any related party of the company;

■ The transaction lacks commercial or economic substance, or is part of a larger series of connected, linked, or otherwise interdependent arrangements that lack commercial or economic substance individually or in the aggregate (e.g., the transaction is entered into shortly prior to period end and is unwound shortly after period end);

■ The transaction occurs with a party that falls outside the definition of a related party (as defined by the accounting principles applicable to that company), with either party able to negotiate terms that may not be available for other, more clearly independent, parties on an arm's-length basis;

■ The transaction enables the company to achieve certain financial targets;

■ Management is placing more emphasis on the need for a particular accounting treatment than on the underlying economic substance of the transaction (e.g., accounting-motivated structured transaction); and

■ Management has discussed the nature of and accounting for the transaction with the audit committee or another committee of the board of directors or the entire board.

> Note: AS 2810.20—.23 provide requirements regarding the auditor's evaluation of whether identified misstatements might be indicative of fraud.

.67A    The auditor must evaluate whether significant unusual transactions that the auditor has identified have been properly accounted for and disclosed in the financial statements. This includes evaluating whether the financial statements contain the information regarding significant unusual transactions essential for a fair presentation of the financial statements in conformity with the applicable financial reporting framework.[25B]

Furthermore, we note that AS 2405 (Illegal Acts by Clients), specifically states:

> *"If specific information comes to the auditor's attention that provides evidence concerning the existence of possible illegal acts that could have a material indirect effect on the financial statements, the auditor should apply audit procedures specifically directed to ascertaining whether an illegal act has occurred."*

To fulfill your professional responsibilities and legal obligations, you should therefore complete a thorough examination into the facts and circumstances of **each and every transaction since inception between B. Riley and the Kahn Enterprise**. Due to the voluminous, intricate, and complex nature of these dealings, such an investigation may require outside independent counsel as well as forensic accountants and document verification specialists to help you formulate

8

MC 0098

enough audit evidence to issue an audit opinion. We believe this investigation should be multifaceted and focus on subjects such as:

i.      Whether transactions between B. Riley and the Kahn Enterprise have any current or prior connection to the Prophecy Fraud or are otherwise contaminated by illegal acts or misrepresentations. This examination should involve detailed testing of all significant and unusual activity, the terms of all contracts between B. Riley and the Kahn Enterprise, and whether any verbal agreements modified such terms, related party testing and analysis, an analysis of potential contingent and regulatory liabilities, and whether management representations of these transactions was accurate.

ii.      The economic substance and purpose of each of B. Riley's equity investments with the Kahn Enterprise and whether these have been valued, accounted for, and disclosed accurately in both current and past financial statements. This examination should include a detailed review of the facts and circumstances surrounding all takeover/buyout proposals issued by the Kahn Enterprise that were backed by B. Riley as well as all takeover/buyout proposals issued by B. Riley on companies beneficially owned or controlled by the Kahn Enterprise.

iii.      The integrity, authenticity, and source of the collateral securing all loans from B. Riley to the Kahn Enterprise, including Brian Kahn and his wife personally, since inception and whether all such loans have been valued, accounted for, and disclosed accurately in B. Riley's financial statements. This examination should include a review of whether these loans and the collateral securing them has had a current or past connection to the Prophecy Fraud or is otherwise contaminated by illegal acts or misrepresentations.

iv.      The economic substance and purpose of all fees paid to B. Riley from the Kahn Enterprise, including any fee or revenue sharing arrangements with Kahn's hedge funds or businesses. This should also include a detailed review of any/all circumstances in which B. Riley raised money from third party investors on behalf of the Kahn Enterprise and/or placed securities in B. Riley Client accounts that were issued by members or companies affiliated with the Kahn Enterprise.

v.      Whether B. Riley, its officers, or related parties have received any communications with regulators about the Prophecy Fraud or the Kahn Enterprise such as SEC or Grand Jury Subpoenas.

vi.      Whether Bryant Riley or other officers, Directors, employees, or affiliates of B. Riley have personally transacted with the Kahn Enterprise and assess whether any such transactions had a current or prior connection to the Prophecy Fraud, created undisclosed conflicts of interest, and whether they were properly reported to and reviewed by the Audit Committee.

9

MC 0099

vii.   Whether current or prior period audits by your firm relied on any representations from Kahn or members and affiliates of the Kahn Enterprise as audit evidence. This is especially important considering the DOJ Criminal Information and SEC Charges (as well as Hughes himself) allege that Kahn provided false information and forged documents in an apparent attempt to fool auditors of the Prophecy Fraud. Consequently, audit procedures may specifically require forensic document examiners or professional forgery detectors. We note that PCAOB guidance states:

> *"The auditor is not expected to be an expert in document authentication. However, if conditions indicate that a document may not be authentic or that the terms in a document have been modified but that the modifications have not been disclosed to the auditor, the auditor should modify the planned audit procedures or perform additional audit procedures to respond to those conditions and should evaluate the effect, if any, on the other aspects of the audit."* (Page 21)

We also believe your audit should thoroughly examine statements from Bryant Riley under AS 2805 (Management Representations). On the November 8, 2023 earnings call, Riley addressed the DOJ Criminal Information and SEC Charges, claiming that he just recently found out about this matter:

> *"I've known Brian [Kahn] for many years and had no direct experience with what has been alleged. We learned of this matter late last week like many others."*

We are highly skeptical of Riley's assertion because his firm also claims to have conducted due diligence prior to completing its leveraged buyout of Kahn's Franchise Group. Even cursory due diligence searches should have revealed that serious allegations regarding Kahn's relationship with Prophecy have been publicly available for a considerable length of time. This February 2021 article specifically references Kahn and the Prophecy losses. We have attached as Exhibit B a separate Civil lawsuit filed in 2020 by a defrauded Prophecy investor that contains detailed allegations and even names Kahn as a co-defendant.

Despite having enormous financial exposure to Kahn, Riley seemed to suggest there is no need for B. Riley to investigate the serious allegations contained in the DOJ Criminal Information and SEC Charges. Riley instead referenced a statement Kahn made professing his innocence and declared "that's good enough for me":

> *"So, there should be no confusion where that is and I know that today, a statement came out from Brian, denying any involvement and what happened with Prophecy and that's good enough for me."*

We recommend that your audit procedures review and examine Bryant Riley's knowledge and awareness of the Prophecy Fraud and allegations about the Kahn Enterprise. This review should inquire what, if any, communications Bryant Riley has received from regulators concerning the Prophecy Fraud or the Kahn Enterprise. It should also test the accuracy of all written

10

representations previously made to you in current or prior year audits including standard representations listed in the relevant PCAOB standard (page 366) such as:

- Knowledge of fraud or suspected fraud affecting the entity involving (1) management, (2) employees who have significant roles in internal control, or (3) others where the fraud could have a material effect on the financial statements.
- Knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.
- Information concerning related party transactions and amounts receivable from or payable to related parties, including support for any assertion that a transaction with a related party was conducted on terms equivalent to those prevailing in an arm's-length transaction.

Determining the accuracy of Bryant Riley's statements to investors and written representations to you is of vital importance to your overall audit because AS 2805 states:

> *"if a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made. Based on the circumstances, **the auditor should consider whether his or her reliance on management's representations relating to other aspects of the financial statements is appropriate and justified.**"*
> *[page 365, emphasis ours]*

It is imperative, however, that your audit work extends beyond simply gathering representations from management and the Audit Committee. The PCAOB instituted disciplinary proceedings against the PriceWaterhouse partner in charge of ArthroCare's 2005-2009 audits, leading to a three-year disbarment for that individual. The PCAOB specifically cited the audit partner's failure to examine short seller allegations beyond accepting statements from management:

> "[Audit Partner] learned no later than early December 2007 that allegations of potential wrongdoing were being made against ArthroCare by short sellers.... After speaking during the 2007 audit with PwC's local Regional Risk Management Partner about the "short-attack on ArthroCare,".... [Audit Partner] accepted management's representations regarding the short seller allegations, ultimately concluding that they did not appear to have merit. Neither [Audit Partner] nor his team performed any additional procedures to specifically respond to the short seller allegations." (Page 21)

Finally, we believe it is essential that Marcum performs a comprehensive analysis of its own independence from B. Riley and any potential conflicts of interest. AS 1005 states:

> "It is of utmost importance to the profession that the general public maintain confidence in the independence of independent auditors. Public confidence would be impaired by evidence that independence was actually lacking, and it might also be impaired by the existence of circumstances which reasonable people might believe likely to influence

11

MC 0101

independence. To be independent, the auditor must be intellectually honest; to be recognized as independent, he must be free from any obligation to or interest in the client, its management, or its owners....Independent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence."

We are not sanguine about the June 2023 Charges the SEC filed against Marcum for "widespread quality control deficiencies" and violations of audit standards for numerous audits. We are equally concerned about the September 2023 SEC charges the SEC filed against Alfonse Gregory Giugliano, Marcum's former National Assurance Services Leader. We also learned that the PCAOB earlier sanctioned Marcum and Giugliano for Auditor Independence Violations in 2019. Form AP filings we reviewed show that Giugliano has personally signed for numerous B. Riley audits. Marcum has previously sponsored conferences hosted by B. Riley and also audits other companies owned or financed by B. Riley such as Applied Digital, Faze Holdings, and Arena Group Holdings. We also obtained the attached letter (Exhibit C) in which **a principal of the Prophecy Fraud claims that Marcum was engaged to perform a "re-audit" of Prophecy's financial statements** although it is unclear to us if this work was ever performed or completed.

An October, 2022 memo from the Securities Exchange Commission states, "independent auditors play an important gatekeeper role in supporting high-quality financial reporting and the protection of investors." We trust you will execute this important responsibility during the course of your audit of B. Riley. We stand ready to assist you in this effort and sincerely appreciate your attention to this important matter.

**We respectfully request that this letter be immediately forwarded to the independent consultant Marcum engaged as part of your firm's remediation agreement with the SEC.** We plan to submit this letter ourselves to applicable regulatory agencies and likely will send you additional relevant documents and information in due course.

Please kindly confirm receipt of this letter and thank you.

Sincerely,

James Gibson and Marc Cohodes

12

MC 0102

# EXHIBIT A

To Gibson-Cohodes Letter

MC 0103

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

UNITED STATES OF AMERICA               CRIMINAL ACTION NUMBER:
                                       23-CR-867-MAS
vs.

                                       INITIAL APPEARANCE
JOHN HUGHES                            GUILTY PLEA
                                       BAIL HEARING

          Defendant
_____

CLARKSON S. FISHER BUILDING & U.S. COURTHOUSE
402 East State Street, Trenton, New Jersey  08608
November 2, 2023
Commencing at 1:01 p.m.

B E F O R E:        THE HONORABLE MICHAEL A. SHIPP
                    UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

OFFICE OF THE UNITED STATES ATTORNEY
BY:  BLAKE A. COPPOTELLI, ASSISTANT UNITED STATES ATTORNEY
97 Broad Street
Newark, NJ  07102


RIKER, DANZIG, SCHERER, HYLAND & PERRETTI
BY:  CHARLES B. McKENNA, ESQUIRE
One Speedwell Avenue,
Morristown, NJ  07962
For the Defendant

NUTTER, MCCLENNEN & FISH, LLP
BY: SETH BERMAN, ESQUIRE
155 Seaport Blvd.
Boston, MA  02210
For the Defendant


          Proceedings recorded by mechanical stenography
          Transcript produced by computer-aided transcription


          Shannan Gagliardi, Official Court Reporter
            shannan_gagliardi@njd.uscourts.gov
                    (609)851-2750

MC 0104

(PROCEEDINGS held in open court before the Honorable Michael A. Shipp, United States District Judge, at 1:01 p.m.)

THE DEPUTY CLERK:  All rise.  *United States v. John Hughes*, Criminal Case No. 23-867.

THE COURT:  Please be seated.  Good afternoon.  Okay. We're here today for an initial appearance, a plea hearing, and a bail hearing.

So let me start, Mr. Hughes, by reading you your rights.  First of all, you should know that you have the right to remain silent.  That means that you are not required to make any statements or speak with anyone, and, if you do, you may stop at any time.

You should know that anything you say can and will be used against you.  You have the right to be represented by an attorney.  If you cannot afford an attorney, I will appoint one for you at no cost.

Do you understand these rights?

THE DEFENDANT:  I do.

THE COURT:  I understand that you have retained your own counsel; is that correct?

THE DEFENDANT:  That's correct.

THE COURT:  Okay.  Let me have appearances of counsel, please.

MR. COPPOTELLI:  For the government, Blake

MC 0105

3

Coppotelli.  Again, good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. McKENNA:  Good afternoon, Your Honor, Charles McKenna, Riker Danzig, as local counsel for Mr. Hughes because we have an attorney from afar.

THE COURT:  Okay.  From afar.  Let's have the attorney from afar enter his appearance.

MR. BERMAN:  Seth Berman at Nutter, McClennen & Fish in Boston, which is not that afar but, anyway, far enough.

THE COURT:  Thank you and welcome.

I understand that the parties have entered into a plea agreement and that this matter is now before the Court for a Rule 11 hearing; is that correct?

MR. COPPOTELLI:  That is correct, Your Honor.

MR. BERMAN:  Yes.

THE COURT:  Okay.  Mr. Rothman, has your client received a copy of the information filed against him?

MR. BERMAN:  Sorry.  I'm Mr. Berman.

THE COURT:  Berman.  Rothman.  Okay.

MR. BERMAN:  And, yes, he has.

THE COURT:  Okay.  Mr. Cappotelli, can you advise the defendant of the charges and the maximum penalties?

MR. COPPOTELLI:  Yes, Your Honor.

The information that has been filed with the Court charges that from in and around January 2015 through in and

MC 0106

around March 2020, in the District of New Jersey and elsewhere, defendant knowingly and intentionally conspired and agreed with others, including Co-conspirator 1 and Co-conspirator 2, to defraud dozens of investors who had invested approximately 360 million in investment funds managed by Prophecy Asset Management LP, defendant's and Co-conspirator-1's company, through lies, deception, misleading statements, and material omissions relating to, among other things, A, the purported low risk transparent and diversified nature of Prophecy's funds; B, the manner and purpose in which the defendant, Co-conspirator-1, and Co-conspirator-2 used money from those funds; and, C, the financial position of Prophecy's funds leading up to the loss of over 290 million in investor funds from its collapse in and around March 2020 contrary to Title 15 United States Code Section 78j(b) and 78ff and Title 17 Code of Federal Regulations Section 240.10b-5 in violation of Title 18 United States Code Section 371.  The defendant is charged with conspiracy to commit securities fraud, Your Honor.  Thank you.

THE COURT:  Okay.  Did you give me the maximum penalties?

MR. COPPOTELLI:  The violation of 18 USC Section 371 charged in the information carries a statutory maximum sentence of five years of imprisonment and a statutory maximum fine of up to $250,000.  There are additional fines and penalties that are set out in the plea memo that the government has provided

MC 0107

to the Court.  I could go through those and read those, but I submit that they're contained in the plea memo.

THE COURT:  Thank you.

Mr. Hughes, do you understand what you've been charged with and the maximum penalties that you face?

THE DEFENDANT:  I do.

THE COURT:  Okay.  Let's move on to the plea.

Jair, can you administer the oath?

THE DEPUTY CLERK:  Place your left hand on the Bible; raise your right.

(Defendant sworn.)

THE DEPUTY CLERK:  Please state your full name for the record and spell your last name.

THE DEFENDANT:  John Patrick Hughes, H-U-G-H-E-S, and it's a junior.

THE COURT:  Thank you.  You can be seated.

Mr. Hughes, do you understand that you are now under oath, and that, if you answer any of my questions falsely, you can later be prosecuted for perjury or for making false statements?  Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  You've given me your full name.

What is your age?

THE DEFENDANT:  Fifty-six.

THE COURT:  Okay.  And what is the highest level of

MC 0108

6

education you've completed?

THE DEFENDANT:  I have a Bachelor of Science degree.

THE COURT:  Okay.  So it's fair to say that you read, write, and otherwise understand English, correct?

THE DEFENDANT:  That's correct.

THE COURT:  Have you had any drugs, alcohol, or any medication within the last 24 hours that might impair your ability to understand the proceeding here today?

THE DEFENDANT:  Not anything that would impair it, no.

THE COURT:  Okay.  And have you received a copy of the information filed against you in this case?

THE DEFENDANT:  I have.

THE COURT:  And have you fully discussed the charges and the case in general with your attorneys?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Are you fully satisfied with the representation and advice provided to you in this case by your attorneys?

THE DEFENDANT:  I am.

THE COURT:  Is your willingness to plead guilty here today because you are indeed guilty?

THE DEFENDANT:  Yes.

THE COURT:  I want to talk to you about a number of things today.  Some of it may appear to be a bit redundant, but

MC 0109

it's important that I understand that you understand the agreement that you've entered into.

Let's start with your waiver of rights to be charged by way of indictment. Do you understand that you have the right to be charged by way of indictment instead of by information?

THE DEFENDANT: I do.

THE COURT: Do you further understand that, unless you waive your rights to be charged by way of indictment, that you cannot be charged with this offense unless a grand jury finds and returns an indictment and finds that there's probable cause that you committed the crime with which you are being charged?

THE DEFENDANT: Yes.

THE COURT: If you do not waive your rights to be charged by way of indictment, the government can present the case to a grand jury and request that you be indicted.

Do you understand that?

THE DEFENDANT: I do.

THE COURT: A grand jury is composed of between 16 and 23 people. At least 12 of the grand jurors present would have to believe that there's probable cause that you committed the crime with which you are being charged in order for you to be indicted.

Do you understand that?

MC 0110

THE DEFENDANT:  I do.

THE COURT:  Do you understand that the grand jury may or may not indict you?

THE DEFENDANT:  I do.

THE COURT:  Okay.  And if you waive your rights to be charged by way of indictment, this case will proceed against you just as if you had been indicted.

Do you understand that?

THE DEFENDANT:  I do understand, yes.

THE COURT:  Okay.  Have you discussed this waiver of indictment with your attorney?

THE DEFENDANT:  I have.

THE COURT:  Okay.  And do you believe that you fully understand your rights as it pertains to your rights to be charged by way of indictment?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Have any threats or promises been made to induce you to waive your rights to be charged by way of indictment?

THE DEFENDANT:  No.

THE COURT:  Okay.  At this time do you wish to waive your rights to be charged by way of indictment?

THE DEFENDANT:  I do.

THE COURT:  Okay.  Mr. Berman, do you know of any reason as to why your client should not waive his rights to be

MC 0111

charged by way of indictment?

MR. BERMAN: I do not.

THE COURT: Mr. McKenna?

MR. McKENNA: I do not, Your Honor.

THE COURT: Okay. I find that the defendant has waived his rights to be charged by way of indictment. It's obvious to me that he understood the questions that I asked him. He answered them responsively. I have no doubt at this time that the waiver is knowingly, voluntarily, and intelligently made.

I want to move on and talk about the elements of a jury trial that you are giving up by entering into this plea.

Do you understand that you have the right to plead not guilty to any offense charged against you?

THE DEFENDANT: I do.

THE COURT: And if you proceeded with a not guilty plea, you would have the right to a trial by jury and the right to the assistance of counsel during that trial.

Do you understand that?

THE DEFENDANT: I do.

THE COURT: You would have the right to see and hear all the witnesses and have them cross-examined in your defense.

Do you understand that?

THE DEFENDANT: I do.

THE COURT: You would have the right on your own part

MC 0112

to decline to testify unless you voluntarily elected to do so in your own defense.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  You would have the right to the issuance of subpoenas or other compulsory process to compel the attendance of witnesses to have them testify in your defense.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  At trial, you would also have the benefit of the presumption of innocence, and what that means is I would inform the jury that you are presumed innocent.  That presumption would remain in place until such time came, if it ever came, where a unanimous jury was satisfied that the government had proven your guilt beyond a reasonable doubt.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  At trial, you would also have no burden of proving anything, and the sole burden would be upon the government to prove each and every essential element of the offense with which you are being charged.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  And do you further understand that by entering into a plea of guilty, if that plea is accepted, that

MC 0113

there will be no trial in this case?

THE DEFENDANT:  I do understand that.

THE COURT:  Okay.  And do you also understand that you will have waived or given up all of the attendant rights that I just went over with you with regards to a jury trial?

THE DEFENDANT:  I do.

THE COURT:  Are you a United States citizen?

THE DEFENDANT:  Yes, I am.

THE COURT:  Do you have your plea agreement in front of you?

Counsel, can you assist and turn to page 5 of that agreement?

There's an entire paragraph devoted to immigration consequences in that agreement, and suffice it to say, if it turns out that you are not a citizen, those would be implicated.  But at this time, I want to invite you to turn to page 7 of that agreement.

Is that your signature on page 7?

THE DEFENDANT:  It is, yes.

THE COURT:  Did you have an opportunity to read and discuss the plea agreement in its totality with your attorney before you signed it?

THE DEFENDANT:  I did.

THE COURT:  Okay.  Mr. Cappotelli, can you please summarize the plea agreement for the Court?

MC 0114

MR. COPPOTELLI:  The plea agreement provides that if the defendant enters a plea of guilty and is sentenced on the information and otherwise fully complies with the terms of the agreement, the United States Attorney's Office for the District of New Jersey will not initiate any further criminal charges against defendant covering the facts detailed in the information occurring from in and around January 2015 through in and around March 2020.

The plea agreement also contains a Schedule A with certain guidelines stipulations, including that the agreed total guidelines offense level applicable to the defendant is 30.  Thank you.

THE COURT:  Mr. Hughes, is that an accurate summary of the plea agreement between you and the United States?

THE DEFENDANT:  I believe it is, yes.

THE COURT:  And do you believe that, with the explanations and advice from your attorneys, that you understand each and every term of that agreement?

THE DEFENDANT:  Yes.

THE COURT:  Has anyone made any other or additional promises to you in an effort to induce you to plead guilty?

THE DEFENDANT:  No.

THE COURT:  Has anyone attempted to force you to plead guilty?

THE DEFENDANT:  No.

MC 0115

THE COURT:  Do you understand that the offense to which you are pleading guilty is a felony offense?

THE DEFENDANT:  I do.

THE COURT:  If your plea is accepted, you'll be adjudged guilty of that felony offense.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  Such an adjudication may deprive you of valuable civil rights, such as the right to vote, the right to serve on a jury, the right to hold public office, or the right to own or possess a firearm.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  If the Court accepts your guilty plea, all that will be left is sentencing.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  The Sentencing Reform Act of 1984 provided guidelines for judges to follow in a criminal case.

Do you understand that those guidelines are advisory and not mandatory?

THE DEFENDANT:  I do.

THE COURT:  Do you understand that the sentencing judge may impose a sentence higher or lower than that recommended by the guidelines?

MC 0116

THE DEFENDANT:  Yes.

THE COURT:  I want to next talk to you about the waiver of your rights to appeal.

Do you understand that in the absence of a waiver, in other words, if there was no waiver, the law permits every defendant, such as yourself, the right to file an appeal of a conviction if you believe that there's been an error?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that, in the absence of a waiver, that you would have a right, if you believe there was an error, to file for collateral challenge to your conviction under 28 USC 2255?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that pursuant to your plea agreement, if your term of imprisonment doesn't exceed 60 months, you will have generally waived all of your rights to appeal, collaterally attack, or seek to reduce any part of your sentence?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that there are narrow exceptions to that general waiver?

THE DEFENDANT:  Yes.

THE COURT:  For example, do you understand that you can still raise a claim for ineffective assistance of counsel?

THE DEFENDANT:  Yes.

THE COURT:  Similarly, you can still move to reduce your term of imprisonment on the grounds that there are extraordinary or compelling reasons that warrant a reduction.

Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  Did you discuss the waiver of appeal with your attorneys?

THE DEFENDANT:  I have.

THE COURT:  And are you satisfied with the explanations that they've provided to you?

THE DEFENDANT:  I am.

THE COURT:  Okay.  In front of you should also be a document called -- it's entitled an application for permission to enter into a plea of guilty.

Do you have that in front of you?

THE DEFENDANT:  I do, yes.

THE COURT:  Okay.  And did your attorneys go over all the questions on that document with you?

THE DEFENDANT:  Yes.

THE COURT:  And have you signed the document?

THE DEFENDANT:  I believe I have.  This copy...

THE COURT:  I don't want the "I believe I have."  I want the "I have" if you signed it.

THE DEFENDANT:  I have, yes.

THE COURT:  Mr. Berman, do you represent that

MC 0118

Mr. Hughes indicated his understanding of the questions on the Rule 11 form and that he signed it voluntarily?

MR. BERMAN:  Yes.

THE COURT:  Mr. McKenna?

MR. McKENNA:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Hughes, you've agreed to plead guilty to a one-count information which charges you with conspiring to commit securities fraud in violation of 18 USC Section 371.

You understand that the government would be required to prove each and every essential element of the offense with which you are being charged, and this Court will only accept a guilty plea if there is a basis in fact.

So at this time, Mr. Cappotelli, I'm going to ask you to please elicit a factual basis from Mr. Hughes.

MR. COPPOTELLI:  Does the Court want me to put on the record the elements of the crimes first?

THE COURT:  No.  Just elicit the factual basis, please.

MR. COPPOTELLI:  Okay.  Mr. Hughes, I'm going to ask you a series of questions.  Each one has to be answered independently.

Between in and around January 2015 through in and around March 2020, did you agree and conspire with Co-conspirator-1 and Co-conspirator-2 referenced in the

17

information to defraud investors in Prophecy Asset Management LP and its funds; Prophecy Trading Advisors International LTD, referenced as "the fund" in the information; and Prophecy Trading Advisors Master Fund LP?  The master fund is referenced in the information, collectively referenced in the information, as "the funds."

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  And as part of that scheme to defraud, did you and Co-conspirator-1 represent to investors that the funds employed a first law trading strategy that purportedly allocated investor money to a diverse array of traders called sub-advisors?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  And contrary to this representation, over time did you and Co-conspirator-1 allocate approximately 86 percent of the fund's capital to six different trading entities each controlled by a single sub-advisor, Co-conspirator-2?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  And did you and Co-conspirator-1 also represent to investors that all sub-advisors had to provide cash or other sufficient collateral equal to approximately 10 percent of the money they sought to invest in order to gain access to the investors' pooled money and backstop any potential losses?

MC 0120

18

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Contrary to this representation, did you and Co-conspirator-1 provide Co-conspirator-2 substantial allocations from the funds without requiring Co-conspirator-2 to provide cash or other sufficient collateral to back Co-conspirator-2's potential losses?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 further represent to investors that if a sub-advisor began to experience trading losses that approached the amount of their required collateral, Prophecy would contact the sub-advisor to increase or replenish their collateral and, if necessary, suspend allocations and trading or even terminate the sub-advisor if losses were substantial?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Contrary to this representation, did you and Co-conspirator-1 fail to suspend Co-conspirator-2's allocations or trading even though he sustained millions of dollars in losses that far exceeded his collateral?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 fraudulently conceal this and other information from the victims causing the victims, as referenced in the information, to believe their investments were far more secure than they actually were?

MC 0121

19

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Over time, did Co-conspirator-2 sustain substantial trading losses in excess of 294 million that ultimately wiped out the funds and caused over 294 million in losses to the victims?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you, Co-conspirator-1, and Co-conspirator-2 fraudulently conceal Co-conspirator-2's losses and deficit cash or other sufficient collateral by, among other things, engaging in a secret round-trip transaction that siphoned off cash from the funds and gave it to Co-conspirator-2, who then fraudulently used it as collateral in order to obtain more investment money from the funds?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  More specifically, in and around November 2017, did you and Co-conspirator-1 enter into fraudulent loan agreement -- a fraudulent loan agreement with Co-conspirator-2 whereby you purported to use money from the funds to loan approximately 11 million to a company that Co-conspirator-2 owned, referenced as Company 1 in the information?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  And based on that purported loan, did Co-conspirator-2 cause Company 1 to engage in two transfers totaling approximately 10 million to another entity that

MC 0122

Co-conspirator-2 owned, referenced as Entity 1 in the information?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did Co-conspirator-2 then wire the approximately 10 million in two separate transactions from Entity 1 back to Prophecy and designate the money as a new cash collateral contribution?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 fail to disclose this fraudulent round-trip transaction to the victims?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you, Co-conspirator-1, and Co-conspirator-2 conceal these transactions and Co-conspirator-2's involvement therein from the fund's administrator and auditor by, among other things, having the signature of Co-conspirator-2's former Company 1 colleague on the 11 million-dollar loan agreement?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  On or about November 22, 2017 and November 30, 2017, did Entity 1 transfer a total of approximately 10 million to the funds, and did you and Co-conspirator-1 cause this money to be falsely recorded in the fund's books as a cash collateral contribution from Co-conspirator-2?

THE DEFENDANT:  Yes.

MC 0123

MR. COPPOTELLI:  Did you and Co-conspirator-1 and Co-conspirator-2 also fraudulently conceal Co-conspirator-2's losses and collateral deficits by allowing Co-conspirator-2 to use purported non-cash collateral, such as personal guaranties or stocks, to secure allocations from the funds without disclosing this to the victims or taking steps to verify that non-cash collateral was legitimate and had actual value?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  For example, in and around April 2019, did Co-conspirator-2 create a fake preferred stock agreement that purportedly granted Prophecy ownership of approximately 125 million of stock in a company, as referenced in the information Company 2, that Co-conspirator-2 controlled?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Was this agreement created to secure non-cash collateral to offset over 85 million in losses that Co-conspirator-2 had incurred as of April 2019?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Was that agreement created in and around June 2019 and intentionally backdated to on or about January 2018 to make it falsely appear to the fund's auditors that the funds had sufficient collateral to offset Co-conspirator-2's trading losses at all times during 2018?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  In and around June 2019, did

MC 0124

Co-conspirator-2 provide you with approximately two Company 2 convertible stock certificates as proof of the ownership reflected in the preferred stock agreement?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Were these stock agreements intentionally backdated to conform with the backdated preferred stock agreement?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  In reality, were the stock certificates fabricated?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 fail to conduct any due diligence on the agreement or certificates to determine their legitimacy?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 fail to disclose to investors that you were allowing Co-conspirator-2 to provide this purported non-cash collateral to offset 85 million in losses?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 make numerous failed investments and loans that threatened to create substantial losses to the funds?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  To conceal these potential losses,

MC 0125

did you, Co-conspirator-1, and Co-conspirator-2 engage in a series of fraudulent transactions that were designed to deceive investors and the fund's auditor?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  For example, from in and around December 2018 through in and around July 2019, through a series of transactions, did you and Co-conspirator-1 use money from the funds to make an investment with a total value of 24 million in Company 3, as referenced in the information, a fund manager owned by a Pennsylvania investment advisor?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  In and around late December 2018, did you and Co-conspirator-1 attempt to redeem the total amount of this investment?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Were the funds only able to receive approximately 6.5 million of the 24 million investment leaving approximately 17.5 million of potential loss on the Funds books?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  To conceal and clear this loss from the fund's books, did you, Co-conspirator-1, and Co-conspirator-2 agree to engage in a series of transactions that made it appear that the investment had been legitimately purchased by an independent third party when, in reality,

MC 0126

Co-conspirator-2 secretly purchased the investment?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  In furtherance of that agreement, on or about May 23, 2019, did Co-conspirator-2 wire $17,579,885.15 to the fund, the exact amount of the outstanding Company 3 investment?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  To conceal Co-conspirator-2's purchase, did Co-conspirator-2 have the investment transferred to Company 1?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Between on or about June 12, 2019 and on or about June 17, 2019, did you and Co-conspirator-1 alter Company 3's limited partnership agreement to allow for the assignment of the Company 3 investment to Company 1?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 forge Individual 1's signature on that altered limited partnership agreement?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  On or about June 12, 2019, did Co-conspirator-2 provide you with an agreement backdated to April 1, 2019, assigning the interest in the investment to Company 1?

THE DEFENDANT:  Yes.

MC 0127

MR. COPPOTELLI:  Did Co-conspirator-2 forge the signature on the agreement using the first and middle names of his son, who was a minor?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you and Co-conspirator-1 provide these fake agreements to the fund's auditor to conceal from the auditor and investors that Co-conspirator-2 had purchased the investment in Company 3?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Did you intentionally engage in these fraudulent activities?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Are you pleading guilty to the charge in the information because you are, in fact, guilty?

THE DEFENDANT:  Yes.

MR. COPPOTELLI:  Your Honor, the United States represents to the Court that, if this matter were to have proceeded to trial, the United States could have proved each and every element of the crime charged in the information beyond a reasonable doubt, including the element that the defendant caused interstate -- what the defendant engaged in affected interstate commerce in furtherance of the conspiracy.

Thus, the United States believes that the defendant's affirmative answers to the foregoing questions coupled with these representations provide a sufficient factual basis for

MC 0128

acceptance of his plea of guilty to the information, Your Honor.

THE COURT:  Thank you.

Mr. Hughes, how do you now plead to the charge, guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  Okay.  It is the finding of the Court in the case of the *United States v. John Hughes* that the defendant is fully competent and capable of entering an informed plea, that the defendant is aware of the nature of the charges and the consequences of the plea, that the plea of guilty is knowing and voluntary supported by an independent basis in fact containing each of the essential elements of the offense.  The plea is therefore accepted.  The defendant is now adjudged guilty of that offense.

Mr. Hughes, a written presentence report will be prepared by our probation department to assist me in sentencing.  You'll be asked to give information for that report.  I strongly urge you to cooperate with probation in the preparation of this report.

You and your attorneys will have an opportunity to raise any objections to the report prior to sentencing, and, at sentencing, you'll have an opportunity to speak in mitigation of your sentence.  And, of course, your attorneys will have an opportunity to speak on your behalf.

MC 0129

The Court has set a sentencing date of March 21, 2024, at 11:00 a.m.

Let's move on to bail. Let me hear from the government on bail.

MR. COPPOTELLI: Your Honor, the government has read Pretrial Services' report that has, I believe, been provided to counsel and the Court, and we defer to their recommendation and conditions that they have outlined in their report. Essentially, 100,000 unsecured appearance bond and the conditions that are set forth, one through five.

THE COURT: Okay. Thank you.

Mr. Berman.

MR. BERMAN: Your Honor, we agree with that. Also, in the pretrial report, there are two things I wanted to bring to your attention, however. One of the conditions of release is that the defendant not contact other codefendants, victims, or witnesses, which, of course, we're fine with. There are, however, several people with whom he is quite close who technically fit into that. We had an earlier discussion with the government about this, and I think we have a short list of people here that we would like excluded.

THE COURT: How many people are on that list?

MR. BERMAN: Eight.

THE COURT: Let's read them onto the record.

MR. BERMAN: Yes. It's Richard and Denise Wright;

MC 0130

Rob and Laura Ernst; Adam Tushek; Dennis Prestia; Maryann Hughes, who is also the defendant's wife; and John Hughes, Sr., the defendant's father.

THE COURT:  Any objection, Counsel?

MR. COPPOTELLI:  No, Your Honor, as long as the discussions have nothing to do with this case, this matter, the facts underlying it, as well as the discussions that counsel and I have had about the defendant's continued cooperation with the matter.

THE COURT:  Mr. Hughes, do you understand that stipulation?

THE DEFENDANT:  I do, yes.

THE COURT:  Mr. Berman.

MR. BERMAN:  Your Honor, if I may add one thing to that.  One of the people on the list is his wife.  I do think that he should be able to have a bit more freer conversation than that with his wife.

THE COURT:  Have you folks discussed this?  Are you stipulating to the wife and the more flexible conversations with the wife?

MR. COPPOTELLI:  Yes, absolutely.

THE COURT:  Okay.  Then it's understood.

MR. BERMAN:  The one thing I wanted to bring to your attention, Your Honor, is the defendant possesses some guns that have been removed from the house, and he signed an

affidavit to that effect.  After that, we had a discussion today.  In addition to those firearms, he also owns a BB gun, which he has not yet removed from the house, but will do so within 24 hours.  I don't think it's technically a firearm, but I think it's probably best if it's not in the house and it be removed.

THE COURT:  Okay.  Thank you.

Mr. Hughes, I'm going to release you today on a 100,000-dollar unsecured appearance bond along with the following conditions.  One, you'll be subject to report to Pretrial Services as directed.  Two, you are to surrender all passports and not apply for any new travel documents.  Three, your travel will be restricted to the continental United States.  Four, you will have no contact with the codefendants, victims, witnesses, or co-conspirators unless in the presence of counsel with the exception of those that have gone and been placed on the record by your attorney.  Five, you are to surrender and not possess any firearms.  All firearms in the home in which you are residing must be removed in compliance with the state law within 24 hours.

I understand that you've already complied with this, but to the extent that you have not, including the BB gun, you must surrender that immediately.  You shall also surrender any Firearms Purchaser Identification Cards to Pretrial Services.

Do you understand all of the conditions of your

release today?

THE DEFENDANT:  I do.

THE COURT:  Okay.  Then with that, that is all that I have.

Is there anything else from the government today?

MR. COPPOTELLI:  Not from the government, Your Honor.  Thank you.

THE COURT:  Anything else from defense counsel?

MR. BERMAN:  No, Your Honor.

MR. McKENNA:  Nothing, Your Honor.

THE COURT:  Okay.  Thank you.  Have a great day.

THE DEPUTY CLERK:  All rise.

(Proceedings adjourned at 1:35 p.m.)


CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



/S/Shannan Gagliardi, RDR, CRR            11/7/23
Court Reporter/Transcriber

MC 0133

# EXHIBIT B

To Gibson-Cohodes Letter

MC 0134

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYONROSS PARTNERS MASTER FUND LP, SUSSEX DIRECTORIES SEZC, TIMBERDALE LIMITED, VLADIMIR KUZNETSOV, and THE PIERS PLAYFAIR RETIREMENT PLAN & TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> PROPHECY TRADING ADVISORS INTERNATIONAL LTD, PROPHECY TRADING ADVISORS MASTER FUND, LP, PROPHECY ASSET MANAGEMENT LP, PROPHECY TRADING ADVISORS GP, LLC, JEFFREY SPOTTS, JOHN HUGHES, JOHN CARUSO and BRIAN KAHN, <br><br> Defendants. | Civil Action No. _____ <br><br> **[SEALED] COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

MC 0135

## TABLE OF CONTENTS

NATURE OF THE CASE .................................................................................................1

JURISDICTION AND VENUE .......................................................................................5

THE PARTIES..................................................................................................................6

STATEMENT OF THE FACTS .......................................................................................9

    A.    Prophecy's False and Misleading Statements Prior to
           Plaintiffs' Investments ..........................................................................9

    B.    Plaintiffs Invest in Reliance on Prophecy's
           Representations ...................................................................................15

    C.    Defendants' Continuing Misrepresentations and Plaintiffs'
           Continuing Reliance.............................................................................16

    D.    Prophecy's Secret Off-platform Investments with Broad
           Reach and Kahn ..................................................................................17

          1.    Prophecy's Hidden Off-platform Investment with
               Broad Reach....................................................................18

          2.    Kahn's Co-Dependent Relationship With Prophecy .....................19

          3.    Kahn's Secret Side-Account Sucked $160M from
               Prophecy, Largely to Build a Controlling and
               Illiquid Position in FRG....................................................20

    E.    The Broad Reach Ponzi Scheme Comes to Light
           and Prophecy Lies to LyonRoss About Not Having
           Invested in It .......................................................................................22

    F.    Kahn and Prophecy Cover Up Prophecy's
           Entanglement with Broad Reach .........................................................23

    G.    LyonRoss's Continued Investigation Reveals the
           Broad Reach Cover-Up........................................................................25

    H.    Prophecy's Massive, Secret Off-platform Investments with
           Kahn are Exposed ................................................................................26

    I.    Its Off-platform Investments with Kahn Caused Prophecy
           to Over-Leverage the Funds and Left it Unable to Pay
           Redemptions .......................................................................................29

MC 0136

J.      Prophecy Reveals That Its Auditor Had Resigned ................................................30

K.      Prophecy Improperly Suspends Redemptions ......................................................31

CAUSES OF ACTION ...............................................................................................................33

PRAYER FOR RELIEF .............................................................................................................60

JURY DEMAND .........................................................................................................................62

176031.27

MC 0137

Plaintiffs LyonRoss Partners Master Fund LP (the "LyonRoss Partners Fund"), Sussex Directories SEZC ("SDS"), Timberdale Limited ("Timberdale"), Vladimir Kuznetsov ("Kuznetsov"), and the Piers Playfair Retirement Plan & Trust ("PPRPT") (collectively, "Plaintiffs"), bring this action for damages and other legal and equitable relief against defendants Prophecy Trading Advisors International Ltd (the "Fund"), Prophecy Trading Advisors Master Fund, LP (the "Master Fund," and together with the Fund, the "Funds"), Prophecy Asset Management LP ("Prophecy"), Prophecy Trading Advisors GP, LLC (the "General Partner"), Jeffrey Spotts ("Spotts"), John Hughes ("Hughes"), John Caruso ("Caruso") (collectively, the "Prophecy Defendants"), and Brian Kahn ("Kahn"), (collectively with the Prophecy Defendants, "Defendants") for (i) violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; (ii) violations of Section 20(a) of the Securities Exchange Act of 1934; (iii) common law fraud; (iv) aiding and abetting common law fraud; (v) civil conspiracy; (vi) negligent misrepresentation; (vii) breach of fiduciary duty; (viii) aiding and abetting breach of fiduciary duty; (ix) breach of contract; (x) negligence; and (xi) unjust enrichment, alleging as follows:

## NATURE OF THE CASE

1.     This is a case of fraud, breach of fiduciary duty, and conspiracy in which Defendants secretly diverted tens of millions of dollars of Plaintiffs' money to one man, Brian Kahn. That money was purportedly invested in a diversified risk-controlled structure, holding liquid assets. Instead, Kahn used it largely to accumulate a controlling shareholder position for himself in one small-cap public company, Franchise Group Inc. ("FRG"), where he is now President and CEO. Kahn acquired his concentrated, illiquid and risky FRG position through

MC 0138

Defendants' deceit and collusion, leaving Plaintiffs unable to recover a single dime of their investments.

2.     Spotts, Hughes, and Caruso ran an investment management firm known as Prophecy. They induced Plaintiffs to entrust over $50 million to them by marketing Prophecy as a careful, risk-averse, "first-loss" money manager. Prophecy's pitch was that it engaged dozens of sub-advisors to deploy investors' capital across a diverse set of liquid investments, using a proprietary platform designed and controlled by Prophecy to minimize losses (the "Platform"). Prophecy touted its first-loss structure, which controlled risk by requiring sub-advisors to put up their own funds, generally in the amount of 10% of the money received from Prophecy, as collateral to absorb the first losses on any of the Funds' investments. Requiring its sub-advisors to maintain the Funds' investments on its proprietary trading Platform provided a further, crucial risk-control mechanism because it gave Prophecy itself the ability to liquidate sub-advisors' positions before serious losses were incurred. These controls, Plaintiffs were told, made Prophecy a low-risk investment that highly-esteemed investors like Bain Capital considered tantamount to a cash alternative.

3.     During due diligence, various Defendants repeatedly emphasized three principles of the Funds' management: (i) liquidity, (ii) diversification (among both sub-advisors and positions), and (iii) risk-controls. Prophecy officers Spotts, Hughes, and Caruso billed their fund as a stable and highly collateralized investment vehicle. It was nothing of the sort.

4.     In fact, Prophecy had a years-long pattern of making and concealing illiquid investments and hidden soft loans (i.e., loans that benefit the recipient with below-market terms) with undisclosed parties in direct contravention of its investment mandate. Before and during Plaintiffs' investments with Prophecy, Defendants had secretly transferred significant capital into

-2-

MC 0139

an opaque investment fund managed by Broad Reach Capital ("Broad Reach"), which turned out to be a Ponzi scheme, and into soft loans with one sub-advisor, now known to be Kahn.

5.      The Broad Reach and Kahn arrangements had been ongoing for years before Plaintiffs invested in the Prophecy Fund and were precisely the kind of investments, and investment structures, that Prophecy claimed to avoid. Thus, they were allocations that Spotts, Hughes, and Caruso could not admit to their prospective investors, and specifically misrepresented to Plaintiffs.

6.      Prophecy disguised the nature of its exposure to Broad Reach, and conspired with Kahn to cover up the ensuing losses when Broad Reach defaulted on a redemption due to be paid in January 2019. To help Prophecy, Kahn *paid full value*—over $17.5 million—for Prophecy's redemption rights.  Then he agreed with Prophecy to back-date the transfer by over two months. Kahn's purchase for full value and back-dating of Prophecy's Broad Reach interest made no economic sense; its purpose could only have been to deceive Prophecy's investors by concealing the loss on this unauthorized investment.

7.      Kahn conspired with Prophecy to cover up its Broad Reach exposure not only because he too was obtaining disguised soft loans from Prophecy, but because Prophecy gave him access to a huge proportion of the Funds' capital.  Of the Funds' $363 million in capital as of January 2020, Khan and Prophecy together sucked $160 million into a fully hidden side account and $36 million into other hidden loans.  Eventually, 86% of Prophecy's capital was at Kahn's disposal, most of it – $196 million – completely hidden from Plaintiffs.  Kahn had used the majority of these Prophecy funds to accumulate his highly concentrated, illiquid position in FRG stock.

MC 0140

8.      Because so much of its capital was dedicated to Kahn's secret positions, Prophecy surreptitiously increased the leverage on its other investments in order to conceal the hidden transfers. Prophecy replaced the secret $196 million allocation to Kahn, dollar-for-dollar, with covert leverage. The combination of Kahn's diversion of the Funds' capital into concentrated, illiquid positions and Prophecy's high levels of leverage made the Funds unstable. Now Kahn is either unwilling, or unable, to return Prophey's capital, and Prophecy, in turn, is either unwilling or unable to honor Plaintiffs' redemption from the Fund.

9.      There is no doubt Defendants' conduct is culpable. Prophecy lied about Broad Reach and issued patently false written reports to Plaintiffs that omitted the $160 million in a secret side account with Kahn and $36 million in undisclosed soft loans to Kahn. Further, and tellingly, Deloitte & Touche LLP ("Deloitte"), Prophecy's auditor, abruptly withdrew its prior year audit opinion apparently due to Prophecy's false reporting concerning Broad Reach, and resigned. These actions by an auditor are a seismic event in the financial world that almost invariably signal wrongdoing.

10.     Kahn clearly conspired with and aided and abetted Prophecy, both by participating in the Broad Reach cover-up and by covertly taking Prophecy's investors' funds to make obviously unauthorized investments that he knew were not disclosed to investors. Kahn was also unjustly enriched both by the money taken from the Funds and not repaid and by the value of his control premium in FRG, which was purchased in part with Plaintiffs' money.

11.     Despite Plaintiffs' valid and timely redemption requests, Prophecy also now stands in breach of its contractual obligations to return Plaintiffs' money. Plaintiffs—all shareholders in the Funds—bring this action to recover their losses due to Defendants' wrongful conduct.

-4-

MC 0141

## JURISDICTION AND VENUE

12.    The claims herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and under state and common law.

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); 28 U.S.C. §§ 1331 and 1337; and principles of supplemental jurisdiction under 28 U.S.C. § 1367.

14.    Venue is proper pursuant to 15 U.S.C. § 78aa, because one or more acts or transactions constituting violations of the federal securities laws occurred in this District.

15.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

16.    This Court has personal jurisdiction over the defendants. The Fund and the Master Fund have significant contacts with New York, which is the principal place of business of their investment manager and general partner. Defendants Prophecy and the General Partner are Delaware entities that conduct significant ongoing business in New York and each maintain a principal place of business in New York. The individual defendants are principals, directors and/or affiliates of such entities, who conduct substantial ongoing business in New York.

17.    This case arises from misrepresentations Defendants Spotts and Hughes made in New York on behalf of Prophecy and the Funds, and that were received in New York by New York-based LyonRoss Capital Management LLC ("LyonRoss"), as agent for all Plaintiffs, and New York-based Plaintiff LyonRoss Partners Fund.

-5-

MC 0142

18.    The Defendants' acts caused injury to LyonRoss Partners Fund in New York. All of the Defendants regularly do or solicit business in New York and should reasonably expect their acts to have consequences in New York, while deriving substantial revenue from interstate or international commerce.

## THE PARTIES

19.    At all relevant times, Plaintiff LyonRoss Partners Fund has been a shareholder in the Fund. The LyonRoss Partners Fund initially invested $15 million in the Fund on February 1, 2019. LyonRoss Partners Fund has its principal place of business in New York.

20.    Relevant non-party LyonRoss is an SEC registered investment advisor with its principal place of business in New York that serves as the investment manager for, and agent of, the LyonRoss Partners Fund. LyonRoss maintains advisory clients, which are third-party investors such as family offices and other dedicated investment vehicles. LyonRoss recommends investments to advisory clients under non-discretionary investment agreements. These advisory clients rely on LyonRoss to research and source investment opportunities, and then invest in certain opportunities alongside LyonRoss. All other Plaintiffs (except for PPRPT) are advisory clients of LyonRoss, which acted as agent for all Plaintiffs in connection with Prophecy and the Fund.

21.    Plaintiff SDS has been a shareholder in the Fund. SDS initially invested in the Fund on or about February 1, 2019. SDS is a Cayman company with offices in the Cayman Islands.

22.    Plaintiff Timberdale has been a shareholder in the Fund. Timberdale initially invested in the Fund on or about February 1, 2019. Timberdale is an investment holding company organized under the laws of Guernsey.

MC 0143

23. Plaintiff Vladimir Kuznetsov has been a shareholder in the Fund. Kuznetsov initially invested in the Fund on or about August 1, 2019. Kuznetsov is an individual who resides in Switzerland.

24. Plaintiff PPRPT has been a shareholder in the Fund. PPRPT is a New York retirement trust for the benefit of Piers Playfair, a principal of LyonRoss, which initially invested in the Fund on or about February 1, 2019.

25. The Fund is an open-end investment company having a place of business in Lynlex Chambers, P.O. BOX 4408, Road Town, Tortola, British Virgins Islands. The Fund is managed from New York by Prophecy. New York is the primary place of business for operating and marketing decisions for the Fund, and the Fund solicits investors in New York. According to Prophecy's representations, the Fund invests all of its investable assets in the Master Fund, subject to oversight by the board of directors of the Fund. The Fund has only two directors to supervise and oversee its activities—Defendant Jeffrey Spotts, a Prophecy principal, and Thomas H. Davis, the sole outside director, who is based in Bermuda. The Fund is managed from New York by Prophecy. Between February and November 2019, Plaintiffs collectively invested approximately $52 million in the Fund.

26. The Master Fund is a Cayman Islands limited partnership that was formed for the purpose of investing and trading in securities and financial instruments. The Master Fund is managed from New York by Prophecy.

27. Defendant Prophecy is a Delaware limited partnership and a registered investment adviser that serves as investment manager to the Fund and the Master Fund. Prophecy's principal place of business is New York. Defendants Spotts and Hughes are principals of

-7-

MC 0144

Prophecy. According to diligence materials provided by Prophecy, in May 2018 it was advising funds with over $500 million of regulatory assets and $232 million of capital.

28.    The General Partner is a Delaware limited liability company that serves as the general partner of the Master Fund. The General Partner has its principal place of business in New York. Defendants Spotts and Hughes are members and principals of the General Partner.

29.    Defendant Jeffrey Spotts is the chief executive officer, portfolio manager, and founder of Prophecy. According to Prophecy's representations, Spotts is a director of the Fund and a principal of Prophecy. Upon information and belief, Spotts resides in New Jersey. Further, upon information and belief, at all relevant times, Spotts managed Prophecy and the Fund from New York.

30.    Defendant John Hughes is the president of Prophecy. Upon information and belief, Hughes resides in New Jersey. Further, upon information and belief, at all relevant times, Hughes managed Prophecy and the Fund from New York.

31.    Defendant John Caruso is the chief risk officer of Prophecy. Upon information and belief, Caruso resides in Charleston, South Carolina, and transacts substantial business in New York. As the chief risk officer of New York-based Prophecy, Caruso participated in meetings and phone calls with New York-based investors, including LyonRoss Partners Fund. Caruso conspired with New York-based Defendants Prophecy, Spotts, and Hughes to defraud and otherwise injure Plaintiffs.

32.    At all relevant times, Defendant Brian Kahn was engaged by Prophecy as a sub-advisor to the Funds with the largest allocation of the Funds' assets. Kahn is the CEO and President of FRG, a publicly listed company whose business lines include Liberty Tax Service, Buddy's Home Furnishings, Sears Outlet, American Freight and The Vitamin Shoppe. FRG currently operates over 4,400 locations predominantly located in the U.S. Upon information and

-8-

MC 0145

belief, Kahn resides in Florida and transacts substantial business in New York. Kahn conspired with New York-based Defendants Prophecy, Spotts, and Hughes to defraud and otherwise injure Plaintiffs.

## STATEMENT OF THE FACTS

**A.     Prophecy's False and Misleading Statements Prior to Plaintiffs' Investments**

33.     In August 2018, LyonRoss was seeking to build stable, long-term relationships with trusted alternative investment managers. Specifically, it was looking for managers that employed niche strategies to offer attractive risk-return profiles and relatively low correlations to equity markets. LyonRoss sought to obtain single-digit returns with relatively low levels of volatility—and an emphasis on capital preservation. Based on these criteria, it was introduced to Prophecy.

34.     On behalf of all the Plaintiffs, LyonRoss began conducting thorough due diligence into Prophecy and its offerings in August 2018. This due diligence included, *inter alia*, numerous direct communications with and requests for information from Prophecy, as well as third-party research and calls with numerous service providers, references, and peer firms to corroborate Prophecy's representations and reputation.

35.     Prophecy, and Spotts in particular, described its Funds as employing a "first-loss multi-manager strategy," meaning that the Funds' assets would be managed by a number of sub-advisors, each of whom placed their own cash as collateral in an escrow account with Prophecy that could be used to cover any losses suffered by the individual manager. Prophecy also claimed to employ strict risk control measures, including a requirement that sub-advisors trade through Prophecy's Platform, which allowed Prophecy to monitor its managers' trading strategies and, if necessary, directly liquidate holdings in each manager's account. Prophecy

-9-

MC 0146

represented that its success depended in part on controlling losses by maintaining the ability to prevent each sub-advisor on the Platform from executing risky trades that could exhaust its collateral with Prophecy. According to Prophecy, when sub-advisors incurred losses approaching the amount of their collateral accounts, Prophecy had the unilateral ability to step in and liquidate their positions—a risk mitigation strategy predicated on the sub-advisors' investing only in highly diversified, liquid assets, using the Prophecy Platform.

36.    Prophecy entered into agreements with each of its sub-advisors that were supposedly intended to generate consistent returns for the Funds while minimizing downside risk. Under these agreements, each sub-advisor agreed to pay the Funds a small percentage, typically around 2%, of the assets allocated to it by Prophecy, referred to as an "administration fee," for the right to access and invest the Funds' capital. In exchange, the sub-advisors were typically permitted to retain a substantial portion of the profits generated by their investments, with the remainder flowing to the Funds. These agreements included restrictions on the size of a stock position relative to its trading volume: "No single position may exceed 15% of the average daily trading volume over the previous 45-day period."

37.    Over the last nine years, this strategy appeared to translate into a steady, reliable rate of return with little downside risk for Prophecy's investors, seeming more akin to a liquid cash alternative than a fluctuating return based on variable market performance. Indeed, Prophecy reported that, prior to Plaintiffs' investment, the Funds had not experienced a single monthly loss over the prior eight years.

38.    Prophecy touted the blue-chip firm Bain Capital as one of its "lead investors." Bain is famous for its prudence and relentless due diligence, and Prophecy told LyonRoss that Bain considered the Funds so low-risk as to be essentially a cash alternative.

-10-

MC 0147

39.    Prior to Plaintiffs' investments, Prophecy's oral representations and written materials repeatedly stressed three things about its investment approach: (i) liquidity; (ii) diversification; and (iii) risk controls.  For example, in Prophecy's Due Diligence Questionnaire ("DDQ") provided to LyonRoss along with other offering documents, Prophecy represented that its investment strategy involved providing capital to a "diverse" set of sub-advisors that trade exclusively in liquid assets, such as "listed US equities, liquid global equities and options."

40.    Asked to describe "the firm's basic trading strategies," Prophecy represented that: "The firm assets are deployed via sub-advisor in discretionary and systematic management strategies, in **liquid equity markets** on a long/short basis" (emphasis added.)

41.    Describing its investment philosophy, Prophecy stated:

> We are not sector or style specific in our selection process.  We are interested in strategies that are process driven, that **traffic in liquid equities,** that have a record of **acceptable downside volatility and exposure,** and that are **consistently profitable.**  (Emphasis added.)

42.    In its response to the questionnaire, Prophecy represented that it "monitor[s] strategies [of its sub-advisors] to ensure they remain diversified across the aggregate of the funds positions," and stated that it would only engage sub-advisors that "have a clearly defined strategy that fits within the overall framework of the fund."

43.    In its materials, Prophecy explained that investor capital is "allocate[ed] to sub-advisors via structured arrangements in separately-managed accounts" and that "[t]hese allocations are **supported by cash deposits** provided by each sub-advisor or third-party investor" which "**serve as the primary downside risk protection** for the fund." (Emphasis added.)

44.    When asked: "How does the firm react if the volume and or open interest of a market in which a position is held are suddenly reduced significantly?" Prophecy responded in

-11-

MC 0148

its DDQ: "Our allocation methodology allows us to avoid that scenario by onboarding strategies that **invest in only the most liquid securities.**" (Emphasis added.)

45.    Prophecy explained that the combination of its trading platform paired with the liquidity of the positions taken by sub-advisors accomplished significant downside risk protection:

> **3.21 How would the firm approach sudden and unexpected illiquidity in any of the markets traded?**
>
> Sub-advisor positions are mostly in liquid markets. Almost all positions across the fund can be **liquidated in less than a day without significantly impacting prices. Prophecy maintains liquidity restrictions for all sub-advisors.** Should the liquidity of a market change, they would be required to reduce exposure on the affected position. (Emphasis added.)
>
> **7.0 Describe the firm's overall risk management and approach?**
>
> There is a multi-level approach to risk management:
>
> First, the structure of the first-loss program is conducive to attracting sub-advisors with their own conscious risk-avoidance thought process. Sub-advisors bear the risk of losses from their trading, and they, or a third party, provide a deposit as collateral against those losses.
>
> Second, our dedicated risk operation monitors all trading activity through the EMS systems [i.e., the Platform, or "execution management system"] to ensure that sub-advisors do not exceed their trading allocation parameters. These allocation parameters are hard-coded into the EMS and will prevent any subadvisor from entering an order that violates the settings.
>
> Third, our risk operation monitors all trading in a real-time risk system that captures all activity, calculates profit and loss, and enables the performance of stress tests on positions. There are three full time risk managers monitoring the portfolios throughout the day in real time.

46.    Defendant Caruso was in charge of Prophecy's risk management and responsible for implementing the above approach. Due to his position, Caruso was responsible for knowing

-12-

MC 0149

and had a duty to monitor all of Prophecy's positions. And indeed, he ran Prophecy's book of investments from a computer terminal with real time visibility and on every position, every sub-advisor and every trade executed on the Platform. He knew how much capital was being allocated to each sub-advisor, the profits and losses of each sub-advisor, the allocation of the Plaintiff's capital to Kahn and the leverage being used to fund the Platform investments.

47. On October 5, 2018, LyonRoss representatives attended a Prophecy "risk webinar." During that webinar, Spotts and Caruso confirmed the following representations (among others) regarding investments in the Funds:

- "Maximum position value is generally no greater than 8% of subaccount allocation;"

- "Maximum loss protections include an alert to risk management at Prophecy to consider closing the account after 50% of deposit balance is gone;"

- "Prophecy monitors the sub-account strategies to ensure they remain diversified across the aggregate of the Funds' positions;"

- "Prophecy employs 2-3x times leverage;"

- "Most sub-advisors make use of stop-loss orders in their portfolios to limit downside risk. In the vetting process, Prophecy favors sub-advisors who make use of stop-loss levels in their process. If an individual sub-advisor's portfolio violates a daily stop-loss limit or if the collateral deposit amount declines to an unacceptable level, the portfolio may be liquidated; and"

- "[T]he Prophecy risk operation would hedge any significant exposure for individual positions."

48. During diligence, LyonRoss analysts noticed a reference to "loans" Prophecy had invested in during 2017. As a category, loans appeared at odds with the investment strategy of holding liquid positions on Prophecy's Platform. On a November 26, 2018 call, LyonRoss asked Spotts about the loans. Spotts explained that Prophecy made these loans when they did not have the operational capability to manage certain strategies through the execution management system

-13-

MC 0150

of their transparent Platform (such as specialized dividend arbitrage strategies or option trades). In such cases, Prophecy lent money to sub-advisors to make so-called "Off-platform" investments.

49.    Spotts represented that Prophecy offset their reduced ability to control risk in Off-platform positions by insisting upon *full position-level transparency* into the underlying securities being traded. They were all low-risk trading strategies with limited downside. There were no commingled funds or limited partnerships, which are inherently less liquid and lack transparency. Spotts minimized the relative significance of the Off-platform positions and said that they constituted less than 5% of the Funds' gross assets. In a similar call on December 7, 2018, Spotts reiterated his previous representations and added that Prophecy only made such Off-platform allocations to strategies with "arbitrage-like qualities and low downside."

50.    Plaintiffs relied on these representations about Prophecy's Off-platform positions, which were recited in LyonRoss's investment memorandum, the document through which LyonRoss sought and was granted authority to invest with Prophecy by its investment committee.

51.    But these representations were lies. In fact, during 2018, while diligence was ongoing, the Funds had made $46 million in loans to Kahn that were completely undisclosed when Plaintiffs decided to invest. Prophecy then also held an undisclosed $24 million investment in the Broad Reach fund, into which it had no "position level transparency" at all.

52.    In January 2019, two LyonRoss analysts conducted an on-site due diligence meeting at Prophecy's Charleston office. Spotts, Hughes and Caruso were all present. At this meeting, LyonRoss reviewed the holdings of the various sub-advisors for the Funds and inquired about a particular sub-advisor with a larger allocation than the others (whose name was not

-14-

MC 0151

disclosed at the time, but who later turned out to be Kahn). Spotts stated that this was a very wealthy money manager with sufficient cash deposited as collateral for any losses on his investments, which were all managed on Prophecy's platform. Spotts also represented that this sub-advisor was well-diversified because he employed six other managers beneath him who were managing part of his overall allocation and that allocations to his account would be decreasing over time to avoid concentration. As events later revealed, however, the reality was once again quite contrary to Prophecy's representations.

53.     Defendants Spotts, Hughes and Caruso made the foregoing statements, or caused them to be made, on behalf of the Prophecy Defendants in their capacity as principals and officers of Prophecy and the General Partner. Defendant Spotts also made the foregoing statements, or caused them to be made, on behalf of the Funds in his capacity as a director of the Funds. LyonRoss, in turn, received all of these representations on behalf of all Plaintiffs.

## B.     Plaintiffs Invest in Reliance on Prophecy's Representations

54.     In reliance on Prophecy's representations, on February 1, 2019, LyonRoss made an initial investment of $15 million in the Fund. In the following months, LyonRoss increased its investment with $5 million subscriptions on each of April 1 and May 1, 2019, for a total of $25 million as of May 1. In reliance, *inter alia*, on the DDQ and other foregoing representations given to LyonRoss by Prophecy, the remaining Plaintiffs committed funds to Prophecy between February 1 and November 1, 2019, with Plaintiffs collectively investing $52 million with Prophecy.

55.     Each Plaintiff executed a contract with Prophecy in the form of a Subscription Agreement in connection with its investment in the Fund. The Subscription Agreements incorporated the terms of a 2018 Private Place Memorandum ("PPM") offering shares in the

-15-

MC 0152

Fund. Thus, the Subscription Agreements provided that investors could redeem their shares on 60 days' notice, in contrast to many other private investment funds, which often include long lock-up periods preventing or limiting redemptions. Indeed, as alleged above, Prophecy had represented that "almost all" of the positions in the Funds could be "liquidated in less than a day."

### C.   Defendants' Continuing Misrepresentations and Plaintiffs' Continuing Reliance

56.   Between February 2019 when Plaintiffs first invested, and January 2020 when Plaintiffs submitted their full redemption requests, LyonRoss, on behalf of all Plaintiffs, continued to communicate with Prophecy regularly and monitor Plaintiffs' investments. Throughout the period that Plaintiffs were invested in the Fund, LyonRoss held monthly calls and received various reports from Prophecy. All of these indicated that the Funds' investments were generally consistent with the purported diversification and liquidity of the Funds.

57.   LyonRoss made additional inquiries about the Funds' allocation to its largest sub-advisor and asked to see the holdings in that account. In February 2019, Spotts provided position-level detail as of year-end 2018 for the sub-advisor (who was Kahn, although he was not identified by name). The detailed report showed that Kahn managed a diversified, well-hedged portfolio, consistent with past statements. Spotts also confirmed by email that Kahn's allocation included six different strategies managed by traders he selected. The report did not reveal any Off-platform loans or positions with Kahn.

58.   To the extent Off-platform investments were disclosed on monthly update calls by Prophecy, the number of sub-advisors, the underlying strategies and amounts of those investments were also generally consistent with Prophecy's putative approach. To the extent Prophecy mentioned Off-platform investments with Kahn, they were described, falsely and

MC 0153

misleadingly, so as to misrepresent their true size and nature—at times falsely indicating such positions were fully covered by a cash deposit that dwarfed the positions themselves and at other times indicating that such positions were no more than $10 million in size. To the extent the Funds indicated Off-platform investments over 5% of its gross assets, LyonRoss was falsely led to believe that this was due to short-term allocations to very low-risk arbitrage strategies.

59.    LyonRoss and its advisory clients continued to maintain their investments with Prophecy and increase their subscription amounts in reliance on the foregoing misrepresentations.

**D.    Prophecy's Secret Off-platform Investments with Broad Reach and Kahn**

60.    Flatly contradicting its representations, Prophecy had a longstanding practice of making undisclosed Off-platform soft loans and buying illiquid, opaque fund participations that violated its professed investment approach and belied its specific representations to Plaintiffs.

61.    In addition to simply misrepresenting and failing to disclose these improper investments, the Prophecy Defendants also made attempts to conceal the true character of the investments by redeeming them at year-end and then re-instating them in the new financial year. By doing so, the investments would be reported on the Balance Sheet of the Funds' financial statements only as 'Receivables', thereby giving analysts the impression that the 'investments' were one step away from being cash. By redeeming at year end, Prophecy avoided having to supply any detail about the investments' underlying nature—did they differ from Prophecy's investment mandate, were they long or short term, were they with third parties, what was their financial yield, what was their structure, were they performing? None of this had to be disclosed if the investments were sold by December 31st, of any given year, and then added back in the following year. And had the investments been held on the Balance Sheet at the year end, the

MC 0154

auditor would be required to describe the assets correctly. Such accounting manipulation is a deceptive practice known as "window dressing."

### 1.    Prophecy's Hidden Off-platform Investment with Broad Reach[1]

62.    Spotts and Hughes had a longstanding and close relationship with Brenda Smith ("Smith"), the principal of Broad Reach Capital, L.P. ("Broad Reach"). Indeed, Smith had helped Spotts and Hughes set up a different Prophecy fund, known as Prophecy Alpha, and had served as an officer of that fund.

63.    During initial diligence, Prophecy mentioned to LyonRoss analysts in passing that a manager known as Broad Reach had been a sub-advisor to the Funds in connection with one specific transaction made using a separate account. Unbeknownst to LyonRoss, Spotts and Hughes purposefully omitted any indication that the Funds had a much closer and broader relationship with Smith and Broad Reach. Indeed, at that very time, Prophecy was investing *directly* into the Broad Reach investment fund without any transparency whatsoever into Broad Reach's underlying investments—transparency that Prophecy had claimed was the *sine qua non* of its Off-platform investments. That Prophecy was blind to Boad Reach's underlying assets is obvious because Broad Reach was a Ponzi scheme, holding assets far different from those it was supposed to—which anyone who really had transparency into it would immediately have seen.

64.    Prophecy had made an Off-platform investment in the Broad Reach investment fund in January 2017 and then hidden it from its own investors by window dressing over at least two year ends, 2017 and 2018. Prophecy's investment grew to $24 million during 2018, $17.5 million of which Prophecy was unable to redeem at the end of 2018, as described in Section E below.

-18-

MC 0155

## 2.    Kahn's Co-Dependent Relationship With Prophecy

65.    Brenda Smith's Broad Reach fund, was not the only sub-advisor for which Prophecy was window dressing investments or loans to conceal them from their investors. Spotts also had a longstanding and close relationship with Brian Kahn, whom Spotts described as being "like a brother" to him. Kahn had acted as a sub-advisor for Prophecy since the beginning of the Funds, and was consistently the Prophecy sub-advisor with the largest allocation. Prophecy had routinely provided marketing and fundraising assistance to Kahn at zero cost—an arrangement that apparently helped generate significant profits for Kahn (but with no discernible benefit for the Funds).

66.    During the time that Plaintiffs were invested in the Fund, it was disclosed that one sub-advisor (eventually identified as Kahn) managed somewhat over 50% of the Funds' assets on Prophecy's transparent execution management Platform. At various times, Spotts and Hughes represented that this allocation was being decreased but was already diversified due to Kahn's use of approximately six sub-managers. These Platform positions were diverse, liquid, hedged and conservatively levered through a relationship with Prophecy's prime broker.

67.    But Prophecy had also been making undisclosed soft loans to Kahn for years, which (as Spotts eventually admitted) Prophecy and Kahn would redeem shortly before the end of each fiscal year so the positions would not appear on the Funds' year-end financial statements. The pattern of window-dressing Kahn's financial relationship was similar to Broad Reach: redeem before year end, and then when the next year began, Kahn and Prophecy would reverse course and reinstate the loans.

68.    As it now admits, "Prophecy had entered into a number of agreements with [Kahn] which include collateral arrangements, personal guarantees, subscriptions, and short-term loans." These undisclosed transactions with Kahn occurred *in addition* to Prophecy's large

-19-

MC 0156

disclosed positions with Kahn as its largest sub-advisor. As it turned out, and unbeknownst to investors, $312 million or *86% of the Funds' $363 million* in capital eventually wound up in Kahn's hands, of which $196 million was kept completely secret from investors in a secret side account of $160 million (described immediately below) and hidden loans of at least $36 million ($160+$36=$196).

69. The pattern of hiding Kahn's Off-platform positions from investors extends back to at least 2017 and involved collusion because Kahn was a counterparty to the year-end redemption and reinstatements, and was aware that such behavior would be opaque to Prophecy investors.

### 3.    Kahn's Secret Side-Account Sucked $160M from Prophecy, Largely to Build a Controlling and Illiquid Position in FRG

70. In the latter half of 2019, Kahn needed money. Lots of it. Kahn had turned his focus to building a controlling position in a small public company, FRG (formerly known as Liberty Tax/TAXA) by buying shares personally, or through vehicles he owned and controlled. He then used FRG, as a roll-up vehicle to acquire several retail franchise businesses, including The Vitamin Shoppe, American Freight and Sears Outlet.

71. Kahn increased his FRG position exponentially from approximately 2 million shares (14.8%) on May 16th 2019 to more than 15 million shares (53.11%) on January 3rd, 2020. The total cost of Kahn's purchases of FRG shares between May 2019 and January 3rd, 2020 would have been roughly $200 million.

72. Finding $200 million for a speculative investment of this kind in FRG would be virtually impossible in any market. But during the latter part of 2019, Kahn obtained what he needed from Prophecy. Secrecy was essential because Prophecy could not justify to its investors or Plaintiffs, under any circumstances, making this kind of investment. It was Off-platform;

-20-

MC 0157

there was no cash guarantee; there was no first-loss provision; it was illiquid and—by orders of magnitude—far too concentrated. In fact, by virtually any standard that Prophecy had articulated, its huge, undisclosed allocation to Kahn was the very opposite of what it had led Plaintiffs to expect.

73.    To conceal this stark betrayal of its investment thesis, Prophecy and Kahn agreed to set up a secret side account into which they funneled over $160 million. Prophecy's reports to LyonRoss blatantly misrepresented the Funds' investments by concealing this secret side account.

74.    As Hughes finally confessed in January 2020, Kahn used "well over $100 million" of these side-account funds to buy FRG shares. Indeed, Kahn himself has recently admitted that he "owed" Prophecy money to amass a controlling number of FRG shares. He thus exploited his access to Prophecy's capital to build a huge interest in FRG, and he used Plaintiff's money to capture a control premium that he and his private equity fund would enjoy.

75.    Kahn's investments in FRG are highly illiquid. During the second half of 2019, the average daily trading volume was no more than 40,000 shares per day, or well under $1 million by dollar value. But Kahn accumulated a block of *15 million* shares valued as of August 2020 at approximately $380 million, a completely illiquid position considering the company's small size and typical trading volume. Even if Kahn or Prophecy wanted to liquidate Kahn's controlling position in FRG, it could not: there is no market for that volume of shares.

76.    Further, Kahn recently admitted that FRG's other lenders did not know of his secret account with the Funds, and that if they found out that Kahn had taken on additional undisclosed debt backed by FRG shares, they could very well seek to accelerate repayment of FRG's debts. Kahn indicated that FRG's lender agreement contained a change-of-control

-21-

MC 0158

provision, meaning that if Kahn's ownership of FRG fell below a certain high percentage, the lenders could accelerate repayment of their loans, and thereby dramatically diminish—if not destroy—the value of the company, rendering Kahn's position in FRG effectively worthless and utterly illiquid. Therefore, Kahn could not sell shares in the company to generate sufficient liquidity for Prophecy without risking acceleration of FRG's debt and likely bankrupting the company.

77.    Defendants knew full well they were deceiving and betraying Prophecy's investors: No first-loss fund makes the slightest sense if the majority of its assets are concentrated, illiquid and not actually subject to first-loss protection at all. Naturally, as set forth below, Plaintiffs sought to escape the Fund as soon as they learned the truth in January 2020— but by then Defendants' misconduct had already rendered that impossible.

### E.    The Broad Reach Ponzi Scheme Comes to Light and Prophecy Lies to LyonRoss About Not Having Invested in It

78.    In August 2019, LyonRoss learned through public reports that Brenda Smith, the founder of Broad Reach, had been arrested and indicted for securities fraud. Authorities alleged that Smith operated Broad Reach as a Ponzi scheme. According to the indictment filed by federal prosecutors, Smith "knowingly and intentionally devised . . . a scheme and artifice to defraud" pursuant to which she made "misrepresent[ations] to investors" and "[i]nstead of investing the money as SMITH advertised, she diverted tens of millions of dollars of investor funds . . . [and] [paid] out millions of dollars to other investors."

79.    Because Broad Reach had been mentioned during diligence, LyonRoss contacted Prophecy to confirm their understanding that Prophecy had not invested any of Plaintiffs' capital into the Broad Reach fund at the center of the Ponzi scheme.

80.    On August 27, 2019, Spotts wrote to LyonRoss:

-22-

MC 0159

Yes, they were the sub-advisor for the dividend skate trade. **We are not in that fund** and ran the trade through her broker dealer-introduced account at ICBC. Subsequently, we have hired away her trader, Jason Ferrari, that actually ran the strategy and we have a direct account at ICBC. **We are not impaired by this event.** (Emphasis added.)

81.   This statement was false and misleading because Prophecy, had, in fact, invested directly in the Broad Reach investment fund, rather than "through [Smith's] broker-dealer."

82.   Spotts repeated this lie the following day on a call with two LyonRoss representatives, claiming, that Prophecy had not had exposure to the Broad Reach fund, but instead had had exposure only through Broad Reach's broker-dealer side.

83.   Three months later, in November 2019, LyonRoss received a call from another Prophecy investor who was alarmed because he had learned that Prophecy had invested directly into Broad Reach's investment fund.

84.   LyonRoss again immediately contacted Spotts. During a call with three LyonRoss representatives, on or about November 15, 2019, Spotts admitted that, in fact, Prophecy *had* made an investment in the Broad Reach investment fund.

85.   Spotts then claimed that Prophecy had fully redeemed the investment at year-end 2018 and therefore had suffered no losses whatsoever.

**F.   Kahn and Prophecy Cover Up Prophecy's Entanglement with Broad Reach**

86.   Prophecy's story about having received full payment for its year-end 2018 redemption from Broad Reach was a lie. Prophecy received only a fraction of the funds it was owed by Broad Reach.

87.   To disguise the existence of the investment in Broad Reach from investors and to hide the default on the redemption, Prophecy and Kahn entered into a sham transaction. Prophecy had requested a redemption of its entire investment of $24 million in Broad Reach in

-23-

MC 0160

December 2018, to avoid disclosing its interest in the Broad Reach fund in Prophecy's year-end audit. But by April 2019, Prophecy had received only $6.5 million. Knowing that the Broad Reach investment would appear in the Funds' audited financial statements, Prophecy sold the outstanding $17,579,885.15 million receivable from the redemption to Kahn in June 2019—*for full value*.

88.    This undiscounted transaction made no economic sense: no rational investor would purchase at full value a months-old redemption right for payment from an investment fund (Broad Reach) that had already failed to honor the redemption.

89.    Kahn is no stranger to understanding the value of past-due receivables. He is CEO of major US retail operations including American Freight and Sears Outlet that excel at providing value on discounted furniture to Americans. And many American Freight and Sears Outlet customers purchase furniture on credit. Kahn therefore well understands that a customer receivable from, say, a sofa that is 180 days past due is not at all the same thing as cash.

90.    As to timing, Kahn paid Prophecy for its unredeemed Broad Reach interests in June 2019, right before Deloitte concluded its 2018 financial audit. Then Kahn and Prophecy dated the assignment so as to appear to have occurred on April 1, 2019.

91.    Having completed the sham transaction, Prophecy and Kahn then tried to cover up their involvement. Spotts's call and email in August 2019, denying to Plaintiffs' that Prophecy was in Broad Reach, which was a bald-faced lie, made all the more brazen given what had just occurred in June. And despite Prophecy's volte-face on November 15th, 2019, Kahn was not disclosed to Plaintiffs as the "buyer" of the redemption rights until January 2020.

-24-

MC 0161

92. That this Prophecy-Kahn receivable transaction was improper—and designed to mislead investors—was later confirmed by Deloitte's withdrawal of its 2018 audited financial statements and its resignation as the Funds' auditor.

### G. LyonRoss's Continued Investigation Reveals the Broad Reach Cover-Up

93. Upon learning in November 2019 that Prophecy had in fact been invested in the Broad Reach investment fund after all, LyonRoss became concerned and probed further. It conducted a number of follow-up meetings and calls with Prophecy from late November 2019 to January 2020. Prophecy appeared to be cooperating with LyonRoss and provided assurances that the Funds would be managed as had been represented going forward, and also that LyonRoss and its investors would suffer no losses as a result of the Broad Reach investment.

94. Not suspecting a far bigger problem, LyonRoss's focus during this period was on trying to ensure that Plaintiffs would not be damaged by Prophecy's participation in Broad Reach.

95. LyonRoss nevertheless inquired about any other Off-platform investments fearing there may be other Broad Reach-like fund investments lurking. LyonRoss received assurances that any Off-platform investments were reasonably cabined because they were abundantly collateralized against loss, had very low downside risk because of their arbitrage-like nature, and/or were small in size.

96. During this period—and before Plaintiffs were informed that Kahn had been involved in the Broad Reach sham—Spotts mentioned Off-platform positions with Kahn, but variously indicated that these were five times overcollateralized by Kahn's cash deposit with Prophecy or limited in size to $10 million.

-25-

MC 0162

97.     Spotts repeatedly promised to make no more material Off-platform loan or fund investments, at one meeting actually raising his right hand and pledging his "scouts honor."

98.     LyonRoss thus sought to ensure that Plaintiffs were not damaged by claw-backs in connection with the Broad Reach Ponzi scheme. In January 2020, to assure LyonRoss that any such exposure to claw-backs was limited, Prophecy admitted that over $17.5 million of its purported redemption from Broad Reach had not been paid by Broad Reach at all but that its redemption rights had been purchased by a "third-party." LyonRoss pressed further, and Spotts revealed that the purported third-party was not a third-party at all: it was actually Kahn.

99.     LyonRoss then asked what discount Kahn had received for buying a defaulted receivable. It was told that he paid full value.

100.    LyonRoss was puzzled and also concerned that Kahn would sue Prophecy for selling him a defaulted receivable from a Ponzi scheme at full value. LyonRoss demanded a call with Kahn and asked him to release Prophecy from any liability for the Broad Reach receivable.

101.    Unaccountably, and despite having been stuck with a $17.5 million debt from a Ponzi scheme, Kahn readily agreed to a broad release. Spotts tried to assuage LyonRoss's obvious suspicions by explaining that he and Kahn "were like brothers" and therefore that Kahn would never sue Prophecy and was untroubled by providing a release.

102.    This made no sense. LyonRoss suspected a *quid pro quo* for Kahn's bizarre willingness to accommodate Prophecy—and soon discovered that that there was one.

### H.    Prophecy's Massive, Secret Off-platform Investments with Kahn are Exposed

103.    By mid-January 2020, LyonRoss was deeply concerned about the integrity of Prophecy and their entanglement with Kahn and realized it needed to re-underwrite Plaintiffs' entire investment with Prophecy or redeem it.

-26-

MC 0163

104.    Tim Bliss ("Bliss"), a LyonRoss analyst demanded a precise report of all of the Funds' positions. Prophecy eventually provided the exposure report on January 22, 2020 that *purported to show 100% of the Funds' assets* as of January 17, 2020. This report indicated a relatively diversified, liquid pool of assets in keeping with Prophecy's advertised investment approach – and *showed that less than 10% of the Funds' assets were Off-platform.* However, in Spotts's cover email attaching the January 17th position report he revealed for the first time that the last three allocations were for Brian Kahn's deals. The three loans were for $20.25 million, $13 million and $3 million ($36.25 million in total) and were the only Off-platform positions listed in the report. Given Kahn's involvement with Broad Reach, LyonRoss dispatched Bliss to South Carolina to meet with Prophecy in person and fully re-underwrite the entire Prophecy portfolio (both on and Off-platform positions).

105.    During a meeting between Bliss and Hughes on January 28, 2020 Bliss dramatically discovered Prophecy's secret $160 million side account with Kahn and another $36 million in hidden soft loans to Kahn.

106.    Bliss had brought the January 17th 2020 exposure report to the meeting with Hughes on January 28, 2020 to verify it. However, at the meeting, Bliss caught Hughes with a copy of a holdings report that was starkly different from Spotts's January 17, 2020 report. Bliss noticed that Hughes's version of the report had two extra line items. Hughes explained that the two line items, amounting to $36 million (one loan for $19 million and another for $17 million— $19+$17=$36) were both hidden investments with Kahn in Off-platform special purpose vehicles, to which "Prophecy provided capital at a fixed rate of return."

107.    Bliss probed further, wanting to ensure that the overall liquidity of Prophecy's portfolio had not significantly deteriorated. Bliss asked Hughes to provide the equity balances in

-27-

MC 0164

the Funds' three prime brokerage accounts and bank account. Hughes initially resisted, saying Prophecy did not regularly provide that level of transparency. But Bliss insisted. Reluctantly, Hughes checked each balance and indicated approximately $105 million of prime brokerage equity balances across the Funds' accounts and approximately $15 million in its bank account amounting to total capital of $120 million ($105 + $15 = $120).

108. Because the known capital of the fund was $363 million, Bliss immediately calculated that there was money missing. Hughes finally revealed that there was in fact an additional secret account jointly owned by Prophecy and Kahn that contained approximately $160 million of capital, including well over $100 million of FRG stock.

109. When Bliss asked how the Funds came to have such a large position without disclosing it, Hughes blamed Spotts for getting in over his head and not thinking through the ramifications of deals. Hughes also admitted there was no cash deposit supporting this position.

110. Bliss also spoke to Caruso to verify the Funds' Platform trading positions, and particularly Kahn's allocations. On Caruso's computer screen, Bliss saw over $100 million of positions, in Kahn's account, in thinly traded, small cap stocks, including a significant *additional* FRG position of over $45 million.

111. This meant that Kahn had taken hostage to at least half the capital of the Funds to purchase his controlling interest in a single small-cap illiquid company. Hughes also admitted to Bliss the obvious: the Funds' arrangements with Kahn and their position with FRG was extremely concentrated.

112. These revelations belied Prophecy's entire investment premise, as well as all of Defendants' representations and reports concerning what it had been doing with Plaintiffs' money.

-28-

MC 0165

113.   Accordingly, Plaintiffs immediately submitted complete redemption requests, seeking to exit the Fund and recover their money. These redemptions should have paid within 30 days of March 31, 2020, but, as set forth below, they were not honored and Plaintiffs have yet to receive any of their money.

### I.   Its Off-platform Investments with Kahn Caused Prophecy to Over-Leverage the Funds and Left it Unable to Pay Redemptions

114.   Prophecy's $196 million of secret investments with Kahn were not only concentrated and illiquid, but also destabilized the portion of the fund for sub-advisors using Prophecy's transparent execution management Platform. Prophecy's secret and Off-platform transfers to Kahn alone now totaled 54% of the capital (or $196M/$363M=54%), dramatically higher than the 10% represented in the Jan 17, 2020 exposure report.

115.   Allowing Kahn to remove so much of the capital from Prophecy's on-platform business created an existential problem. Prophecy needed to replace those sums dollar-for-dollar (totaling $196 million)—as and when the sums had been removed—with borrowed money in order to support the Platform investments. If Prophecy hadn't secretly borrowed this money, Prophecy would have been forced to shrink its Platform by removing sub-advisors, and it would have quickly become clear to those sub-advisors on the Platform, and to Plaintiffs, that Prophecy's capital had been lost, redeemed or plundered. Any of those eventualities would have collapsed Prophecy's Funds and taken with it Kahn's funding source and his control over his investments.

116.   The consequence of so much leverage being added was that it left only $131 million ($363M-$196M-$36M=$131M) of fund capital supporting the $500+ million of investments on Prophecy's Platform. These numbers imply a nearly 4:1 leverage ratio, which for a 'conservative investment' is very high. This amount of leverage, in combination with the

MC 0166

Kahn's extraction of capital fundamentally altered the Funds' risk profile, making it far riskier than was represented to Plaintiffs, and far riskier than Plaintiffs would have accepted. The reports that Prophecy sent to Plaintiffs on a monthly basis grossly under-represented the Funds' leverage.

117.   Due to Plaintiffs' redemptions totaling over $50 million, Prophecy would have been required to reduce the small amount of capital that had been left undistributed to Kahn (from $131 million to approximately $81 million) and, in so doing, collapse its Platform business. Further, Kahn is unwilling or unable to return the Prophecy money tied up in FRG. The combination of capital sucked from the Funds by Kahn and replaced with leverage to support the Platform rendered Prophecy unable to fulfill Plaintiffs' redemption requests.

**J.     Prophecy Reveals That Its Auditor Had Resigned**

118.   On March 31, 2020, Prophecy sent a letter to all its investors disclosing that Deloitte & Touche LLP ("Deloitte") had withdrawn its audit opinion for Prophecy's 2018 financial statements and resigned as auditor of the Funds almost two weeks earlier on March 18. The significance of Deloitte's resignation cannot be overstated: the withdrawal of an auditor's opinion combined with its resignation is extremely rare, often portends underlying fraud; it typically results only from a complete lack of confidence in the integrity and representations of fund management, such that the auditor can no longer trust the information provided for its audit. Deloitte's withdrawal of its audit opinion for the prior year's financial statements also meant that investors could no longer rely on the information that had been presented to them—suggesting that Prophecy misled both its auditors and its investors in the prior financial statements.

119.   Prophecy's 2018 audited financial statements, which were issued in June 2019, were clearly misleading in light of information that LyonRoss subsequently learned about

-30-

MC 0167

Prophecy's investment in the Broad Reach investment fund. Notes to the financial statements represented that Prophecy had "invested into Funds and redeemed the same at the end of the year. These redemptions were collected." That statement was untrue when made in June 2019: as set forth above, Prophecy had in fact not collected $17.5 million in redemptions owed by Broad Reach.

### K.  Prophecy Improperly Suspends Redemptions

120.    Prophecy's March 31 letter concluded with more bad news: Prophecy stated that it was *retroactively* suspending redemptions, effective March 30, 2020. Despite these dire circumstances, Prophecy insisted that "patience" was required in order to avoid liquidating assets at price levels that would be "to the severe detriment of our investors."

121.    Prophecy's attempt to suspend redemptions on March 31 was ineffective because (i) LyonRoss had made an initial redemption request of $10 million in December 2019 (prior to discovery of the fraud), which should have been paid out in full by March 30, using a NAV calculated as of the Redemption Date of February 28, and there is no provision in the PPM or elsewhere granting Prophecy the right to suspend redemptions retroactively; and (ii) the suspension notice was delivered to Plaintiffs after close of business on March 31, which was the Redemption Date for Plaintiffs' second redemption request of $43,612,215 made in January 2020, and the suspension notice was therefore untimely.

122.    The information about the Funds' assets subsequently provided by Prophecy to all its investors leaves no room for doubt: the Funds are in dire straits, and its remaining assets are sunk heavily into Kahn's illiquid and highly leveraged investment schemes. It is now entirely clear that Prophecy's statements about its "risk mitigation strategy" and cautious investment approach were utter fabrications—instead of investing in liquid equities managed by a diverse

MC 0168

group of sub-advisors, Prophecy has heavily concentrated its investors' money in a set of opaque, illiquid, leveraged and high-risk investments managed by Kahn.

123.    Whatever the scheme cooked up between them, Prophecy still has not disclosed its full relationship with Kahn.  Indeed, to date, Prophecy has not provided financials for the Funds for 2018 and 2019 and has not provided information establishing the Funds' NAV since January 2020.

124.    Prophecy and Kahn have apparently now turned on each other, asserting claims and counterclaims against one another in arbitration.  Kahn still enjoys the money taken from Prophecy and remains the beneficial owner or 15.3 million shares in FRG worth over $380 million (as of August 3, 2020).  Plaintiffs have received nothing.

-32-

MC 0169

## CAUSES OF ACTION

### COUNT I

**(Against the Prophecy Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder)**

125.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

126.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

127.    The Prophecy Defendants knowingly, or recklessly, made false and/or misleading material statements and omissions of material fact to Plaintiffs prior to Plaintiffs' various investments in the Fund throughout 2019, for the purpose of inducing Plaintiffs to invest in the Fund.

128.    The Prophecy Defendants' material misrepresentations included, *inter alia*, the following:

(a)    The Prophecy Defendants' claims, made by Spotts, Hughes and Caruso, to LyonRoss personnel, including Piers Playfair ("Playfair"), Bliss and Bing Xu ("Xu"), during Plaintiffs' due diligence between August 2018 and February 2019, that the principles of the Funds' management were (i) liquidity, (ii) diversification (among both sub-advisors and positions), and (iii) risk-controls, and that the Funds were stable and highly collateralized investment vehicles.

(b)    The Prophecy Defendants' claim made by Spotts, Hughes and Caruso, to LyonRoss personnel, including Playfair, Bliss and Xu, during Plaintiffs' due diligence between August 2018 and February 2019, that Prophecy employed strict risk control measures, including a requirement that sub-advisors trade through its

-33-

MC 0170

Platform, which allowed Prophecy to monitor its managers' trading strategies and, if necessary, directly liquidate holdings in each manager's account.

(c)     The Prophecy Defendants' claim, made by Spotts, Hughes and Caruso, to LyonRoss personnel, including Playfair, Bliss and Xu, during Plaintiffs' due diligence between August 2018 and February 2019, that Prophecy had the ability to prevent each sub-advisor on the Platform from executing risky trades that could exhaust its collateral with Prophecy.

(d)     The Prophecy Defendants' claim in the Fund's DDQ that, "[a]lmost all positions across the [F]und[s] can be liquidated in less than a day without significantly impacting prices."

(e)     The Prophecy Defendants' claim in their DDQ that their investment strategy involved providing capital to a "diverse" set of sub-advisors that trade exclusively in liquid assets, such as "listed US equities, liquid global equities and options."

(f)     The Prophecy Defendants' claim in their DDQ that "[t]he firm assets are deployed via sub-advisor in discretionary and systematic management strategies, *in liquid equity markets* on a long/short basis." (Emphasis added.)

(g)     The Prophecy Defendants' claim in their DDQ that they are "interested in strategies that are process driven, that *traffic in liquid equities*, that have a record of *acceptable downside volatility and exposure*, and that are *consistently profitable*." (Emphasis added.)

(h)     The Prophecy Defendants' claim in their DDQ that they "monitor strategies [of its sub-advisors] to ensure they remain diversified across the

-34-

MC 0171

aggregate of the funds positions" and that they would only engage sub-advisors that "have a clearly defined strategy that fits within the overall framework of the fund."

(i)     The Prophecy Defendants' claim in their DDQ that sub-advisors' allocations "are *supported by cash deposits* provided by each sub-advisor or third-party investor" which "serve as the primary downside risk protection for the fund." (Emphasis added.)

(j)     The Prophecy Defendants' claim in their DDQ that they "onboard strategies that invest in only the most liquid securities."

(k)     The Prophecy Defendants' claim in their DDQ that "Sub-advisor positions are mostly in liquid markets.  Almost all positions across the fund can be liquidated in less than a day without significantly impacting prices.  Prophecy maintains liquidity restrictions for all sub-advisors.  Should the liquidity of a market change, they would be required to reduce exposure on the affected position."

(l)     The Prophecy Defendants' claim in their DDQ that Prophecy's "dedicated risk operation monitors all trading activity through the EMS systems [i.e., the Platform, or "execution management system"] to ensure that sub-advisors do not exceed their trading allocation parameters.  These allocation parameters are hard-coded into the EMS and will prevent any subadvisor from entering an order that violates the settings."

MC 0172

(m)     The Prophecy Defendants' claim in their DDQ that their "risk operation monitors all trading in a real-time risk system that captures all activity, calculates profit and loss, and enables the performance of stress tests on positions."

(n)     The Prophecy Defendants' claim, made by Spotts on a September 7, 2018 call with Bliss, Xu , and Mike Handelman ("Handelman") of LyonRoss, that, "*All* [Prophecy's sub-] managers have to use Prophecy's order management system." (Emphasis added.)

(o)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar, attended by Bliss, Xu, and Handleman that maximum position value is generally no greater than 8% of subaccount allocation.

(p)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar that "Prophecy monitors the sub-account strategies to ensure they remain diversified across the aggregate of the Fund's positions."

(q)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar that "[i]f an individual sub-advisor's portfolio violates a daily stop-loss limit or if the collateral deposit amount declines to an unacceptable level, the portfolio may be liquidated."

(r)     The Prophecy Defendants' claim, made by Spotts and Caruso, during the October 5, 2018 webinar that "the Prophecy risk operation would hedge any significant exposure for individual positions" and that the Funds would employ "2-3x leverage."

(s)     The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Prophecy lent money

-36-

MC 0173

to sub-advisors to make Off-platform investments only when they did not have the operational capability to manage certain strategies through their Platform.

(t)    The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Prophecy offset its reduced ability to control risk in Off-platform positions by receiving full position-level transparency into the underlying securities being traded.

(u)    The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Off-platform positions were all low-risk trading strategies with limited downside.

(v)    The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that Off-platform positions constituted less than 5% of the Funds' gross assets.

(w)    The Prophecy Defendants' claim, made by Spotts on a November 26, 2018 call with Bliss, Xu, and Handelman of LyonRoss, that the Funds' Off-platform positions did not include any commingled funds or limited partnerships, which are inherently less liquid and lack transparency.

(x)    The Prophecy Defendants' claim, made by Spotts on a December 7, 2018 call with Bliss of LyonRoss, that Off-platform investments represented less than 5% of the Funds' gross assets, that Prophecy had "full position level transparency" into its Off-platform investments, and that it only made such investments in strategies with "arbitrage-like qualities and low downside."

(y)    The Prophecy Defendants' claim, made by Spotts and Caruso, during the January 11, 2019 due diligence meeting with Bliss and Xu of LyonRoss that the

-37-

MC 0174

sub-advisor with a larger allocation than the others had sufficient cash deposited as collateral for any losses on his investments, which were all managed on Prophecy's Platform, that this sub-advisor was well-diversified because he employed other managers beneath him (later confirming that the sub-advisor's allocation included six strategies managed by traders he selected, and that allocations to his account would be decreasing over time to avoid concentration).

(z)     The February 2019 report provided by Spotts that misleadingly showed that Kahn managed a diversified, well-hedged portfolio.

(aa)     The Fund's representation in the Subscription Agreement and PPM that any investor could redeem its shares of the Fund in full on 60 days' notice.

(bb)     The Prophecy Defendants' mischaracterizations, made by Spotts, during calls with Bliss, Xu and/or others from LyonRoss on July 25, 2019, November 15, 2019, and December 17, 2019 of the nature of Prophecy's Off-platform exposure, falsely making it sound risk-controlled and generally consistent with its professed investment strategy.

(cc)     The Prophecy Defendants' statements, made by Spotts, in an August 27, 2019 email and on an August 28, 2019 call with Bliss and Xu of LyonRoss to the effect that Prophecy had not invested in the Broad Reach fund that turned out to be a Ponzi scheme.

(dd)     The Prophecy Defendants' claim, made by Spotts, on a November 15, 2019 call with Xu, Handelman, and John Carlson ("Carlson") of LyonRoss that Prophecy had fully redeemed the Broad Reach investment at year-end 2018.

-38-

MC 0175

(ee)   The Prophecy Defendants' representations, made by Spotts and Hughes, at a December 5, 2019 meeting in New York to Bliss and Xu of LyonRoss that the Funds' redemption from Broad Reach had been paid in full by April 2019.

(ff)   The Prophecy Defendants' representations, made by Spotts, on monthly calls with Bliss, Xu and/or others at LyonRoss that the Funds' investments were consistent with Prophecy's purported diversification and liquidity goals.

129.   As described above, these representations were false at the time they were made. *Inter alia*, the Prophecy Defendants had no intention of managing the Funds as represented, because they already had not been doing so.

130.   The Prophecy Defendants' material omissions included, *inter alia*, that:

(a)   Prophecy had a years-long pattern of making and concealing illiquid investments and hidden soft loans with undisclosed parties in direct contravention of its investment mandate.

(b)   Before and during Plaintiffs' investments in the Funds, the Prophecy Defendants had secretly transferred significant capital into an opaque investment fund managed by Broad Reach, which turned out to be a Ponzi scheme, and into soft loans with one sub-adviser, now known to be Kahn.

(c)   Spotts and Hughes had a longstanding and close relationship with Brenda Smith, the principal of Broad Reach. Smith had helped Spotts and Hughes set up a different Prophecy fund and had served as an officer of that fund.

(d)   The Funds had a broad relationship with Brenda Smith and Broad Reach beyond one specific transaction.

-39-

MC 0176

(e)     The Prophecy Defendants did not have transparency into the Broad Reach investment fund.

(f)     Prophecy had made an Off-platform investment in the Broad Reach investment fund in January 2017 and hid it from its own investors by window dressing over two year ends, 2017 and 2018.

(g)     Prophecy had not been able to redeem most of the Funds' Broad Reach investment at the end of 2018 and had sold for full value and backdated a receivable for the unpaid portion to Kahn.

(h)     Prophecy had a longstanding practice of making undisclosed Off-platform soft loans and illiquid, opaque fund participations that violated its professed investment approach and specific representations to Plaintiffs.  The Prophecy Defendants made attempts to conceal the true character of the investments by redeeming them at year-end and then re-instating them in the new financial year. Prophecy had been making undisclosed soft loans to Kahn for years, redeeming them shortly before the end of each fiscal year and then reinstating them.

(i)     During 2018, while Plaintiffs' due diligence was ongoing, the Funds had made $46 million in loans to Kahn that were undisclosed when Plaintiffs decided to invest.

(j)     During 2018, while Plaintiffs' due diligence was ongoing, the Funds held an undisclosed $24 million investment in the Broad Reach fund, into which Prophecy had no "position level transparency" at all.

(k)     Of the Funds' $363 million of capital as of January 2020, Khan and Prophecy together, during the course of 2019, had syphoned $160 million into a

-40-

MC 0177

fully hidden side account and $36 million into other hidden loans to Kahn. These facts were omitted from Prophecy's reports to Plaintiffs that purported to disclose all of Prophecy's positions.

(l)     Eventually, 86% of the Funds' capital was at Kahn's disposal, most of it—$196 million—completely hidden from Plaintiffs. Kahn had used the majority of these funds to accumulate his highly concentrated, illiquid position in FRG stock.

(m)     Kahn held additional concentrated and illiquid positions purchased with the Funds' capital in addition to FRG.

(n)     The Funds' investments were overly concentrated in contravention of the Funds' guidelines.

(o)     The Funds were secretly over-leveraged to conceal their undisclosed Off-platform positions with Kahn. Prophecy replaced the secret $196 million allocation to Kahn, dollar-for-dollar, with covert leverage.

131.     Each of the foregoing misrepresentations and omissions were material and would have been important to the investment decisions of a reasonable investor.

132.     The Prophecy Defendants had a duty to disclose material information, such as the magnitude and illiquidity of Defendant Kahn's investments, because they owed Plaintiffs duties of care and loyalty with respect to the management of the capital Plaintiffs entrusted to them. Defendant Spotts owed a fiduciary duty to Plaintiffs as a director of the Fund. Defendants Spotts and Hughes further owed a fiduciary duty to Plaintiffs as a result of their role as the principals of Prophecy and the General Partner. Defendant Caruso owed a fiduciary duty to Plaintiffs as Prophecy's chief risk officer. These Defendants further had a duty to not tell half-truths and to

-41-

MC 0178

supply information necessary to make the statements they had made, and upon which they knew Plaintiffs were relying, not misleading.

133.    The Prophecy Defendants made these false and/or misleading representations and omissions to Plaintiffs with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made.  Spotts and Hughes were principals of Prophecy and operated the Fund.  Caruso was Prophecy's chief risk officer.  They had access to Prophecy's information systems and records and were well aware, *inter alia,* of the allocation of the Funds' capital to the Funds' sub-advisors because they themselves made them or were involved in making them.  Each of the Prophecy Defendants also knew the disposition of the Fund's Off-platform and Platform investments by Kahn and Broad Reach or were reckless in not knowing them.  Each of the Prophecy Defendants had a duty to monitor the disposition of all of the Fund's Off-platform and Platform investments.  The Prophecy Defendants' scienter, knowledge, recklessness and intent to deceive are evidenced by, *inter alia*:

(a)    Their actual knowledge that the Funds had invested in the Broad Reach investment fund, in contravention of their investment mandate;

(b)    Their actual knowledge that they did not have transparency into Broad Reach's positions, and recklessness in not knowing what its positions were, including knowledge that Prophecy had not received audited financials from Broad Reach for two years prior to 2018.

(c)    Their actual knowledge, prior to February 2019, that Broad Reach had assets in the $30-$40 million range and therefore that Prophecy's representations about its conducting arbitrage-like options strategy were false;

(d)    Spotts's false denial of having invested in the Broad Reach fund;

-42-

MC 0179

(e)     The Prophecy Defendants' conspiring with Kahn to conceal the Funds' uncollected receivable from Broad Reach;

(f)     The Prophecy Defendants' actual knowledge of enormous, undisclosed Off-platform positions with Kahn;

(g)     The Prophecy Defendant's provision of patently false reports, including, notably, the January 17, 2020 position report, falsely purporting to show 100% of the Funds' assets and falsely showing that less than 10% of the Funds' assets were Off-platform.

(h)     Hughes's admission that these positions had not been disclosed.

(i)     Hughes's blaming Spotts for the undisclosed positions.

(j)     Caruso's telling another prospective investor that Prophecy was positioned to trade in and out of positions as needed to preserve capital and avoid losses, when that was patently false.

134.    The Prophecy Defendants made these material misrepresentations or omitted to disclose the material facts with the intention of inducing Plaintiffs, in reliance thereon, to make investments in the Funds and to retain those investments.

135.    Plaintiffs reasonably and justifiably relied on these misstatements and omissions in deciding to purchase securities in the form of shares of the Fund. Several of Defendants' misrepresentations were recited in LyonRoss's investment memorandum, the document through which LyonRoss sought and was granted authority to invest with Prophecy by its investment committee. During the pre-investment phase, LyonRoss vetted Prophecy's representations by conducting third-party research into the Funds and calling numerous service providers, references and peer firms to corroborate Prophecy's reputation and representations. The

-43-

MC 0180

documents Prophecy provided to Plaintiffs, including monthly reports, and numerous oral communications prior to January 2020, including monthly status calls, were consistent with the diversified, liquid strategies Prophecy claimed to be pursuing. Spotts and Hughes plausibly explained any minor deviations from their professed investment procedure and couched such deviations with assurances of appropriate risk-controls, small size of such positions or both. Plaintiffs discovered the truth only through vigilant diligence, and the Prophecy Defendants' eventual ineptitude in continuing to conceal their deception.

136. By virtue of the foregoing, the Prophecy Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that they, directly or indirectly, by use of the means or instrumentalities of interstate commerce and/or the mails, or of a facility of a national securities exchange, knowingly or recklessly employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon Plaintiffs, all in connection with the purchase or sale of securities.

137. Each of the Plaintiffs was harmed by the wrongful conduct of the Prophecy Defendants.

138. As a direct and proximate result of the Prophecy Defendants' material misrepresentations and omissions, Plaintiffs have lost tens of millions of dollars that the Prophecy Defendants refuse to return. The Prophecy Defendants' pattern of repeated misrepresentations and omission concerning the Funds' Off-platform investments and their investments with Kahn, directly led to the loss of the value of their investments and their inability to redeem them due to concentration, illiquidity and over-leverage in the Funds, and losses and illiquidity directly due to Kahn's positions. Indeed, Kahn has either refused, or is

-44-

MC 0181

unable, to return Plaintiffs' capital diverted from the Funds and now tied up in FRG stock. Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

**COUNT II**

**(Against Prophecy, the General Partner, Spotts, and Hughes for Violations of Section 20(a) of the Securities Exchange Act of 1934)**

139.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

140.   This claim is brought on behalf of all Plaintiffs against Defendants Prophecy, the General Partner, Spotts, and Hughes.

141.   As alleged more fully above, the conduct of the Prophecy Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

142.   Prophecy serves as the investment manager for the Fund and the Master Fund, and the General Partner serves as the general partner for the Master Fund. In such capacities, Prophecy and the General Partner act as agents of the Fund and the Master Fund, and conducted and participated, directly and indirectly, in the conduct of the business affairs of the Fund and the Master Fund. Prophecy and the General Partner had the power, both direct and indirect, to control the Fund and the Master Fund, did in fact exercise such control and were therefore controlling "person[s]" within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).

143.   Defendants Spotts and Hughes participated in the operation and management of the Prophecy Defendants, including the Fund and the Master Fund, and conducted and participated, directly and indirectly, in the conduct of the Prophecy Defendants' business affairs. Defendants Spotts and Hughes had the power, both direct and indirect, to control the Prophecy

-45-

MC 0182

Defendants, did in fact exercise such control and were therefore controlling "person[s]" within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)). To that end, for example, Defendant Spotts is a director of the Fund, and Defendants Spotts and Hughes are principals of Prophecy and the General Partner, which act as agents of the Fund and the Master Fund.

144.    As described above, Prophecy, the General Partner, Spotts, and Hughes were culpable participants in the violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

145.    By reason of the foregoing, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT III

### (Against the Prophecy Defendants for Common Law Fraud)

146.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

147.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

148.    The Prophecy Defendants knowingly, or recklessly, made false and/or misleading material statements and omissions to Plaintiffs prior to Plaintiffs' investments in the Fund, for the purpose of inducing Plaintiffs to invest in the Fund.

149.    In connection with their fraudulent scheme, the Prophecy Defendants continued to disseminate false and/or misleading statements and omissions to the Plaintiffs after Plaintiffs made their investments for the purpose of concealing the truth to induce Plaintiffs, in reliance on the false statement and omissions, to retain their investment interests in the Fund.

150.    The Prophecy Defendants' misrepresentations included those listed in paragraph 128.

-46-

MC 0183

151.   The Prophecy Defendants' omissions included those listed in paragraph 130.

152.   The Prophecy Defendants had a duty to disclose material omissions such as the magnitude and illiquidity of Defendant Kahn's investments because they owe Plaintiffs duties of care and loyalty with respect to the management of the capital Plaintiffs entrusted to them. Defendant Spotts owes a fiduciary duty to Plaintiffs as a director of the Fund. Defendants Spotts and Hughes further owe a fiduciary duty to Plaintiffs as a result of their role as the principals of Prophecy and the General Partner. Defendant Caruso owes Plaintiffs a fiduciary duty as the chief risk officer of Prophecy. The Defendants further had a duty to not tell half-truths and to supply information necessary to make statements they had made not misleading. Finally, the Prophecy Defendants had a duty to disclose material omissions because they had superior and peculiar knowledge not available to Plaintiffs.

153.   The Prophecy Defendants intended to defraud Plaintiffs. They made the false and/or misleading representations and omissions listed in paragraphs 128 and 130 to Plaintiffs with actual knowledge of their falsity and/or reckless disregard for the truth at the time they were made, as alleged above. Spotts and Hughes were principals of Prophecy and operated the Funds. Caruso was Prophecy's chief risk officer. They were well aware of the investments made by the Funds' sub-advisors, including Kahn. Spotts, Hughes, and Caruso knowingly misrepresented the nature of these investments to Plaintiffs. At the January 28, 2020 meeting, LyonRoss caught Hughes with a report inconsistent with the one Prophecy had provided to Plaintiffs. This report showed some of Kahn's previously concealed off-platform investments. When pressed, Hughes admitted that Kahn had received $196 million in additional off-platform capital. On the same day, Bliss saw previously concealed, large illiquid positions on Caruso's computer screen.

MC 0184

154.    Plaintiffs reasonably and justifiably relied on these misstatements and/or omissions in deciding to invest in the Fund, and in maintaining their investments as shareholders. Some of Defendants' misrepresentations were recited in LyonRoss's investment memorandum, the document through which LyonRoss sought and was granted authority to invest with Prophecy by its investment committee. During the pre-investment phase, LyonRoss vetted the Prophecy Defendants' representations by conducting third-party research into the Funds and calling numerous service providers, references and peer firms to corroborate Prophecy's reputation and representations. Plaintiffs could not have known that the Prophecy Defendants' representations were false, as the Prophecy Defendants concealed the truth during Plaintiffs' due diligence and thereafter. The documents Prophecy provided to Plaintiffs, including monthly reports, were consistent with the diversified, liquid strategies the Prophecy Defendants claimed to be pursuing. Spotts and Hughes plausibly explained any minor deviations from their normal process, such as the purportedly small investments that they claimed were Off-platform for operational reasons. Plaintiffs discovered the truth through vigilant diligence, and by pressing the Prophecy Defendants until the fraud came out.

155.    If Plaintiffs had known the truth, they would not have made their investments in the Fund, would not have continued to invest in the Fund, and would have redeemed their investments.

156.    By virtue of the foregoing, the Prophecy Defendants have committed fraud.

157.    The fraudulent conduct of Prophecy Defendants, as outlined above, was committed purposefully, knowingly, recklessly and without regard for the rights and interests of Plaintiffs.

-48-

MC 0185

158.    As a direct and proximate result of the Prophecy Defendants' material misrepresentations and omissions, Plaintiffs have found their capital invested in far riskier and less liquid investments than they otherwise would have chosen and have been denied the ability to redeem their investments.  Plaintiffs are therefore entitled to damages in an amount to be determined at trial.

## COUNT IV

### (Against The Prophecy Defendants for Negligent Misrepresentation)

159.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

160.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

161.    When providing Plaintiffs with information relating to the nature of the Funds' investments, the Prophecy Defendants were engaged in the course of their business.

162.    The Prophecy Defendants, owed duties of care and loyalty to Plaintiffs because Plaintiffs had entrusted their capital to them, and reposed trust and confidence in them.  The Prophecy Defendants accepted Plaintiffs' trust and confidence, forming a fiduciary relationship.

163.    In connection with Plaintiffs' consideration of the Fund, these Defendants provided false and/or misleading information, or caused such false and/or misleading information to be provided, both before Plaintiffs purchased shares in the Fund and later, once Plaintiffs became shareholders, for the purpose of keeping Plaintiffs as shareholders in the Fund.

164.    The Prophecy Defendants intended Plaintiffs to rely upon the false and/or misleading information in deciding whether to invest, or remain in, the Fund.

165.    The Prophecy Defendants failed to exercise reasonable care or competence in obtaining or communicating the information supplied to Plaintiffs.  Defendants acted negligently and carelessly.

-49-

MC 0186

166.    Plaintiffs justifiably relied upon the information supplied by the Prophecy Defendants in deciding to make and retain their investments in the Fund, and suffered harm as a result. Plaintiffs could not have known that the Prophecy Defendants' representations were false, as the Prophecy Defendants concealed the truth during Plaintiffs' due diligence and thereafter.

167.    If Plaintiffs had known the truth, they would not have made their investments in the Fund, would not have continued to invest in the Fund, and would have redeemed their investments.

168.    As a direct and proximate result of the conduct of the Prophecy Defendants Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT V

### (Against Defendants Kahn, Hughes, and Caruso for Aiding and Abetting Common Law Fraud)

169.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

170.    This claim is brought on behalf of all Plaintiffs against Defendants Kahn, Hughes, and Caruso.

171.    Defendants Kahn, Hughes, and Caruso played a significant and vital role in the fraudulent scheme alleged herein, with knowledge thereof.

172.    As a longstanding sub-advisor to the Funds, Defendant Kahn had actual knowledge that the Prophecy Defendants knowingly, or recklessly, made materially false and/or misleading statements and omissions to Plaintiffs prior to Plaintiffs' investment in the Fund, for the purpose of inducing Plaintiffs to invest in the Fund, and during Plaintiffs' investment in the

-50-

MC 0187

Fund, for the purpose of inducing them to maintain their investments. Kahn's actual knowledge of the underlying fraud is evidenced by, *inter alia* the following:

(a)     Kahn had acted as a sub-advisor for Prophecy since the beginning of the Funds, and he was consistently the Prophecy sub-advisor with the largest allocation.

(b)     Kahn also had a longstanding and close relationship with Prophecy and with Spotts, who described Kahn as being "like a brother" to him.

(c)     Due, *inter alia*, to his position as the largest sub-advisor and his multi-year relationship with Prophecy, Kahn was well aware of the Funds' purported strategy and how they were marketed to investors. For instance, he knew that Prophecy's website stated that its strategy was "to obtain consistent absolute returns primarily through capital appreciation, while preserving capital and mitigating risk," which necessarily indicates that its allocations would be in liquid securities.

(d)     Further, although Prophecy's sub-advisors' general agreement specified that no position in a stock would exceed its average daily trading volume by more than 15%, Kahn's FRG position purchased with Prophecy money was orders of magnitude more than FRG's average trading volume.

(e)     Kahn paid full value for Prophecy's defaulted redemption rights owed by Broad Reach—a transaction that made no economic sense—and agreed to backdate the transaction.

(f)     On January 18, 2020—just one week before the in-person meeting where LyonRoss discovered Prophecy's secret side account with Kahn and its hidden soft loans to Kahn—Kahn spoke to LyonRoss and Spotts by phone. During that call, Kahn

-51-

MC 0188

admitted that he had purchased the Broad Reach receivable with his personal money, but he said nothing about his huge, illiquid position in FRG.

(g)     Kahn was a counterparty to the Funds' redemptions and reinstatements of loans to him over the year ends 2017 and 2018, and was aware that such behavior would be opaque to Prophecy investors.

(h)     Kahn knew it would have been virtually impossible to raise sufficient funds, of this kind, in the market for the speculative investments he made using money from the Funds.

173.    Kahn substantially assisted the Prophecy Defendants' fraud. As described above, Kahn was instrumental both in making the investments that the other Defendants fraudulently concealed from Plaintiffs and in helping the other Defendants to conceal those investments and the Fund's loss relating to Broad Reach. He purchased the Broad Reach receivable at full value and admitted that he then provided a release to LyonRoss, to "keep [Plaintiffs] in the Fund."

174.    Defendants Hughes and Caruso also knew that the other Prophecy Defendants and Spotts were defrauding Plaintiffs. Hughes, as a principal of Prophecy, and Caruso, as Prophecy's chief risk officer, were well aware of the investments made by Prophecy's sub-advisors and of the representations the Prophecy Defendants and Spotts made to Plaintiffs. Due to his position, Caruso was responsible for knowing and had a duty to monitor all of Prophecy's positions. And indeed, he ran Prophecy's book of investments from a computer terminal with real time visibility and on every position, every sub-advisor and every trade executed on the Platform. He knew how much capital was being allocated to each sub-advisor, the profits and losses of each sub-advisor, the allocation of the Plaintiff's capital to Kahn and the leverage being

-52-

MC 0189

used to fund the Platform investments. Hughes and Caruso attended meetings with LyonRoss, including the January 28, 2020 meeting where the fraud was revealed.

175. Hughes and Caruso substantially assisted the fraudulent conduct of the other Prophecy Defendants and Spotts. They, *inter alia,* helped Spotts maintain the illusion of liquidity during calls and meetings with LyonRoss, and failed to correct false and misleading reports and statements made by Spotts.

176. The fraudulent conduct of the other Prophecy Defendants and Spotts, as outlined above, and as aided and abetted by Kahn, Hughes, and Caruso, was committed purposefully, knowingly, recklessly, and without regard for the rights and interests of Plaintiffs.

177. As a direct and proximate result of the conduct of Defendants Kahn, Hughes, and Caruso, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT VI

### (Against all Defendants for Civil Conspiracy to Commit Fraud)

178. Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

179. This claim is brought on behalf of all Plaintiffs against all Defendants.

180. As alleged above, the Prophecy Defendants committed acts of fraud by knowingly or recklessly making false and/or misleading statements and omissions to Plaintiffs in connection with Plaintiff's investments in the Fund.

181. All Defendants agreed and conspired together to commit fraud and engage in a course of material misrepresentations and omissions to conceal the fraudulent acts. Kahn and the Prophecy Defendants agreed that Kahn would invest the Funds' capital into Off-platform investments that would be concealed from investors, including Plaintiffs. They further agreed that Kahn would purchase the Broad Reach receivable to conceal the Funds' losses from

-53-

MC 0190

Plaintiffs relating to Broad Reach and procure and offer a release from Kahn to the Funds, to induce Plaintiffs to maintain their investment.

182.    Defendants intentionally and knowingly committed overt acts in furtherance of this conspiracy, including by making the misrepresentations detailed above as well as Defendant Kahn's purchase of the Broad Reach receivable.

183.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT VII

### (Against The Prophecy Defendants for Breach of Fiduciary Duty)

184.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

185.    This claim is brought on behalf of all Plaintiffs against the Prophecy Defendants.

186.    The Prophecy Defendants owed fiduciary obligations to Plaintiffs, including the duties of loyalty, good faith, candor and due care. Defendant Spotts is one of only two directors of the Fund, and therefore owes a fiduciary duty to Plaintiffs as shareholders of the Fund. Defendants Spotts and Hughes further owe a fiduciary duty to Plaintiffs as a result of their role as the principals of Prophecy and the General Partner, which were responsible for managing the investments of the Master Fund and the Fund in which Plaintiffs invested. Defendant Caruso owes a fiduciary duty to Plaintiffs as the chief risk officer of Prophecy.

187.    The Prophecy Defendants, owed duties of care and loyalty to Plaintiffs because Plaintiffs had entrusted their capital to them and reposed trust and confidence in them. The Prophecy Defendants accepted Plaintiffs' trust and confidence, forming a fiduciary relationship.

188.    The Prophecy Defendants breached those duties and committed actual fraud by making repeated false and/or misleading statements and omissions to Plaintiffs regarding the

-54-

MC 0191

nature and liquidity of the Funds' investments, both before and during the course of their investments. These false and/or misleading statements and omissions were made specifically and uniquely to Plaintiffs in response to their specific inquiries for the purpose of keeping Plaintiffs in the Fund as shareholders by concealing the truth in violation of those Defendants' fiduciary duties.

189.    Moreover, the Prophecy Defendants caused the Funds to be managed in a manner that was inconsistent with the investment mandate for the Funds and their fiduciary duties towards Plaintiffs as investors in the Funds. Acting in their own self-interest and in knowing violation of, or reckless and bad-faith disregard of, the law, the Prophecy Defendants allowed or caused Plaintiffs' capital to become invested in highly concentrated and illiquid positions, contrary to the Funds' mandate to invest only in highly diversified and liquid positions. Defendants Prophecy, Spotts, Hughes, and Caruso therefore breached their fiduciary duties to Plaintiffs through their mismanagement of the Funds' investments.

190.    The Prophecy Defendants further owed a fiduciary duty to Plaintiffs to supervise the issuance and content of the Fund's offering documents, periodic reports and other statements to ensure that they were truthful and accurate and that such statements conformed to applicable securities laws. The Prophecy Defendants, however, breached their fiduciary duties by allowing the Fund to issue and disseminate statements that were materially false and/or misleading and failed to disclose material information.

191.    Plaintiffs were uniquely injured by Defendants Spotts, Hughes, and Caruso's breaches of fiduciary duty, insofar as the misstatements and omissions perpetrated by these Defendants caused Plaintiffs to remain as shareholders in the Fund and contributed directly to the injury they suffered.

-55-

MC 0192

192.    These wrongful acts of Spotts, Hughes and Caruso constitute actual fraud and/or willful default of all fiduciary duties owed to Plaintiffs.

193.    As a direct and proximate result of the Prophecy Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT VIII

### (Against Defendant Kahn for Aiding and Abetting Breach of Fiduciary Duty)

194.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

195.    This claim is brought on behalf of all Plaintiffs against Defendant Kahn.

196.    Defendant Kahn knew that the Prophecy Defendants owed fiduciary obligations to Plaintiffs with respect to the management of the capital entrusted to the Prophecy Defendants, including the duties of loyalty, good faith, candor and due care.

197.    Based on his role in the scheme, Defendant Kahn knew that the Prophecy Defendants were breaching those duties, through the conduct described above.

198.    Defendant Kahn substantially assisted such breach of fiduciary duties by investing the Funds' capital in illiquid, concentrated holdings contrary to the representations made to Plaintiffs, and by helping Prophecy cover up the Broad Reach transaction, including providing a release in order to keep LyonRoss in the Fund.

199.    As a direct and proximate result of Defendant Kahn's conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT IX

### (Against The Fund for Breach of Contract)

200.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

MC 0193

201.   This claim is brought on behalf of all Plaintiffs against the Fund.

202.   Each Plaintiff entered into a Subscription Agreement with the Fund in connection with their investments in the Fund. The Subscription Agreements incorporated by reference the PPM of the Fund and, collectively, the Subscription Agreements and the PPM formed the contracts between each Plaintiff and the Fund.

203.   Plaintiffs, as shareholders in the Fund, had a contractual right to redeem their interests in the Fund at their election. According to the PPM that was incorporated into the Subscription Agreement that each of the Plaintiffs signed: "Shareholder may redeem all or any portion of its Shares on the last calendar day of each month . . . by providing 60 calendar days' written notice . . . before the applicable Redemption Date."

204.   The PPM further provides that "[s]hares will be redeemed at the Redemption Price as of the close of business on the applicable Redemption Date," and that such a redemption "shall be paid within 30 calendar days after the applicable Redemption Date." *Id.* at 12–13. The Redemption Price is calculated by reference to net asset value ("NAV") of the redeeming party's shares. According to the PPM, the NAV is calculated "in accordance with GAAP" accounting principles at the end of each month.

205.   On December 24, 2019, LyonRoss had requested a redemption of $10 million on behalf of the LyonRoss Partners Fund (effective February 28, 2020). (This initial redemption request had already been made before the Funds' concentration or Off-platform investments with Kahn had come to light and under the belief that the Funds' assets were substantially liquid.) In an email, Prophecy acknowledged receipt of the redemption request on January 6, and noted that, pursuant to the terms of the PPM, the Redemption Date for the request would be February 28,

MC 0194

2020. According to the PPM, Prophecy had 30 calendar days from that date—until March 30, 2020—to pay the LyonRoss Partners Fund the full value of its redeemed shares.

206.   On January 31, 2020, immediately after learning of the Defendants' fraud, all Plaintiffs requested in writing from Prophecy a full redemption of their remaining shares. Pursuant to the terms set forth in the PPM, the Redemption Date for the January 2020 redemption request was March 31, 2020. Prophecy was obligated to make payments to LyonRoss and its advisory clients within 30 calendar days of that date. To date, no payment has been made as to either redemption request, both of which are due and owing.

207.   Plaintiffs performed all of their obligations under the Subscription Agreements and the PPM.

208.   These failures constitute material breaches of contractual provisions.

209.   As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial.

## COUNT X

**(Against Defendants Prophecy, Spotts, Hughes, and Caruso for Negligence)**

210.   Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

211.   Defendant Prophecy, as the investment manager of the Fund, and Defendants Spotts, Hughes, and Caruso, as the portfolio manager, president, and chief risk officer, respectively, of the Fund's manager, directly owed the highest duties of care and loyalty to Plaintiffs, who were investors in the Fund.

-58-

MC 0195

212.    Additionally, Prophecy, as an investment advisor registered with the SEC, owed professional duties of care to its clients, irrespective of any contractual duties, to exercise that degree of skill normally expected of investment advisers performing advisory services of the nature provided here.

213.    Plaintiffs reasonably and foreseeably relied on Prophecy to exercise such care as ordinarily exercised by an experienced investment manager in managing the Fund. Likewise, Plaintiffs reasonably and foreseeably relied on Spotts, Hughes, and Caruso to exercise such care as ordinarily exercised by experienced officers of an investment fund manager.

214.    Prophecy failed to act as a reasonably prudent investment fund manager by mismanaging the Fund in the manner described above, including but not limited to, allowing or causing Plaintiffs' capital to become invested in highly concentrated and illiquid positions, contrary to the Fund's mandate to invest only in highly diversified and liquid positions. Likewise, Spotts, Hughes, and Caruso, as officers of Prophecy, failed to act as reasonably prudent officers of an investment fund manager by causing or allowing the Fund to engage in the behavior described herein.

215.    In addition to the misrepresentations and omissions that caused Plaintiffs to invest and retain their investments in the Fund and therefore lose all of their investment capital, Defendants' mismanagement caused the Funds' capital to be tied up with Kahn's highly illiquid and concentrated holdings and thus, denied Plaintiffs the ability to redeem their investments in the Fund.

216.    As a direct and proximate result of Prophecy's, Spotts', Hughes', and Caruso's negligence, Plaintiffs have sustained damages in an amount to be determined at trial.

-59-

MC 0196

## COUNT XI

### (Against Defendant Kahn for Unjust Enrichment)

217.    Plaintiffs repeat and reallege, as if set forth in full herein, the allegations of all of the preceding paragraphs of this Complaint.

218.    Defendant Kahn was unjustly enriched at Plaintiffs' expense, in that he secretly, and contrary to Prophecy's representations to Plaintiffs, used Plaintiffs' capital to build up a huge interest in a company that he controls.

219.    Defendant Kahn had a relationship with Plaintiffs: he was aware of Plaintiffs, communicated with them directly, and admittedly provided a release in connection with the Broad Reach receivable purchase specifically to induce Plaintiffs to remain invested in the Fund.

220.    It is against equity and good conscience to permit Defendant Kahn to retain Plaintiffs' capital and the benefits of his use thereof because, *inter alia*, he conspired with the Prophecy Defendants to decieve Plaintiffs and misuse their capital.

221.    Accordingly, as Defendant Kahn's acts directly and proximately caused injury to Plaintiffs, Plaintiffs are entitled to the return of their capital and the value of any benefit Kahn received as a result of his unjust acts, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment from this Court awarding:

A.    Damages to all Plaintiffs against each of the Defendants, jointly and severally, in an amount to be determined at the trial of this action, but no less than the entire consideration paid by these Plaintiffs for their interests in the Fund;

B.    Punitive damages in an amount to be determined at the trial of this action;

C.    Interest on any award at the maximum allowable rate; and

-60-

MC 0197

D.    Such other relief as this Court deems just and proper to adequately compensate

Plaintiffs.


Dated: August 24, 2020

SCHINDLER COHEN & HOCHMAN LLP

By:_____
        Jonathan L. Hochman
        Matthew A. Katz
        Anna Vinogradov
        100 Wall Street, 15th Floor
        New York, NY 10005
        (212) 277-6300
        (212) 277-6333 (fax)

-61-

MC 0198

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable, including liability and damages.

Dated: August 24, 2020

New York, New York

Respectfully submitted,

By: _____

*Attorneys for Plaintiffs*

-62-

MC 0199

# EXHIBIT C

To Gibson-Cohodes Letter

MC 0200

# EXHIBIT 13

MC 0201

| | |
|---|---|
| **From:** | Jeffrey Spotts <jeffrey.spotts@prophecyfund.com> |
| **Sent:** | Thursday, September 10, 2020 7:34 AM |
| **To:** | jeffrey.spotts@prophecyfund.com |
| **Subject:** | Prophecy Investor Update - Reporting |

September 10, 2020

Dear Prophecy Investors,

From all of us at Prophecy Asset Management, LP ("Prophecy"), we hope this letter finds you and your families safe and well. We write to update you regarding a few items relating to reporting for Prophecy Trading Advisors, LP and Trading Advisors International LTD and Prophecy Special Opportunities Fund, LP and Special Opportunities International LTD.

**Tax Reporting Statements**

Notwithstanding the pending dispute with one of Prophecy's sub-advisors and the sub-advisor's related entities, Marcum LLP, our auditor and tax preparer, has advised Prophecy to issue the 2019 tax reporting statements prior to September 15th.

Accordingly, we currently expect to issue K-1s via the administrator during the week of September 7th.
I will also personally deliver these via email to those for whom I have contact information. Please feel free to reach out to me directly if you are in urgent need of your K-1 statement.

In the event that we need to restate income, Marcum has advised that the appropriate course would be to amend the returns and produce updated K-1s at that time. Marcum also has advised that any losses and/or the inability to recover collateral would be appropriately addressed after a resolution of the dispute.

**2018 Restated Audit Financial Statements**

As we have previously disclosed, Prophecy has engaged Marcum to re-audit the 2018 financial statements of Prophecy Trading Advisors, LP and Trading Advisors International, LTD. Prophecy also has engaged Marcum to complete the 2019 audit for Prophecy Special Opportunities Fund, LP and Special Opportunities International, LTD. We expect that Marcum will complete its re-audit of the 2018 financial statements in the coming weeks. As soon as these are completed, we will deliver them via the administrator.

**Net Asset Value Statements and 2019 Audited Financial Statements**

Many of our clients have requested Net Asset Value statements. Unfortunately, we have been forced to suspend this effort for multiple reasons:

First, since we are in a pending arbitration with the sub-advisor over various matters, including his losses under his agreements with Prophecy, it is difficult to value the funds' portfolios and to provide standard NAV statements.

Second, since the sub-advisor has been unwilling or unable to provide monthly statements for certain of the funds' investments as he has in the past, it is impossible to provide an accounting.

While Marcum is in the process of completing its audit for 2018, it is unable to complete its audit for 2019 for the reasons discussed above relating to NAV statements. Without the sub-advisor's confirmation to Marcum of the value of the investments, Marcum is unable to complete its work.

1

MC 0202

It is our belief, based on discussions and advice from Pluris Valuation Advisors, LLC, that until the dispute with the sub-adviser is resolved, Prophecy will not be able to provide a reasonable basis for calculation of NAV statements or to provide audited financial statements of Prophecy Trading Advisors LP, International LTD or Prophecy Special Opportunities Fund, LP or International LTD.

If you have any questions, please do not hesitate to email me at: jeffrey.spotts@prophecyfund.com

Kind regards,

**Jeffrey Spotts, CMT**
Chief Executive Officer

**PROPHECY ASSET MANAGEMENT, LP**
55 Union Place, Suite 335 | Summit, NJ 07901
Mobile: 908.451.5892 | Fax: 212.656.1778

Email: jeffrey.spotts@prophecyfund.com | Web: prophecyfund.com | Vcard | LinkedIn

CONFIDENTIALITY NOTE: This email transmission, including any attachments thereto, may contain information that is confidential, legally privileged, and/or exempt from disclosure. The information is intended only for the use of the individual(s) or entity to whom this transmission is addressed. If you are not the intended recipient, or the person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information is strictly PROHIBITED. If you have received this transmission in error, please let us know immediately and delete the email, including any attachments thereto, from your computer.

2

MC 0203

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Submission Number 17013-051-624-477 was submitted on Thursday, November 30, 2023 at 07:28:34 PM EST**

**This PDF was generated on Thursday, November 30, 2023 at 07:28:48 PM EST**

Thank you for contacting the United States Securities and Exchange Commission. This automated response confirms that your submission has been received successfully. We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

**Q: Please select the option that best describes your complaint.**
**A:** Material misstatement or omission in a company's public filings or financial statements, or a failure to file

**Q: Please select the specific category that best describes your complaint.**
**A:** Audit

**Q: Is this supplemental information to a previous complaint?**
**A:** No

**Q: In your own words, describe the conduct or situation you are complaining about.**
**A:** Please see attached letter and three exhibits thereto.

**Q: Is the conduct ongoing?**
**A:** Yes

MC 0204

Page 1 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Has the individual or firm acknowledged the conduct?**

**A:** No

**Q: How did you learn about the conduct? You may select more than one answer.**

**A:** Publicly available information; Social media (e.g., Facebook, Twitter, blogs, chat rooms, and electronic communities of interest)

**Q: Have you taken any action regarding your complaint? You may select more than one answer.**

**A:** Other

**Q: Provide details.**

**A:** Mr. Gibson and Mr. Cohodes sent the attached letter to Marcum LLP, the auditors for B. Riley Financial, Inc. They intend to share the letter with at least: (1) The United States Attorney's Office for the District of New Jersey; (2) the PCAOB; (3) FINRA; (4) FinCEN; and (5) B. Riley's audit committee.

## Who are you complaining about?

**Subject # 1**

**Q: Are you complaining about a person or a firm?**

**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**

**A:** Publicly held company

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**

**A:** No

**Q: Identifier Type**

MC 0205

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** Ticker Symbol

**Q: Ticker Symbol**
**A:** RILY

**Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**
**A:** No

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**
**A:** No

**Q: Firm Name**
**A:** B. RILEY FINANCIAL, INC.

**Q: Street Address**
**A:** 11100 Santa Monica Blvd

**Q: Address (Continued)**
**A:** Suite 800

**Q: Zip / Postal Code**
**A:** 90025

**Q: City**
**A:** LOS ANGELES

**Q: State / Province**

MC 0206

Page 3 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** CA

**Q: Country**
**A:** US

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
**A:** No

## About you

**Submitter # 1**

**Q: Are you filing this tip under the SEC's whistleblower program?**
**A:** Yes

**Q: Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**
**A:** No

**Q: First Name**
**A:** James; Marc

**Q: Last Name**
**A:** Gibson; Cohodes

**Q: Email Address**
**A:** ljudge@nortonlaw.com

**Q: What is the best way to reach you?**

MC 0207

Page 4 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** Email

**Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**
**A:** Yes

**Q: Attorney First Name**
**A:** Leah

**Q: Attorney Last Name**
**A:** Judge

**Q: Attorney Firm Name**
**A:** The Norton Law Firm

**Q: Attorney Street Address**
**A:** 299 Third Street

**Q: Attorney Address (Continued)**
**A:** Suite 200

**Q: Attorney Zip / Postal Code**
**A:** 94607

**Q: Attorney City**
**A:** OAKLAND

**Q: Attorney State / Province**
**A:** CA

MC 0208

Page 5 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Attorney Country**
A: US

**Q: Attorney Work Telephone**
A: (510) 906-4919

**Q: Attorney Email Address**
A: ljudge@nortonlaw.com

**Q: Are documents or other information being submitted that could potentially identify the whistleblower?**
A: Yes

**Q: Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.**
A: The attached letter reveals the identity of Mr. Gibson and Mr. Cohodes; they do not require anonymity.

**Q: Does the whistleblower want to be eligible to apply for a whistleblower award?**
A: Yes

**Q: 1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?**
A: No

**Q: 2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(52))?**

MC 0209

Page 6 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** No

**Q: 3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**

**A:** No

**Q: 4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?**

**A:** No

**Q: 5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**

**A:** No

**Q: 6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?**

**A:** No

**Q: 7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**

**A:** No

**Q: 8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?**

**A:** No

**Q: I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection**

MC 0210

Page 7 of 9

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.

**A:** Agree

Case 2:24-cv-00175-DLC    Document 55-2    Filed 05/28/26    Page 270 of 270
Summary Page - Submitted Externally

## Documents

| Document Name | Document Type |
| --- | --- |
| RILY Audit Letter (TCR).pdf | application/pdf |
| Exhibit A to Gibson-Cohodes TCR.pdf | application/pdf |
| Exhibit B to Gibson-Cohodes TCR.pdf | application/pdf |
| Exhibit C to Gibson-Cohodes TCR.pdf | application/pdf |

MC 0212